**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| STACK TECK SYSTEMS, INC., | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | C.A. No.: 06-507 |
| | : | |
| DAVID BROWN, | : | JURY TRIAL DEMANDED |
| | : | |
| Defendant. | : | |

## APPENDIX TO

## DEFENDANT'S MOTION TO DISMISS FOR FORUM NON CONVENIENS

Richard R. Wier, Jr. (#716)
Daniel W. Scialpi (#4146)
RICHARD R. WIER, JR., P.A.
Two Mill Road, Suite 200
Wilmington, DE 19806
(302)888-3222

## <u>INDEX</u>

Affidavit of David Brown  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Exhibit A

Employment Standards Act, S.O. 2000, C-41 (Can.). . . . . . . . . . . . . . . . . . . . . . . . . . . Exhibit B

<u>Machtinger v. HOJ Industries Ltd.</u> [1992] S.C.J. 41.  . . . . . . . . . . . . . . . . . . . . . . . . . . Exhibit C

<u>McKinley v. BC Tel.</u> [2001] S.C.J. 40 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Exhibit D

## CERTIFICATE OF SERVICE

I certify that on this 22nd day of August 2006, that I caused the attached document to be filed with the Clerk of the Court through CM/ECF, which will send notification of said filing to counsel of record.

**RICHARD R. WIER, JR., P.A.**

_/s/ Richard R. Wier, Jr._
Richard R. Wier, Jr. (#716)
Daniel W. Scialpi (#4146)
Two Mill Road, Suite 200
Wilmington, DE 19806
(302)888-3222

# TAB A

## AFFIDAVIT OF DAVID BROWN

Now comes Defendant, David Brown, a competent adult, who, under penalty of perjury, does depose and say that:

1. David Brown is a resident and citizen of Ontario, Canada.

2. Stack Teck Systems, Inc. (the Plaintiff in this action; hereinafter "Stack Teck Holding") is a holding company, which is incorporated in Delaware. It has no offices. There are no individuals paid by Stack Teck Holding.

3. There are two operating companies of Stack Teck Holding: Stack Teck Systems Limited (hereinafter Stack Teck Canada", a Canadian corporation, which is located at 1 Paget Road, Ontario, Canada; and Stack Teck Systems California (hereinafter "Stack Teck California", which is a Californian corporation, located at 20109 Paseo del Prado, Walnut, California. The two operating companies are engaged in the business of providing integrated plastic tooling solutions for the injection molding industry.

4. Until July 19, 2006, David Brown was the Chief Executive Officer ("CEO) of Stack Teck Holding, President and CEO of Stack Teck Canada, and held the title of President of Stack Teck California.

5. David Brown was employed by Stack Teck Canada, or its precursors, from 1979 until his termination on July 19, 2006. His salary and bonuses came directly from Stack Teck Canada.

6. While an employee of Stack Teck Canada, David Brown had no communications or business activity in the State of Delaware.

## BONUS PLAN

7. On September 21, 2004 the Board of Directors for Stack Teck Holding unanimously approved the budget for 2005, which contained an incentive plan that included bonuses and commissions for employees that had been utilized for repeated years. The bonus plan had always been paid, even when the company was in default of its loan agreements, provided that the company hit its targets. As President and CEO of Stack Teck Canada, Mr. Brown was charged with administering the plan since its inception years prior.

8. The bonus plan varied for different levels of employees, i.e., for senior management of Stack Teck Canada, a non-discretionary bonus, which was a predetermined percentage of base salary, would be received if Stack Teck Canada met its target, which for 2005 was $2.6 million EBITDA. There would also be another non-discretionary bonus if both Stack Teck Canada and Stack Teck California met the corporate target of $4.9 million. In addition, there was a small discretionary bonus that could be earned, which was a portion of the base bonus. This formula was similar for employees of Stack Teck California, who had a target of $2.3 million.

9. In March 2005, the bonus plans containing the specific formulas were distributed to the employees of Stack Teck Canada..

10. Each month, the Board would receive statements containing the actual administration expenses, as well as the accrued bonus payout for the end of the fiscal year.

11. In the Fall of 2005, Annex Capital and Woodside Capital purchased Stack Teck Holding, Stack Teck Canada and Stack Teck California, and replaced the Board of Directors with Scott Schooley, Daphnee Firth, Alex Coleman, and Robert Fowler. In addition, David Brown remained on the Board. All of the Board meetings were held in Toronto, Canada or by telephone. For many months prior to the purchase, both Annex and Woodside had also received the aforesaid monthly statements since they were the holders of the senior debt of the company.

12. At the end of the 2005 fiscal year (November 30, 2005), it was learned that Stack Teck Canada had met and exceeded its $2.6 million target, with an EBIDTA of $3.4 million. Stack Teck California, however, failed to meet its target and had an EBITDA of negative $1.4 million.

13. In accordance with the bonus plan, and consistent with the payment of the plan in prior years, approximately fifty employees of Stack Teck Canada, including David Brown, were distributed the bonus payments beginning in December 2005. The bonuses were paid by Stack Teck Canada from a Canadian bank account. The employees that received the bonuses work and reside in Canada. Documents relating to the bonuses are also in Canada. Since Stack Teck California failed to meet its target, no bonuses were paid to Stack Teck California employees.

14. David Brown received a bonus of $105,000 CAD. David Brown, however, had been holding a promissory note for $120,000 CAD for the company, which he received in 1996 for, _inter alia_, releasing his three percent equity interest in the company at the time of a merger in 1996. The promissory note was amended and restated in 1998 and matured in 2005. Consistent with a conversation in November 2005 that he had with Scott Schooley, and Mr. Schooley's authorization to do so, Mr. Brown received repayment of $105,000 CAD of his $120,000 CAD promissory note, in lieu of his $105,000 CAD taxable bonus payment.

15. In early June, David Brown was questioned about payment of the bonuses to the Stack Teck Canada employees. On June 16, 2006, David Brown received an e-mail from Scott Schooley asking for a meeting.

16. On June 22, 2006, David Brown met with Scott Schooley at a trade show in Chicago, Illinois. Mr. Schooley reaffirmed their November 2005 conversation about repayment of Mr. Brown's note in lieu of his bonus payment. Mr. Schooley, however, advised Mr. Brown that there was a Board meeting on June 28, 2006 in Toronto, Canada to discuss the payments of the bonuses, which Mr. Schooley claimed were unknown by the Board.

17. Mr. Brown met with part of the Board, _i.e._, Scott Schooley and Daphne Firth, on June 28, 2006 and was placed on a leave of absence.

18. On July 19, 2006, Mr. Brown met with Scott Schooley and Daphne Firth in Canada, and was advised that he was terminated as a result of the payment of the bonuses to the employees of Stack Teck Canada.

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on A٧٦.٢٢|٥٦

David Brown

# TAB B



Canadian Legal Information Institute



FRANÇAIS

Ontario >> Statutes and Regulations >> S.O. 2000, c. 41 >> Complete text

**Citation**: Employment Standards Act, 2000, S.O. 2000, c. 41
**Version available as of 2006-06-14** (Last update on CanLII: 2006-06-14)
**URL**: http://www.canlii.org/on/laws/sta/2000c.41/20060614/whole.html
**Enabled Regulations**: 10 Regulations
**Information about this text**
  Consolidation: Amended by:  2001, c. 9, Sched. I, s. 1; 2002, c. 18, Sched. J, s. 3;
  2004, c. 15; 2004, c. 21; 2005, c. 5, s. 23.

## Employment Standards Act, 2000

## S.O. 2000, Chapter 41

**Notice of Currency:\***  This document is up to date.

within two business days of accessing this document. For more
current amendment information, see the Table of Public Statutes –
Legislative History Overview.

Amended by:  2001, c. 9, Sched. I, s. 1; 2002, c. 18, Sched. J, s. 3;
2004, c. 15; 2004, c. 21; 2005, c. 5, s. 23.

Skip Table of Contents

## CONTENTS

PART I
DEFINITIONS
1.                Definitions
PART II
POSTING OF INFORMATION CONCERNING RIGHTS AND OBLIGATIO
2.                Minister to prepare poster
PART III
HOW THIS ACT APPLIES
3.                To whom Act applies
4.                Separate persons treated as one employer
5.                No contracting out
6.                Settlement by trade union binding

7.         Agents
8.         Civil proceedings not affected
PART IV
CONTINUITY OF EMPLOYMENT
9.         Sale, etc., of business
10.        New building services provider
PART V
PAYMENT OF WAGES
11.        Payment of wages
12.        Statement re wages
12.1       Statement re wages on termination
13.        Deductions, etc.
14.        Priority of claims
PART VI
RECORDS
15.        Records
15.1       Record re vacation time and vacation pay
16.        Availability
PART VII
HOURS OF WORK AND EATING PERIODS
17.        Limit on hours of work
17.1       Hours in work week: application for approval
17.2       Non-application of s. 5 (2)
17.3       Delegation by Director
18.        Hours free from work
19.        Exceptional circumstances
20.        Eating periods
21.        Payment not required
21.1       Director to prepare document
PART VIII
OVERTIME PAY
22.        Overtime threshold
22.1       Averaging: application for approval
22.2       Delegation by Director
PART IX
MINIMUM WAGE
23.        Minimum wage
PART X
PUBLIC HOLIDAYS
24.        Public holiday pay

25.          Two kinds of work
26.          Public holiday ordinarily a working day
27.          Agreement to work, ordinarily a working day
28.          Requirement to work on a public holiday: certain operations
29.          Public holiday not ordinarily a working day
30.          Agreement to work where not ordinarily a working day
31.          Premium pay hours not overtime hours
32.          If employment ends
PART XI
VACATION WITH PAY
33.          Right to vacation
34.          Alternative vacation entitlement year
35.          Timing of vacation
35.1         Timing of vacation, alternative vacation entitlement year
35.2         Vacation pay
36.          When to pay vacation pay
37.          Payment during labour dispute
38.          If employment ends
39.          Multi-employer plans
40.          Vacation pay in trust
41.          Approval to forego vacation
41.1         Vacation statements
PART XII
EQUAL PAY FOR EQUAL WORK
42.          Equal pay for equal work
PART XIII
BENEFIT PLANS
43.          Definition
44.          Differentiation prohibited
PART XIV
LEAVES OF ABSENCE
45.          Definitions
Pregnancy Leave
46.          Pregnancy leave
47.          End of pregnancy leave
Parental Leave
48.          Parental leave
49.          End of parental leave
Family Medical Leave
49.1         Family medical leave

Case 1:06-cv-00507-JJF-MPT          Document 6-3          Filed 08/22/2006          Page 5 of 60

Emergency Leave
50.              Emergency leave
General Provisions Concerning Leaves
51.              Rights during leave
51.1             Leave and vacation conflict
52.              Length of employment
53.              Reinstatement
PART XV
TERMINATION AND SEVERANCE OF EMPLOYMENT
Termination of Employment
54.              No termination without notice
55.              Prescribed employees not entitled
56.              What constitutes termination
57.              Employer notice period
58.              Notice, 50 or more employees
59.              Period of employment: included, excluded time
60.              Requirements during notice period
61.              Pay instead of notice
62.              Deemed active employment
Severance of Employment
63.              What constitutes severance
64.              Entitlement to severance pay
65.              Calculating severance pay
66.              Instalments
Election re Recall rights
67.              Where election may be made
PART XVI
LIE DETECTORS
68.              Definitions
69.              Right to refuse test
70.              Prohibition: testing
71.              Consent to test by police
PART XVII
RETAIL BUSINESS ESTABLISHMENTS
72.              Application of Part
73.              Right to refuse work
PART XVIII
REPRISAL
74.              Reprisal prohibited
PART XIX

## BUILDING SERVICES PROVIDERS

75.        New provider
76.        Vacation pay
77.        Information request, possible new provider
78.        Use of information

## PART XX
## LIABILITY OF DIRECTORS

79.        Definition
80.        Application of Part
81.        Directors' liability for wages
82.        No relief by contract, etc.
83.        Civil remedies protected

## PART XXI
## WHO ENFORCES THIS ACT AND WHAT THEY CAN DO

84.        Minister responsible
85.        Director
86.        Employment standards officers
87.        Delegation
88.        Powers and duties of Director
89.        Powers and duties of officers
90.        Officers not compellable
91.        Investigation and inspection powers
92.        Warrant
93.        Posting of notices
94.        Powers under the Canada Labour Code
95.        Service of documents

## PART XXII
## COMPLAINTS AND ENFORCEMENT

### Complaints

96.        Complaints
97.        When civil proceeding not permitted
98.        When complaint not permitted

### Enforcement under Collective Agreement

99.        When collective agreement applies
100.       If arbitrator finds contravention
101.       Arbitration and s. 4

### Enforcement by Employment Standards Officer

102.       Meeting may be required
103.       Order to pay wages
104.       Orders for compensation or reinstatement

105.          Employee cannot be found
106.          Order against director, Part XX
107.          Further order, Part XX
108.          Compliance order
109.          Money paid when no review
110.          Refusal to issue order
111.          Time limit on recovery, employee's complaint
Settlements
112.          Settlement
Notices of Contravention
113.          Notice of contravention
Limitation Period
114.          Limitation period re orders and notices
115.          Meaning of "substantially the same"
PART XXIII
REVIEWS BY THE BOARD
Reviews of Orders
116.          Review
117.          Money held in trust pending review
118.          Rules of practice
119.          Powers of Board
120.          Settlement through labour relations officer
Referral of Matter under Part XIII
121.          Referral
Review of Notice of Contravention
122.          Review of notice of contravention
General Provisions Respecting the Board
123.          Persons from Board not compellable
124.          When no decision after six months
PART XXIV
COLLECTION
125.          Third party demand
126.          Filing of order
Collectors
127.          Director may authorize collector
128.          Collector's powers
129.          Settlement by collector
Reciprocal Enforcement of Orders
130.          Definitions
PART XXV

## OFFENCES AND PROSECUTIONS

Offences

131.          Offence to keep false records
132.          General offence
133.          Additional orders re s. 74
134.          Offence re order for reinstatement
135.          Additional orders re other contraventions
136.          Offence re directors' liability
137.          Offence re permitting offence by corporation
137.1        Prosecution of employment standards officer
138.          Where prosecution may be heard
138.1        Publication re convictions
139.          Limitation period

PART XXVI

MISCELLANEOUS EVIDENTIARY PROVISIONS

140.          Copy constitutes evidence

PART XXVII

REGULATIONS

141.          Regulations

PART XXVIII

TRANSITION

142.          Transition

part i

definitions

Definitions

**1.** (1)  In this Act,

"agent" includes a trade union that represents an employee in collective bargaining; ("mandataire")

"alternative vacation entitlement year" means, with respect to an employee, a recurring 12-month period that begins on a date chosen by the employer, other than the first day of the employee's employment; ("année de référence différente")

"arbitrator" includes,

(a)    a board of arbitration, and

(b)    the Board, when it is acting under section 133 of the *Labour Relations Act, 1995*; ("arbitre")

"benefit plan" means a benefit plan provided for an employee by or through his or her employer; ("régime d'avantages sociaux")

"Board" means the Ontario Labour Relations Board; ("Commission")

"building services" means services for a building with respect to food, security and cleaning and any prescribed services for a building; ("services de gestion d'immeubles")

"building services provider" or "provider" means a person who provides building services for a premises and includes the owner or manager of a premises if the owner or manager provides building services for premises the person owns or manages; ("fournisseur de services de gestion d'immeubles", "fournisseur")

"business" includes an activity, trade or undertaking; ("entreprise")

"collector" means a person, other than an employment standards officer, who is authorized by the Director to collect an amount owing under this Act; ("agent de recouvrement")

"continuous operation" means an operation or that part of an operation that normally continues 24 hours a day without cessation in each seven-day period until it is concluded for that period; ("exploitation à fonctionnement ininterrompu")

"Director" means the Director of Employment Standards; ("directeur")

"employee" includes,

(a)    a person, including an officer of a corporation, who performs work for an employer for wages,

(b)    a person who supplies services to an employer for

wages,

(c)    a person who receives training from a person who is an employer, as set out in subsection (2), or

(d)    a person who is a homeworker,

and includes a person who was an employee; ("employé")

"employer" includes,

(a)    an owner, proprietor, manager, superintendent, overseer, receiver or trustee of an activity, business, work, trade, occupation, profession, project or undertaking who has control or direction of, or is directly or indirectly responsible for, the employment of a person in it, and

(b)    any persons treated as one employer under section 4, and includes a person who was an employer; ("employeur")

"employment contract" includes a collective agreement; ("contrat de travail")

"employment standard" means a requirement or prohibition under this Act that applies to an employer for the benefit of an employee; ("norme d'emploi")

"establishment", with respect to an employer, means a location at which the employer carries on business but, if the employer carries on business at more than one location, separate locations constitute one establishment if,

(a)    the separate locations are located within the same municipality, or

(b)    one or more employees at a location have seniority rights that extend to the other location under a written employment contract whereby the employee or employees may displace another employee of the same employer; ("établissement")

"homeworker" means an individual who performs work for

compensation in premises occupied by the individual primarily as residential quarters but does not include an independent contractor; ("travailleur à domicile")

"hospital" means a hospital as defined in the *Hospital Labour Disputes Arbitration Act*; ("hôpital")

"labour relations officer" means a labour relations officer appointed under the *Labour Relations Act, 1995*; ("agent des relations de travail")

"Minister" means the Minister of Labour; ("ministre")

"Ministry" means the Ministry of Labour; ("ministère")

"overtime hour", with respect to an employee, means,

    (a)   if one or more provisions in the employee's employment contract or in another Act that applies to the employee's employment provides a greater benefit for overtime than Part VIII (Overtime Pay), an hour of work in excess of the overtime threshold set out in that provision, and

    (b)   otherwise, an hour of work in excess of the overtime threshold under this Act that applies to the employee's employment; ("heure supplémentaire")

"person" includes a trade union; ("personne")

"premium pay" means an employee's entitlement for working on a public holiday as described in subsection 24 (2); ("salaire majoré")

"prescribed" means prescribed by the regulations; ("prescrit")

"public holiday" means any of the following:

    1.   New Year's Day.

    2.   Good Friday.

    3.   Victoria Day.

4.    Canada Day.

5.    Labour Day.

6.    Thanksgiving Day.

7.    Christmas Day.

8.    December 26.

9.    Any day prescribed as a public holiday; ("jour férié")

"public holiday pay" means an employee's entitlement with respect to a public holiday as determined under subsection 24 (1); ("salaire pour jour férié")

"regular rate" means, subject to any regulation made under paragraph 10 of subsection 141 (1),

(a)    for an employee who is paid by the hour, the amount earned for an hour of work in the employee's usual work week, not counting overtime hours,

(b)    otherwise, the amount earned in a given work week divided by the number of non-overtime hours actually worked in that week; ("taux horaire normal")

"regular wages" means wages other than overtime pay, public holiday pay, premium pay, vacation pay, termination pay and severance pay and entitlements under a provision of an employee's contract of employment that under subsection 5 (2) prevail over Part VIII, Part X, Part XI or Part XV; ("salaire normal")

"regular work day", with respect to an employee who usually works the same number of hours each day, means a day of that many hours; ("journée normale de travail")

"regular work week", with respect to an employee who usually works the same number of hours each week, means a week of that many hours but not including overtime hours; ("semaine normale de travail")

"regulations" means the regulations made under this Act; ("règlements")

"standard vacation entitlement year" means, with respect to an employee, a recurring 12-month period that begins on the first day of the employee's employment; ("année de référence normale")

"statutory notice period" means,

(a)    the period of notice of termination required to be given by an employer under Part XV, or

(b)    where the employer provides a greater amount of notice than is required under Part XV, that part of the notice period ending with the termination date specified in the notice which equals the period of notice required under Part XV; ("délai de préavis prévu par la loi")

"stub period" means, with respect to an employee for whom the employer establishes an alternative vacation entitlement year that starts on or after the day on which section 3 of Schedule J to the *Government Efficiency Act, 2002* comes into force,

(a)    if the employee's first alternative vacation entitlement year begins before the completion of his or her first 12 months of employment, the period that begins on the first day of employment and ends on the day before the start of the alternative vacation entitlement year,

(b)    if the employee's first alternative vacation entitlement year begins after the completion of his or her first 12 months of employment, the period that begins on the day after the day on which his or her most recent standard vacation entitlement year ended and ends on the day before the start of the alternative vacation entitlement year; ("période tampon")

"trade union" means an organization that represents employees in collective bargaining under any of the following:

1.    The *Labour Relations Act, 1995.*

Case 1:06-cv-00507-LJF-MPT    Document 6-3    Filed 08/22/2006    Page 14 of 60

Page 13 of 175

2.   The *Crown Employees Collective Bargaining Act, 1993*.

3.   Part X.1 of the *Education Act*.

4.   Part IX of the *Fire Protection and Prevention Act, 1997*.

5.   The *Colleges Collective Bargaining Act*.

6.   Any prescribed Acts or provisions of Acts; ("syndicat")

"vacation entitlement year" means an alternative vacation entitlement year or a standard vacation entitlement year; ("année de référence")

"wages" means,

    (a)   monetary remuneration payable by an employer to an employee under the terms of an employment contract, oral or written, express or implied,

    (b)   any payment required to be made by an employer to an employee under this Act, and

    (c)   any allowances for room or board under an employment contract or prescribed allowances,

but does not include,

    (d)   tips and other gratuities,

    (e)   any sums paid as gifts or bonuses that are dependent on the discretion of the employer and that are not related to hours, production or efficiency,

    (f)   expenses and travelling allowances, or

    (g)   subject to subsections 60 (3) or 62 (2), employer contributions to a benefit plan and payments to which an employee is entitled from a benefit plan; ("salaire")

"work week" means,

Employment Standards Act, 2000

(a)    a recurring period of seven consecutive days selected by the employer for the purpose of scheduling work, or

(b)    if the employer has not selected such a period, a recurring period of seven consecutive days beginning on Sunday and ending on Saturday. ("semaine de travail")  2000, c. 41, s. 1 (1); 2001, c. 9, Sched. I, s. 1 (1); 2002, c. 18, Sched. J, s. 3 (1, 2).

Person receiving training

(2)  For the purposes of clause (c) of the definition of "employee" in subsection (1), an individual receiving training from a person who is an employer is an employee of that person if the skill in which the individual is being trained is a skill used by the person's employees, unless all of the following conditions are met:

1.    The training is similar to that which is given in a vocational school.

2.    The training is for the benefit of the individual.

3.    The person providing the training derives little, if any, benefit from the activity of the individual while he or she is being trained.

4.    The individual does not displace employees of the person providing the training.

5.    The individual is not accorded a right to become an employee of the person providing the training.

6.    The individual is advised that he or she will receive no remuneration for the time that he or she spends in training.  2000, c. 41, s. 1 (2).

Agreements in writing

(3)  Unless otherwise provided, a reference in this Act to an agreement between an employer and an employee or to an employer and an employee agreeing to something shall be deemed

to be a reference to an agreement in writing or to their agreeing in writing to do something.  2000, c. 41, s. 1 (3).

Exception

(4)  Nothing in subsection (3) requires an employment contract that is not a collective agreement to be in writing.  2000, c. 41, s. 1 (4).

part ii
Posting of information CONCERNING rights and obligations

Minister to prepare poster

**2.** (1)  The Minister shall prepare and publish a poster providing such information about this Act and the regulations as the Minister considers appropriate.  2004, c. 21, s. 1.

If poster not up to date

(2)  If the Minister believes that the poster prepared under subsection (1) has become out of date, he or she shall prepare and publish a new poster.  2004, c. 21, s. 1.

Material to be posted

(3)  Every employer shall post and keep posted in at least one conspicuous place in every workplace of the employer where it is likely to come to the attention of employees in that workplace a copy of the most recent poster published by the Minister under this section.  2004, c. 21, s. 1.

Where majority language not English

(4)  If the majority language of a workplace of an employer is a language other than English, the employer shall make enquiries as to whether the Minister has prepared a translation of the poster into that language, and if the Minister has done so, the employer shall post and keep posted a copy of the translation next to the copy of the poster.  2004, c. 21, s. 1.

## PART IIi
## HOW THIS ACT APPLIES

### To whom Act applies

**3.** (1)  Subject to subsections (2) to (5), the employment standards set out in this Act apply with respect to an employee and his or her employer if,

(a)   the employee's work is to be performed in Ontario; or

(b)   the employee's work is to be performed in Ontario and outside Ontario but the work performed outside Ontario is a continuation of work performed in Ontario.  2000, c. 41, s. 3 (1).

### Exception, federal jurisdiction

(2)  This Act does not apply with respect to an employee and his or her employer if their employment relationship is within the legislative jurisdiction of the Parliament of Canada.  2000, c. 41, s. 3 (2).

### Exception, diplomatic personnel

(3)  This Act does not apply with respect to an employee of an embassy or consulate of a foreign nation and his or her employer.  2000, c. 41, s. 3 (3).

### Exception, Crown employees

(4)  Only the following provisions of this Act apply with respect to an employee and his or her employer if the employer is the Crown, a Crown agency or an authority, board, commission or corporation all of whose members are appointed by the Crown:

1.   Part IV (Continuity of Employment).

2.   Section 14.

3.   Part XII (Equal Pay for Equal Work).

    4.    Part XIII (Benefit Plans).

    5.    Part XIV (Leaves of Absence).

    6.    Part XV (Termination and Severance of Employment).

    7.    Part XVI (Lie Detectors).

    8.    Part XVIII (Reprisal), except for subclause 74 (1) (a) (vii) and clause 74 (1) (b).

    9.    Part XIX (Building Services Providers).  2000, c. 41, s. 3 (4).

Other exceptions

    (5)  This Act does not apply with respect to the following individuals and any person for whom such an individual performs work or from whom such an individual receives compensation:

    1.    A secondary school student who performs work under a work experience program authorized by the school board that operates the school in which the student is enrolled.

    2.    An individual who performs work under a program approved by a college of applied arts and technology or a university.

    3.    A participant in community participation under the *Ontario Works Act, 1997.*

    4.    An individual who is an inmate of a correctional institution operated by or under the Ministry of Correctional Services, is an inmate of a penitentiary or is being held in a detention centre or place of custody under the *Young Offenders Act* (Canada), if the individual participates inside or outside the institution, penitentiary, detention centre or place of custody in a work project or rehabilitation program.

    5.    An offender who performs work under an order or sentence of a court or as part of an alternative measure under the

*Young Offenders Act* (Canada).

     6.   An individual who performs work in a simulated job or working environment if the primary purpose in placing the individual in the job or environment is his or her rehabilitation.

     7.   A holder of political, religious or judicial office.

     8.   A member of a quasi-judicial tribunal.

     9.   A holder of elected office in an organization, including a trade union.

     10.   A police officer, except as provided in Part XVI (Lie Detectors).

     11.   A director of a corporation, except as provided in Part XX (Liability of Directors), Part XXI (Who Enforces this Act and What They Can Do), Part XXII (Complaints and Enforcement), Part XXIII (Reviews by the Board), Part XXIV (Collection), Part XXV (Offences and Prosecutions), Part XXVI (Miscellaneous Evidentiary Provisions), Part XXVII (Regulations) and Part XXVIII (Transition, Amendment, Repeals, Commencement and Short Title).

     12.   Any prescribed individuals.  2000, c. 41, s. 3 (5).

Dual roles

    (6)  Where an individual who performs work or occupies a position described in subsection (5) also performs some other work or occupies some other position and does so as an employee, nothing in subsection (5) precludes the application of this Act to that individual and his or her employer insofar as that other work or position is concerned.  2000, c. 41, s. 3 (6).

Separate persons treated as one employer

    **4.** (1) Subsection (2) applies if,

    (a)   associated or related activities or businesses are or were carried on by or through an employer and one or more other

persons; and

    (b)   the intent or effect of their doing so is or has been to directly or indirectly defeat the intent and purpose of this Act.  2000, c. 41, s. 4 (1).

Same

    (2)  The employer and the other person or persons described in subsection (1) shall all be treated as one employer for the purposes of this Act.  2000, c. 41, s. 4 (2).

Businesses need not be carried on at same time

    (3)  Subsection (2) applies even if the activities or businesses are not carried on at the same time.  2000, c. 41, s. 4 (3).

Exception, individuals

    (4)  Subsection (2) does not apply with respect to a corporation and an individual who is a shareholder of the corporation unless the individual is a member of a partnership and the shares are held for the purposes of the partnership.  2000, c. 41, s. 4 (4).

Joint and several liability

    (5)  Persons who are treated as one employer under this section are jointly and severally liable for any contravention of this Act and the regulations under it and for any wages owing to an employee of any of them.  2000, c. 41, s. 4 (5).

No contracting out

    **5.**  (1)  Subject to subsection (2), no employer or agent of an employer and no employee or agent of an employee shall contract out of or waive an employment standard and any such contracting out or waiver is void.  2000, c. 41, s. 5 (1).

Greater contractual or statutory right

    (2)  If one or more provisions in an employment contract or in

another Act that directly relate to the same subject matter as an
employment standard provide a greater benefit to an employee
than the employment standard, the provision or provisions in the
contract or Act apply and the employment standard does not apply.
2000, c. 41, s. 5 (2).

Settlement by trade union binding

   **6.** A settlement made on an employee's behalf by a trade union
that represents the employee is binding on the employee.  2000,
c. 41, s. 6.

Agents

   **7.** An agreement or authorization that may lawfully be made or
given by an employee under this Act may be made or given by his
or her agent and is binding on the employee as if it had been made
or given by the employee. 2000, c. 41, s. 7.

Civil proceedings not affected

   **8.** (1) Subject to section 97, no civil remedy of an employee
against his or her employer is affected by this Act.  2000, c. 41, s. 8
(1).

Notice

   (2) Where an employee commences a civil proceeding against
his or her employer under this Act, notice of the proceeding shall be
served on the Director on a form approved by the Director on or
before the date the civil proceeding is set down for trial.  2000,
c. 41, s. 8 (2).

part iV
continuity of employment

Sale, etc., of business

   **9.** (1) If an employer sells a business or a part of a business
and the purchaser employs an employee of the seller, the
employment of the employee shall be deemed not to have been

terminated or severed for the purposes of this Act and his or her employment with the seller shall be deemed to have been employment with the purchaser for the purpose of any subsequent calculation of the employee's length or period of employment. 2000, c. 41, s. 9 (1).

Exception

(2) Subsection (1) does not apply if the day on which the purchaser hires the employee is more than 13 weeks after the earlier of his or her last day of employment with the seller and the day of the sale. 2000, c. 41, s. 9 (2).

Definitions

(3) In this section,

"sells" includes leases, transfers or disposes of in any other manner, and "sale" has a corresponding meaning. 2000, c. 41, s. 9 (3).

Predecessor Acts

(4) For the purposes of subsection (1), employment with the seller includes any employment attributed to the seller under this section or a provision of a predecessor Act dealing with sales of businesses. 2000, c. 41, s. 9 (4).

New building services provider

**10.** (1) This section applies if the building services provider for a building is replaced by a new provider and an employee of the replaced provider is employed by the new provider. 2000, c. 41, s. 10 (1).

No termination or severance

(2) The employment of the employee shall be deemed not to have been terminated or severed for the purposes of this Act and his or her employment with the replaced provider shall be deemed to have been employment with the new provider for the purpose of

any subsequent calculation of the employee's length or period of employment.  2000, c. 41, s. 10 (2).

Exception

(3)  Subsection (2) does not apply if the day on which the new provider hires the employee is more than 13 weeks after the earlier of his or her last day of employment with the replaced provider and the day on which the new provider began servicing the premises.  2000, c. 41, s. 10 (3).

Predecessor Acts

(4)  For the purposes of subsection (2), employment with the replaced provider includes any employment attributed to the replaced provider under this section or under a provision of a predecessor Act dealing with building services providers.  2000, c. 41, s. 10 (4).

PART v
PAYMENT OF WAGES

Payment of wages

**11.**  (1)  An employer shall establish a recurring pay period and a recurring pay day and shall pay all wages earned during each pay period, other than accruing vacation pay, no later than the pay day for that period.  2000, c. 41, s. 11 (1).

Manner of payment

(2)  An employer shall pay an employee's wages,

(a)    by cash;

(b)    by cheque payable only to the employee; or

(c)    in accordance with subsection (4).  2000, c. 41, s. 11 (2).

Place of payment by cash or cheque

(3)  If payment is made by cash or cheque, the employer shall ensure that the cash or cheque is given to the employee at his or her workplace or at some other place agreeable to the employee. 2000, c. 41, s. 11 (3).

Direct deposit

(4)  An employer may pay an employee's wages by direct deposit into an account of a financial institution if,

(a)    the account is in the employee's name;

(b)    no person other than the employee or a person authorized by the employee has access to the account; and

(c)    unless the employee agrees otherwise, an office or facility of the financial institution is located within a reasonable distance from the location where the employee usually works. 2000, c. 41, s. 11 (4).

If employment ends

(5)  If an employee's employment ends, the employer shall pay any wages to which the employee is entitled to the employee not later than the later of,

(a)    seven days after the employment ends; and

(b)    the day that would have been the employee's next pay day.  2000, c. 41, s. 11 (5).

Statement re wages

**12.**  (1)  On or before an employee's pay day, the employer shall give to the employee a written statement setting out,

(a)    the pay period for which the wages are being paid;

(b)    the wage rate, if there is one;

(c)    the gross amount of wages and, unless the information

Case 1:06-cv-00507-JJF-MPT    Document 6-3    Filed 08/22/2006    Page 25 of 60
Page 24 of 175

is provided to the employee in some other manner, how that amount was calculated;

    (d)   Repealed:  2002, c. 18, Sched. J, s. 3 (3).

    (e)   the amount and purpose of each deduction from wages;

    (f)   any amount with respect to room or board that is deemed to have been paid to the employee under subsection 23 (2); and

    (g)   the net amount of wages being paid to the employee. 2001, c. 9, Sched. I, s. 1 (2); 2002, c. 18, Sched. J, s. 3 (3).

    (2)  Repealed:  2002, c. 18, Sched. J, s. 3 (4).

Electronic copies

    (3)  The statement may be provided to the employee by electronic mail rather than in writing if the employee has access to a means of making a paper copy of the statement.  2000, c. 41, s. 12 (3).

Statement re wages on termination

    **12.1**  On or before the day on which the employer is required to pay wages under subsection 11 (5), the employer shall provide the employee with a written statement setting out,

    (a)   the gross amount of any termination pay or severance pay being paid to the employee;

    (b)   the gross amount of any vacation pay being paid to the employee;

    (c)   unless the information is provided to the employee in some other manner, how the amounts referred to in clauses (a) and (b) were calculated;

    (d)   the pay period for which any wages other than wages described in clauses (a) or (b) are being paid;

(e)    the wage rate, if there is one;

(f)    the gross amount of any wages referred to in clause (d) and, unless the information is provided to the employee in some other manner, how that amount was calculated;

(g)    the amount and purpose of each deduction from wages;

(h)    any amount with respect to room or board that is deemed to have been paid to the employee under subsection 23 (2); and

(i)    the net amount of wages being paid to the employee. 2002, c. 18, Sched. J, s. 3 (5).

Deductions, etc.

**13.** (1)  An employer shall not withhold wages payable to an employee, make a deduction from an employee's wages or cause the employee to return his or her wages to the employer unless authorized to do so under this section.  2000, c. 41, s. 13 (1).

Statute or court order

(2)  An employer may withhold or make a deduction from an employee's wages or cause the employee to return them if a statute of Ontario or Canada or a court order authorizes it.  2000, c. 41, s. 13 (2).

Employee authorization

(3)  An employer may withhold or make a deduction from an employee's wages or cause the employee to return them with the employee's written authorization.  2000, c. 41, s. 13 (3).

Exception

(4)  Subsections (2) and (3) do not apply if the statute, order or written authorization from the employee requires the employer to remit the withheld or deducted wages to a third person and the employer fails to do so.  2000, c. 41, s. 13 (4).

Same

(5)  Subsection (3) does not apply if,

(a)  the employee's authorization does not refer to a specific amount or provide a formula from which a specific amount may be calculated;

(b)  the employee's wages were withheld, deducted or required to be returned,

(i)  because of faulty work,

(ii)  because the employer had a cash shortage, lost property or had property stolen and a person other than the employee had access to the cash or property, or

(iii)  under any prescribed conditions; or

(c)  the employee's wages were required to be returned and those wages were the subject of an order under this Act.  2000, c. 41, s. 13 (5).

Priority of claims

**14.**  (1)  Despite any other Act, wages shall have priority over and be paid before the claims and rights of all other unsecured creditors of an employer, to the extent of $10,000 per employee. 2000, c. 41, s. 14 (1).

Exception

(2)  Subsection (1) does not apply with respect to a distribution made under the *Bankruptcy and Insolvency Act* (Canada) or other legislation enacted by the Parliament of Canada respecting bankruptcy or insolvency.  2001, c. 9, Sched. I, s. 1 (3).

PART vi
RECORDS

Records

**15.** (1)  An employer shall record the following information with respect to each employee, including an employee who is a homeworker:

    1.    The employee's name and address.

    2.    The employee's date of birth, if the employee is a student and under 18 years of age.

    3.    The date on which the employee began his or her employment.

    4.    The number of hours the employee worked in each day and each week.

    5.    The information contained in each written statement given to the employee under subsection 12 (1), section 12.1 and clause 36 (3) (b).

    6.    Repealed:  2002, c. 18, Sched. J, s. 3 (7).

2000, c. 41, s. 15 (1); 2002, c. 18, Sched. J, s. 3 (6, 7).

Homeworkers

    (2)  In addition to the record described in subsection (1), the employer shall maintain a register of any homeworkers the employer employs showing the following information:

    1.    The employee's name and address.

    2.    The information that is contained in all statements required to be provided to the employee described in clause 12 (1) (b).

    3.    Any prescribed information.  2000, c. 41, s. 15 (2).

Exception

    (3)  An employer is not required to record the information described in paragraph 4 of subsection (1) with respect to an

employee who is paid a salary if,

(a)   the employer records the number of hours in excess of those in his or her regular work week and,

(i)   the number of hours in excess of eight that the employee worked in each day, or

(ii)   if the number of hours in the employee's regular work day is more than eight hours, the number in excess; or

(b)   sections 17 to 19 and Part VIII (Overtime Pay) do not apply with respect to the employee.  2000, c. 41, s. 15 (3).

Meaning of salary

(4)  An employee is considered to be paid a salary for the purposes of subsection (3) if,

(a)   the employee is entitled to be paid a fixed amount for each pay period; and

(b)   the amount actually paid for each pay period does not vary according to the number of hours worked by the employee, unless he or she works more than 44 hours in a week.  2000, c. 41, s. 15 (4).

Retention of records

(5)  The employer shall retain or arrange for some other person to retain the records of the information required under this section for the following periods:

1.   For information referred to in paragraph 1 or 3 of subsection (1), three years after the employee ceased to be employed by the employer.

2.   For information referred to in paragraph 2 of subsection (1), the earlier of,

i.   three years after the employee's 18th birthday,

or

   ii. three years after the employee ceased to be employed by the employer.

  3. For information referred to in paragraph 4 of subsection (1) or in subsection (3), three years after the day or week to which the information relates.

  4. For information referred to in paragraph 5 of subsection (1), three years after the information was given to the employee.

  5. Repealed:  2002, c. 18, Sched. J, s. 3 (8).

2000, c. 41, s. 15 (5); 2002, c. 18, Sched. J, s. 3 (8).

Register of homeworkers

  (6)  Information pertaining to a homeworker may be deleted from the register three years after the homeworker ceases to be employed by the employer.  2000, c. 41, s. 15 (6).

Retain documents re leave

  (7)  An employer shall retain or arrange for some other person to retain all notices, certificates, correspondence and other documents given to or produced by the employer that relate to an employee taking pregnancy leave, parental leave or emergency leave for three years after the day on which the leave expired. 2000, c. 41, s. 15 (7).

Retention of agreements re excess hours

  (8)  An employer shall retain or arrange for some other person to retain copies of every agreement that the employer has made with an employee permitting the employee to work hours in excess of the limits set out in subsection 17 (1) for three years after the last day on which work was performed under the agreement.  2004, c. 21, s. 2.

Retention of averaging agreements

(9)  An employer shall retain or arrange for some other person to retain copies of every averaging agreement that the employer has made with an employee under clause 22 (2) (a) for three years after the last day on which work was performed under the agreement.  2004, c. 21, s. 2.

Record re vacation time and vacation pay

**15.1**  (1)  An employer shall record information concerning an employee's entitlement to vacation time and vacation pay in accordance with this section.  2002, c. 18, Sched. J, s. 3 (9).

Content of record

(2)  The employer shall record the following information:

1.    The amount of vacation time, if any, that the employee had earned since the start of employment but had not taken before the start of the vacation entitlement year.

2.    The amount of vacation time that the employee earned during the vacation entitlement year.

3.    The amount of vacation time, if any, taken by the employee during the vacation entitlement year.

4.    The amount of vacation time, if any, that the employee had earned since the start of employment but had not taken as of the end of the vacation entitlement year.

5.    The amount of vacation pay paid to the employee during the vacation entitlement year.

6.    The amount of wages on which the vacation pay referred to in paragraph 5 was calculated and the period of time to which those wages relate.  2002, c. 18, Sched. J, s. 3 (9).

Additional requirement, alternative vacation entitlement year

(3)  If the employer establishes for an employee an alternative vacation entitlement year that starts on or after the day on which

section 3 of Schedule J to the *Government Efficiency Act, 2002* comes into force, the employer shall record the following information for the stub period:

    1.   The amount of vacation time that the employee earned during the stub period.

    2.   The amount of vacation time, if any, that the employee took during the stub period.

    3.   The amount of vacation time, if any, earned but not taken by the employee during the stub period.

    4.   The amount of vacation pay paid to the employee during the stub period.

    5.   The amount of wages on which the vacation pay referred to in paragraph 4 was calculated and the period of time to which those wages relate.  2002, c. 18, Sched. J, s. 3 (9).

When information to be recorded

    (4)  The employer shall record information under this section by a date that is not later than the later of,

    (a)   seven days after the start of the next vacation entitlement year or the first vacation entitlement year, as the case may be; and

    (b)   the first pay day of the next vacation entitlement year or of the first vacation entitlement year, as the case may be.  2002, c. 18, Sched. J, s. 3 (9).

Retention of records

    (5)  The employer shall retain or arrange for some other person to retain each record required under this section for three years after it was made.  2002, c. 18, Sched. J, s. 3 (9).

Exception

(6)  Paragraphs 5 and 6 of subsection (2) and paragraphs 4 and 5 of subsection (3) do not apply with respect to an employee whose employer pays vacation pay in accordance with subsection 36 (3). 2002, c. 18, Sched. J, s. 3 (9).

Transition

(7)  This section does not apply with respect to a vacation entitlement year or a stub period that is completed before the day on which section 3 of Schedule J to the *Government Efficiency Act, 2002* comes into force.  2002, c. 18, Sched. J, s. 3 (9).

Availability

**16.**  An employer shall ensure that all of the records and documents required to be retained under sections 15 and 15.1 are readily available for inspection as required by an employment standards officer, even if the employer has arranged for another person to retain them.  2000, c. 41, s. 16; 2004, c. 21, s. 3.

PART Vii
HOURS OF WORK AND EATING PERIODS

Limit on hours of work

**17.**  (1)  Subject to subsections (2) and (3), no employer shall require or permit an employee to work more than,

(a)    eight hours in a day or, if the employer establishes a regular work day of more than eight hours for the employee, the number of hours in his or her regular work day; and

(b)    48 hours in a work week.  2004, c. 21, s. 4.

Exception: hours in a day

(2)  An employee's hours of work may exceed the limit set out in clause (1) (a) if the employee has made an agreement with the employer that he or she will work up to a specified number of hours in a day in excess of the limit and his or her hours of work in a day do not exceed the number specified in the agreement.  2004, c. 21,

s. 4.

Exception: hours in a work week

(3)  An employee's hours of work may exceed the limit set out in clause (1) (b) if,

(a)   the employee has made an agreement with the employer that he or she will work up to a specified number of hours in a work week in excess of the limit;

(b)   the employer has received an approval under section 17.1 that applies to the employee or to a class of employees that includes the employee; and

(c)   the employee's hours of work in a work week do not exceed the lesser of,

(i)   the number of hours specified in the agreement, and

(ii)   the number of hours specified in the approval. 2004, c. 21, s. 4.

Same, pending approval

(4)  Despite subsection (3), an employee's hours of work may exceed the limit set out in clause (1) (b) even though the employer has not received the approval described in clause (3) (b), if,

(a)   the employee has made an agreement described in clause (3) (a) with the employer;

(b)   the employer has served on the Director an application for an approval under section 17.1;

(c)   the application is for an approval that applies to the employee or to a class of employees that includes the employee;

(d)   30 days have passed since the application was served on the Director;

(e)    the employer has not received a notice that the application has been refused;

(f)    the employer's most recent previous application, if any, for an approval under section 17.1 was not refused;

(g)    the most recent approval, if any, received by the employer under section 17.1 was not revoked;

(h)    the employer has posted and kept posted a copy of the application in at least one conspicuous place in the workplace where the employee works, so that it is likely to come to the employee's attention; and

(i)    the employee's hours of work in a work week do not exceed any of,

(i)    the number of hours specified in the application,

(ii)    the number of hours specified in the agreement, and

(iii)    60 hours.  2004, c. 21, s. 4.

Document re employee rights

(5)  An agreement described in subsection (2) or in clause (3) (a) is not valid unless,

(a)    the employer has, before the agreement is made, provided the employee with a copy of the most recent document published by the Director under section 21.1; and

(b)    the agreement contains a statement in which the employee acknowledges that he or she has received a document that the employer has represented is the most recent document published by the Director under section 21.1.  2004, c. 21, s. 4.

Revocation by employee

(6)  An employee may revoke an agreement described in

subsection (2) or in clause (3) (a) two weeks after giving written notice to the employer.  2004, c. 21, s. 4.

Revocation by employer

(7)  An employer may revoke an agreement described in subsection (2) or in clause (3) (a) after giving reasonable notice to the employee.  2004, c. 21, s. 4.

Transition:  certain agreements

(8)  For the purposes of this section,

(a)    an agreement to exceed the limit on hours of work in a day set out in clause (1) (a) of this section as it read on February 28, 2005 shall be treated as if it were an agreement described in subsection (2);

(b)    an agreement to exceed the limit on hours of work in a work week set out in clause (1) (b) of this section as it read on February 28, 2005 shall be treated as if it were an agreement described in clause (3) (a); and

(c)    an agreement to exceed the limit on hours of work in a work week set out in clause (2) (b) of this section as it read on February 28, 2005 shall be treated as if it were an agreement described in clause (3) (a).  2004, c. 21, s. 4.

Document re employee rights – exceptions

(9)  Subsection (5) does not apply in respect of,

(a)    an agreement described in subsection (8); or

(b)    an agreement described in subsection (2) or in clause (3) (a) in respect of an employee who is represented by a trade union.  2004, c. 21, s. 4.

Transition: document re employee rights

(10)  On or before June 1, 2005, an employer who made an

agreement described in subsection (8) with an employee who is not represented by a trade union shall provide the employee with a copy of the most recent document published by the Director under section 21.1.  2004, c. 21, s. 4.

Transition: application for approval before commencement

(11)  If the employer applies for an approval under section 17.1 before March 1, 2005, the 30-day period referred to in clause (4) (d) shall be deemed to end on the later of,

(a)   the last day of the 30-day period; and

(b)   March 1, 2005.  2004, c. 21, s. 4.

Hours in work week: application for approval

**17.1**  (1)  An employer may apply to the Director for an approval allowing some or all of its employees to work more than 48 hours in a week.  2004, c. 21, s. 4.

Form

(2)  The application shall be in a form provided by the Director. 2004, c. 21, s. 4.

Service of application

(3)  The application shall be served on the Director,

(a)   by being delivered to the Director's office on a day and at a time when it is open;

(b)   by being mailed to the Director's office using a method of mail delivery that allows delivery to be verified; or

(c)   by being sent to the Director's office by electronic transmission or by telephonic transmission of a facsimile.  2004, c. 21, s. 4.

When service effective

(4)  Service under subsection (3) shall be deemed to be effected,

(a)    in the case of service under clause (3) (a), on the day shown on a receipt or acknowledgment provided to the employer by the Director or his or her representative;

(b)    in the case of service under clause (3) (b), on the day shown in the verification;

(c)    in the case of service under clause (3) (c), on the day on which the electronic or telephonic transmission is made, subject to subsection (5).  2004, c. 21, s. 4.

Same

(5)  Service shall be deemed to be effected on the next day on which the Director's office is not closed, if the electronic or telephonic transmission is made,

(a)    on a day on which the Director's office is closed; or

(b)    after 5 p.m. on any day.  2004, c. 21, s. 4.

Application to be posted

(6)  An employer who makes an application under subsection (1) shall,

(a)    on the day the application is served on the Director, post a copy of the application in at least one conspicuous place in every workplace of the employer where the employee or class of employees in respect of whom the application applies works, so that it is likely to come to the attention of the employee or class of employees;

(b)    keep the copy or copies posted as set out in clause (a) until an approval is issued or a notice of refusal is given to the employer.  2004, c. 21, s. 4.

Criteria

(7)  The Director may issue an approval to the employer if the Director is of the view that it would be appropriate to do so.  2004, c. 21, s. 4.

Same

(8)  In deciding whether it is appropriate to issue an approval to the employer, the Director may take into consideration any factors that he or she considers relevant, and, without restricting the generality of the foregoing, he or she may consider,

(a)    any current or past contraventions of this Act or the regulations on the part of the employer;

(b)    the health and safety of employees; and

(c)    any prescribed factors.  2004, c. 21, s. 4.

Employees to whom approval applies

(9)  An approval applies to the employee or class of employees specified in the approval, and applies to every employee in a specified class whether or not the employee was employed by the employer at the time the approval was issued.  2004, c. 21, s. 4.

Same

(10)  For greater certainty, all the employees of the employer may constitute a specified class.  2004, c. 21, s. 4.

Approval to be posted

(11)  An employer to whom an approval is issued shall,

(a)    remove the copy or copies of the application that were posted under subsection (6); and

(b)    post the approval or a copy of the approval in at least one conspicuous place in every workplace of the employer where the employee or class of employees in respect of whom the approval applies works, so that it is likely to come to the attention of

the employee or class of employees.  2004, c. 21, s. 4.

Same

(12)  The employer shall keep each approval or copy posted as set out in clause (11) (b) until the approval expires or is revoked, and shall then remove it.  2004, c. 21, s. 4.

Expiry

(13)  An approval under this section expires on the date that is specified in the approval, which shall not be more than three years after the approval was issued.  2004, c. 21, s. 4.

Same

(14)  Despite subsection (13), an approval under this section that would allow an employee to work more than 60 hours in a week shall specify an expiry date that is not more than one year after the approval was issued.  2004, c. 21, s. 4.

Conditions

(15)  The Director may impose conditions on an approval. 2004, c. 21, s. 4.

Revocation

(16)  The Director may revoke an approval on giving the employer such notice as the Director considers reasonable in the circumstances.  2004, c. 21, s. 4.

Criteria

(17)  In deciding whether to impose conditions on or to revoke an approval, the Director may take into consideration any factors that he or she considers relevant, including but not limited to any factor that the Director could consider under subsection (8).  2004, c. 21, s. 4.

Further applications

(18)  For greater certainty, nothing in this section prevents an employer from applying for an approval after an earlier approval expires or is revoked or after an application is refused.  2004, c. 21, s. 4.

Refusal to approve

(19)  If the Director decides that it is inappropriate to issue an approval to the employer, the Director shall give notice to the employer that the application for approval has been refused.  2004, c. 21, s. 4.

Notice to be posted

(20)  An employer who receives notice from the Director that an application has been refused shall,

(a)    remove the copy or copies of the application that were posted under subsection (6); and

(b)    for the 60-day period following the date on which the notice was issued, post and keep posted the notice or a copy of it in at least one conspicuous place in every workplace of the employer where the employee or the class of employees in respect of whom the application applied works, so that it is likely to come to the attention of that employee or class of employees.  2004, c. 21, s. 4.

Termination of old approvals

(21)  Any approval granted by the Director under a regulation made under paragraph 8 of subsection 141 (1), as that paragraph read on February 28, 2005, ceases to have effect on March 1, 2005.  2004, c. 21, s. 4.

Time for applications

(22)  An application under subsection (1) may be made on or after the day the *Employment Standards Amendment Act (Hours of Work and Other Matters), 2004* receives Royal Assent.  2004, c. 21, s. 4.

Non-application of s. 5 (2)

**17.2**  Despite subsection 5 (2), an employer shall not require or permit an employee to work more than the limit specified in clause 17 (1) (b), except in accordance with subsection 17 (3) or (4), even if one or more provisions in the employee's employment contract that directly relate to limits on hours of work provide a greater benefit, within the meaning of subsection 5 (2), to an employee than is provided by section 17.  2004, c. 21, s. 4.

Delegation by Director

**17.3**  (1)  The Director may authorize an individual employed in the Ministry to exercise a power or to perform a duty conferred on the Director under section 17.1, either orally or in writing.  2004, c. 21, s. 4.

Residual powers

(2)  The Director may exercise a power conferred on the Director under section 17.1 even if he or she has delegated it to a person under subsection (1).  2004, c. 21, s. 4.

Hours free from work

**18.**  (1)  An employer shall give an employee a period of at least 11 consecutive hours free from performing work in each day.  2000, c. 41, s. 18 (1); 2002, c. 18, Sched. J, s. 3 (10).

Exception

(2)  Subsection (1) does not apply to an employee who is on call and called in during a period in which the employee would not otherwise be expected to perform work for his or her employer.  2000, c. 41, s. 18 (2).

Free from work between shifts

(3)  An employer shall give an employee a period of at least eight hours free from the performance of work between shifts unless the total time worked on successive shifts does not exceed

13 hours or unless the employer and the employee agree otherwise.  2000, c. 41, s. 18 (3).

Weekly or biweekly free time requirements

(4)  An employer shall give an employee a period free from the performance of work equal to,

(a)    at least 24 consecutive hours in every work week; or

(b)    at least 48 consecutive hours in every period of two consecutive work weeks.  2000, c. 41, s. 18 (4).

Exceptional circumstances

**19.**  An employer may require an employee to work more than the maximum number of hours permitted under section 17 or to work during a period that is required to be free from performing work under section 18 only as follows, but only so far as is necessary to avoid serious interference with the ordinary working of the employer's establishment or operations:

1.    To deal with an emergency.

2.    If something unforeseen occurs, to ensure the continued delivery of essential public services, regardless of who delivers those services.

3.    If something unforeseen occurs, to ensure that continuous processes or seasonal operations are not interrupted.

4.    To carry out urgent repair work to the employer's plant or equipment.  2000, c. 41, s. 19.

Eating periods

**20.**  (1)  An employer shall give an employee an eating period of at least 30 minutes at intervals that will result in the employee working no more than five consecutive hours without an eating period.  2000, c. 41, s. 20 (1).

Exception

(2)  Subsection (1) does not apply if the employer and the employee agree, whether or not in writing, that the employee is to be given two eating periods that together total at least 30 minutes in each consecutive five-hour period.  2000, c. 41, s. 20 (2).

Payment not required

**21.**  An employer is not required to pay an employee for an eating period in which work is not being performed unless his or her employment contract requires such payment.  2000, c. 41, s. 21.

Director to prepare document

**21.1**  (1)  The Director shall prepare and publish a document that describes such rights of employees and obligations of employers under this Part and Part VIII as the Director believes an employee should be made aware of in connection with an agreement referred to in subsection 17 (2) or clause 17 (3) (a). 2004, c. 21, s. 5.

If document not up to date

(2)  If the Director believes that a document prepared under subsection (1) has become out of date, he or she shall prepare and publish a new document.  2004, c. 21, s. 5.

PART Viii
OVERTIME PAY

Overtime threshold

**22.**  (1)  An employer shall pay an employee overtime pay of at least one and one-half times his or her regular rate for each hour of work in excess of 44 hours in each week or, if another threshold is prescribed, that prescribed threshold.  2000, c. 41, s. 22 (1).

Averaging

(2)  An employee's hours of work may be averaged over

separate, non-overlapping, contiguous periods of two or more consecutive weeks for the purpose of determining the employee's entitlement, if any, to overtime pay if,

(a)   the employee has made an agreement with the employer that his or her hours of work may be averaged over periods of a specified number of weeks;

(b)   the employer has received an approval under section 22.1 that applies to the employee or a class of employees that includes the employee; and

(c)   the averaging period does not exceed the lesser of,

(i)   the number of weeks specified in the agreement, and

(ii)   the number of weeks specified in the approval. 2004, c. 21, s. 6 (1).

Same, pending approval

(2.1)  Despite subsection (2), an employee's hours of work may be averaged for the purpose of determining the employee's entitlement, if any, to overtime pay even though the employer has not received the approval described in clause (2) (b), if,

(a)   the employee has made an agreement described in clause (2) (a) with the employer;

(b)   the employer has served on the Director an application for an approval under section 22.1;

(c)   the application is for an approval that applies to the employee or to a class of employees that includes the employee;

(d)   30 days have passed since the application was served on the Director;

(e)   the employer has not received a notice that the application has been refused;

(f)   the employer's most recent previous application, if any, for an approval under section 22.1 was not refused;

(g)   the most recent approval, if any, received by the employer under section 22.1 was not revoked; and

(h)   the employee's hours of work, pending the approval, are averaged over separate, non-overlapping, contiguous periods of not more than two consecutive weeks.  2004, c. 21, s. 6 (1).

Transition: certain agreements

(2.2)  For the purposes of this section, each of the following agreements shall be treated as if it were an agreement described in clause (2) (a):

1.   An agreement to average hours of work made under a predecessor to this Act.

2.   An agreement to average hours of work made under this section as it read on February 28, 2005.

3.   An agreement to average hours of work that complies with the conditions prescribed by the regulations made under paragraph 7 of subsection 141 (1) as it read on February 28, 2005. 2004, c. 21, s. 6 (1).

Term of agreement

(3)  An averaging agreement is not valid unless it provides for an expiry date and, if it involves an employee who is not represented by a trade union, the expiry date shall not be more than two years after the day the agreement takes effect.  2000, c. 41, s. 22 (3).

Agreement may be renewed

(4)  Nothing in subsection (3) prevents an employer and employee from agreeing to renew or replace an averaging agreement.  2000, c. 41, s. 22 (4).

Existing agreement

(5)  An averaging agreement made before this Act comes into force that was approved by the Director under the *Employment Standards Act* is valid for the purposes of subsection (2) until,

(a)    one year after the day this section comes into force; or

(b)    if the employee is represented by a trade union and a collective agreement applies to the employee,

(i)    the day a subsequent collective agreement that applies to the employee comes into operation, or

(ii)    if no subsequent collective agreement comes into operation within one year after the existing agreement expires, at the end of that year.  2000, c. 41, s. 22 (5); 2001, c. 9, Sched. I, s. 1 (4).

Transition: application for approval before commencement

(5.1)  If the employer applies for an approval under section 22.1 before March 1, 2005, the 30-day period referred to in clause (2.1) (d) shall be deemed to end on the later of,

(a)    the last day of the 30-day period; and

(b)    March 1, 2005.  2004, c. 21, s. 6 (2).

Agreement irrevocable

(6)  No averaging agreement referred to in this section may be revoked before it expires unless the employer and the employee agree to revoke it.  2000, c. 41, s. 22 (6).

Time off in lieu

(7)  The employee may be compensated for overtime hours by receiving one and one-half hours of paid time off work for each hour of overtime worked instead of overtime pay if,

Case 1:06-cv-00507-JF-MPT    Document 6-3    Filed 08/22/2006    Page 48 of 60
Page 47 of 175

(a)    the employee and the employer agree to do so; and

(b)    the paid time off work is taken within three months of the work week in which the overtime was earned or, with the employee's agreement, within 12 months of that work week.  2000, c. 41, s. 22 (7).

**Where employment ends**

(8)  If the employment of an employee ends before the paid time off is taken under subsection (7), the employer shall pay the employee overtime pay for the overtime hours that were worked in accordance with subsection 11 (5).  2000, c. 41, s. 22 (8).

**Changing work**

(9)  If an employee who performs work of a particular kind or character is exempted from the application of this section by the regulations or the regulations prescribe an overtime threshold of other than 44 hours for an employee who performs such work, and the duties of an employee's position require him or her to perform both that work and work of another kind or character, this Part shall apply to the employee in respect of all work performed by him or her in a work week unless the time spent by the employee performing that other work constitutes less than half the time that the employee spent fulfilling the duties of his or her position in that work week.  2000, c. 41, s. 22 (9).

**Averaging: application for approval**

**22.1**  (1)  An employer may apply to the Director for an approval permitting the employer to average an employee's hours of work for the purpose of determining the employee's entitlement, if any, to overtime pay.  2004, c. 21, s. 7.

**Form**

(2)  The application shall be in a form provided by the Director.  2004, c. 21, s. 7.

**Service of application**

(3)  The application shall be served on the Director,

(a)    by being delivered to the Director's office on a day and at a time when it is open;

(b)    by being mailed to the Director's office using a method of mail delivery that allows delivery to be verified; or

(c)    by being sent to the Director's office by electronic transmission or by telephonic transmission of a facsimile.  2004, c. 21, s. 7.

When service effective

(4)  Service under subsection (3) shall be deemed to be effected,

(a)    in the case of service under clause (3) (a), on the day shown on a receipt or acknowledgment provided to the employer by the Director or his or her representative;

(b)    in the case of service under clause (3) (b), on the day shown in the verification;

(c)    in the case of service under clause (3) (c), on the day on which the electronic or telephonic transmission is made, subject to subsection (5).  2004, c. 21, s. 7.

Same

(5)  Service shall be deemed to be effected on the next day on which the Director's office is not closed, if the electronic or telephonic transmission is made,

(a)    on a day on which the Director's office is closed; or

(b)    after 5 p.m. on any day.  2004, c. 21, s. 7.

Criteria

(6)  The Director may issue an approval to the employer if the

Director is of the view that it would be appropriate to do so.  2004, c. 21, s. 7.

Same

(7)  In deciding whether it is appropriate to issue the approval to the employer, the Director may take into consideration any factors that he or she considers relevant, and, without restricting the generality of the foregoing, he or she may consider,

(a)  any current or past contraventions of this Act or the regulations on the part of the employer;

(b)  the health and safety of employees; and

(c)  any prescribed factors.  2004, c. 21, s. 7.

Employees to whom approval applies

(8)  An approval applies to the employee or class of employees specified in the approval, and applies to every employee in a specified class whether or not the employee was employed by the employer at the time the approval was issued.  2004, c. 21, s. 7.

Same

(9)  For greater certainty, all the employees of the employer may constitute a specified class.  2004, c. 21, s. 7.

Approval to be posted

(10)  An employer to whom an approval is issued shall post the approval or a copy of the approval in at least one conspicuous place in every workplace of the employer where the employee or the class of employees in respect of whom the approval applies works, so that it is likely to come to the attention of that employee or class of employees.  2004, c. 21, s. 7.

Same

(11)  The employer shall keep each approval or copy posted as

set out in subsection (10) until the approval expires or is revoked, and shall then remove it.  2004, c. 21, s. 7.

Expiry

(12)  An approval under this section expires on the date on which the averaging agreement between the employer and the employee expires, or on the earlier date that the Director specifies in the approval.  2004, c. 21, s. 7.

Conditions

(13)  The Director may impose conditions on an approval. 2004, c. 21, s. 7.

Revocation

(14)  The Director may revoke an approval on giving the employer such notice as the Director considers reasonable in the circumstances.  2004, c. 21, s. 7.

Criteria

(15)  In deciding whether to impose conditions on or to revoke an approval, the Director may take into consideration any factors that he or she considers relevant, including but not limited to any factor that the Director could consider under subsection (7).  2004, c. 21, s. 7.

Further applications

(16)  For greater certainty, nothing in this section prevents an employer from applying for an approval after an earlier approval expires or is revoked or after an application is refused.  2004, c. 21, s. 7.

Refusal to approve

(17)  If the Director decides that it is inappropriate to issue an approval to the employer, the Director shall give notice to the employer that the application for approval has been refused.  2004,

c. 21, s. 7.

Termination of old approvals

(18)  Any approval of an averaging agreement that is granted by the Director under a regulation made under paragraph 7 of subsection 141 (1), as that paragraph read on February 28, 2005, ceases to have effect on March 1, 2005.  2004, c. 21, s. 7.

Time for applications

(19)  An application under subsection (1) may be made on or after the day the *Employment Standards Amendment Act (Hours of Work and Other Matters), 2004* receives Royal Assent.  2004, c. 21, s. 7.

Delegation by Director

**22.2**  (1)  The Director may authorize an individual employed in the Ministry to exercise a power or to perform a duty conferred on the Director under section 22.1, either orally or in writing.  2004, c. 21, s. 7.

Residual powers

(2)  The Director may exercise a power conferred on the Director under section 22.1 even if he or she has delegated it to a person under subsection (1).  2004, c. 21, s. 7.

PART ix
MINIMUM WAGE

Minimum wage

**23.**  (1)  An employer shall pay employees at least the prescribed minimum wage.  2000, c. 41, s. 23 (1).

Room or board

(2)  If an employer provides room or board to an employee, the prescribed amount with respect to room or board shall be deemed

to have been paid by the employer to the employee as wages. 2000, c. 41, s. 23 (2).

Determining compliance

(3) Compliance with this Part shall be determined on a pay period basis. 2000, c. 41, s. 23 (3).

Hourly rate

(4) Without restricting the generality of subsection (3), if the prescribed minimum wage applicable with respect to an employee is expressed as an hourly rate, the employer shall not be considered to have complied with this Part unless,

(a) when the amount of regular wages paid to the employee in the pay period is divided by the number of hours he or she worked in the pay period, other than hours for which the employee was entitled to receive overtime pay or premium pay, the quotient is at least equal to the prescribed minimum wage; and

(b) when the amount of overtime pay and premium pay paid to the employee in the pay period is divided by the number of hours worked in the pay period for which the employee was entitled to receive overtime pay or premium pay, the quotient is at least equal to one and one half times the prescribed minimum wage. 2000, c. 41, s. 23 (4).

part x
public holidays

Public holiday pay

**24.** (1) An employee's public holiday pay for a given public holiday shall be equal to,

(a) the total amount of regular wages earned and vacation pay payable to the employee in the four work weeks before the work week in which the public holiday occurred, divided by 20; or

(b) if some other manner of calculation is prescribed, the

amount determined using that manner of calculation. 2000, c. 41, s. 24 (1); 2002, c. 18, Sched. J, s. 3 (12).

Premium pay

(2)  An employer who is required under this Part to pay premium pay to an employee shall pay the employee at least one and one half times his or her regular rate. 2000, c. 41, s. 24 (2).

Two kinds of work

**25.** (1)  Subsection (2) applies with respect to an employee if,

(a)   an employee performs work of a particular kind or character in a work week in which a public holiday occurs;

(b)   the regulations exempt employees who perform work of that kind or character from the application of this Part; and

(c)   the duties of the employee's position also require him or her to perform work of another kind or character. 2000, c. 41, s. 25 (1).

Same

(2)  This Part applies to the employee with respect to that public holiday unless the time spent by the employee performing the work referred to in clause (1) (b) constitutes more than half the time that the employee spent fulfilling the duties of his or her position in that work week. 2000, c. 41, s. 25 (2).

Public holiday ordinarily a working day

**26.** (1)  If a public holiday falls on a day that would ordinarily be a working day for an employee and the employee is not on vacation that day, the employer shall give the employee the day off work and pay him or her public holiday pay for that day. 2000, c. 41, s. 26 (1).

Exception

(2)  The employee has no entitlement under subsection (1) if he or she fails, without reasonable cause, to work all of his or her last regularly scheduled day of work before the public holiday or all of his or her first regularly scheduled day of work after the public holiday.  2000, c. 41, s. 26 (2).

Agreement to work, ordinarily a working day

**27.**  (1)  An employee and employer may agree that the employee will work on a public holiday that would ordinarily be a working day for that employee, and if they do, section 26 does not apply to the employee.  2000, c. 41, s. 27 (1).

Employee's entitlement

(2)  Subject to subsections (3) and (4), if an employer and an employee make an agreement under subsection (1),

(a)  the employer shall pay to the employee wages at his or her regular rate for the hours worked on the public holiday and substitute another day that would ordinarily be a working day for the employee to take off work and for which he or she shall be paid public holiday pay as if the substitute day were a public holiday; or

(b)  if the employee and the employer agree, the employer shall pay to the employee public holiday pay for the day plus premium pay for each hour worked on that day.  2000, c. 41, s. 27 (2).

Restriction

(3)  A day that is substituted for a public holiday under clause (2) (a) shall be,

(a)  a day that is no more than three months after the public holiday; or

(b)  if the employee and the employer agree, a day that is no more than 12 months after the public holiday.  2000, c. 41, s. 27 (3).

Where certain work not performed

(4)  The employee's entitlement under subsection (2) is subject to the following rules:

1.  If the employee, without reasonable cause, performs none of the work that he or she agreed to perform on the public holiday, the employee has no entitlement under subsection (2).

2.  If the employee, with reasonable cause, performs none of the work that he or she agreed to perform on the public holiday, the employer shall give the employee a substitute day off work in accordance with clause (2) (a) or, if an agreement was made under clause (2) (b), public holiday pay for the public holiday. However, if the employee also fails, without reasonable cause, to work all of his or her last regularly scheduled day of work before the public holiday or all of his or her first regularly scheduled day of work after the public holiday, the employee has no entitlement under subsection (2).

3.  If the employee performs some of the work that he or she agreed to perform on the public holiday but fails, without reasonable cause, to perform all of it, the employer shall give the employee premium pay for each hour worked on the public holiday but the employee has no other entitlement under subsection (2).

4.  If the employee performs some of the work that he or she agreed to perform on the public holiday but fails, with reasonable cause, to perform all of it, the employer shall give the employee wages at his or her regular rate for the hours worked on the public holiday and a substitute day off work in accordance with clause (2) (a) or, if an agreement was made under clause (2) (b), public holiday pay for the public holiday plus premium pay for each hour worked on the public holiday. However, if the employee also fails, without reasonable cause, to work all of his or her last regularly scheduled day of work before the public holiday or all of his or her first regularly scheduled day of work after the public holiday, the employer shall give the employee premium pay for each hour worked on the public holiday but the employee has no other entitlement under subsection (2).

5.   If the employee performs all of the work that he or she agreed to perform on the public holiday but fails, without reasonable cause, to work all of his or her last regularly scheduled day of work before or all of his or her first regularly scheduled day of work after the public holiday, the employer shall give the employee premium pay for each hour worked on the public holiday but the employee has no other entitlement under subsection (2). 2000, c. 41, s. 27 (4); 2002, c. 18, Sched. J, s. 3 (13).

Requirement to work on a public holiday: certain operations

**28.**  (1)  If an employee is employed in a hospital, a continuous operation, or a hotel, motel, tourist resort, restaurant or tavern, the employer may require the employee to work on a public holiday that is ordinarily a working day for the employee and that is not a day on which the employee is on vacation, and if the employer does so, sections 26 and 27 do not apply to the employee.  2000, c. 41, s. 28 (1).

Employee's entitlement

(2)  Subject to subsections (3) and (4), if an employer requires an employee to work on a public holiday under subsection (1), the employer shall,

(a)   pay to the employee wages at his or her regular rate for the hours worked on the public holiday and substitute another day that would ordinarily be a working day for the employee to take off work and for which he or she shall be paid public holiday pay as if the substitute day were a public holiday; or

(b)   pay to the employee public holiday pay for the day plus premium pay for each hour worked on that day.  2000, c. 41, s. 28 (2).

Restriction

(3)  A day that is substituted for a public holiday under clause (2) (a) shall be,

(a)   a day that is no more than three months after the public holiday; or

(b)   if the employee and the employer agree, a day that is no more than 12 months after the public holiday.  2000, c. 41, s. 28 (3).

Where certain work not performed

(4)  The employee's entitlement under subsection (2) is subject to the following rules:

1.   If the employee, without reasonable cause, performs none of the work that he or she was required to perform on the public holiday, the employee has no entitlement under subsection (2).

2.   If the employee, with reasonable cause, performs none of the work that he or she was required to perform on the public holiday, the employer shall give the employee a substitute day off work in accordance with clause (2) (a) or public holiday pay for the public holiday under clause (2) (b), as the employer chooses. However, if the employee also fails, without reasonable cause, to work all of his or her last regularly scheduled day of work before the public holiday or all of his or her first regularly scheduled day of work after the public holiday, the employee has no entitlement under subsection (2).

3.   If the employee performs some of the work that he or she was required to perform on the public holiday but fails, without reasonable cause, to perform all of it, he or she is entitled to premium pay for each hour worked on the public holiday but has no other entitlement under subsection (2).

4.   If the employee performs some of the work that he or she was required to perform on the public holiday but fails, with reasonable cause, to perform all of it, the employer shall give the employee wages at his or her regular rate for the hours worked on the public holiday and a substitute day off work in accordance with clause (2) (a) or public holiday pay for the public holiday plus

premium pay for each hour worked on the public holiday under clause (2) (b), as the employer chooses. However, if the employee also fails, without reasonable cause, to work all of his or her last regularly scheduled day of work before the public holiday or all of his or her first regularly scheduled day of work after the public holiday, the employer shall give the employee premium pay for each hour worked on the public holiday but the employee has no other entitlement under subsection (2).

5.    If the employee performs all of the work that he or she was required to perform on the public holiday but fails, without reasonable cause, to work all of his or her last regularly scheduled day of work before or all of his or her first regularly scheduled day of work after the public holiday, the employer shall give the employee premium pay for each hour worked on the public holiday but the employee has no other entitlement under subsection (2). 2000, c. 41, s. 28 (4); 2002, c. 18, Sched. J, s. 3 (14).

Public holiday not ordinarily a working day

**29.** (1) If a public holiday falls on a day that would not ordinarily be a working day for an employee or a day on which the employee is on vacation, the employer shall substitute another day that would ordinarily be a working day for the employee to take off work and for which he or she shall be paid public holiday pay as if the substitute day were a public holiday. 2000, c. 41, s. 29 (1).

Restriction

(2) A day that is substituted for a public holiday under subsection (1) shall be,

(a)    a day that is no more than three months after the public holiday; or

(b)    if the employee and the employer agree, a day that is no more than 12 months after the public holiday. 2000, c. 41, s. 29 (2).

Employee on leave or lay-off

(2.1)  If a public holiday falls on a day that would not ordinarily be a working day for an employee and the employee is on a leave of absence under section 46 or 48 or on a layoff on that day, the employee is entitled to public holiday pay for the day but has no other entitlement under this Part with respect to the public holiday. 2002, c. 18, Sched. J, s. 3 (15).

Layoff resulting in termination

(2.2)  Subsection (2.1) does not apply to an employee if his or her employment has been terminated under clause 56 (1) (c) and the public holiday falls on or after the day on which the lay-off first exceeded the period of a temporary lay-off.  2002, c. 18, Sched. J, s. 3 (15).

Agreement re: public holiday pay

(3)  An employer and an employee may agree that, instead of complying with subsection (1), the employer shall pay the employee public holiday pay for the public holiday, and if they do subsection (1) does not apply to the employee.  2000, c. 41, s. 29 (3).

Exception

(4)  The employee has no entitlement under subsection (1), (2.1) or (3) if he or she fails, without reasonable cause, to work all of his or her last regularly scheduled day of work before the public holiday or all of his or her first regularly scheduled day of work after the public holiday.  2000, c. 41, s. 29 (4); 2002, c. 18, Sched. J, s. 3 (16).

Agreement to work where not ordinarily a working day

**30.**  (1)  An employee and employer may agree that the employee will work on a public holiday that falls on a day that would not ordinarily be a working day for that employee or on a day on which the employee is on vacation, and if they do, section 29 does not apply to the employee.  2000, c. 41, s. 30 (1).

Employee's entitlement

(2)  Subject to subsections (3) and (4), if an employer and an employee make an agreement under subsection (1),

(a)  the employer shall pay to the employee wages at his or her regular rate for the hours worked on the public holiday and substitute another day that would ordinarily be a working day for the employee to take off work and for which he or she shall be paid public holiday pay as if the substitute day were a public holiday; or

(b)  if the employer and employee agree, the employer shall pay the employee public holiday pay for the day plus premium pay for each hour worked.  2000, c. 41, s. 30 (2).

Restriction

(3)  A day that is substituted for a public holiday under clause (2) (a) shall be,

(a)  a day that is no more than three months after the public holiday; or

(b)  if the employee and the employer agree, a day that is no more than 12 months after the public holiday.  2000, c. 41, s. 30 (3).

Where certain work not performed

(4)  The employee's entitlement under subsection (2) is subject to the following rules:

1.  If the employee, without reasonable cause, performs none of the work that he or she agreed to perform on the public holiday, the employee has no entitlement under subsection (2).

2.  If the employee, with reasonable cause, performs none of the work that he or she agreed to perform on the public holiday, the employer shall give the employee a substitute day off work in accordance with clause (2) (a) or, if an agreement was made under clause (2) (b), public holiday pay for the public holiday.  However, if the employee also fails, without reasonable cause, to work all of his or her last regularly scheduled day of work before the public holiday

or all of his or her first regularly scheduled day of work after the public holiday, the employee has no entitlement under subsection (2).

3.  If the employee performs some of the work that he or she agreed to perform on the public holiday but fails, without reasonable cause, to perform all of it, the employer shall give the employee premium pay for each hour worked on the public holiday but the employee has no other entitlement under subsection (2).

4.  If the employee performs some of the work that he or she agreed to perform on the public holiday but fails, with reasonable cause, to perform all of the work that he or she agreed to perform on the public holiday, the employer shall give the employee wages at his or her regular rate for the hours worked on the public holiday and a substitute day off work in accordance with clause (2) (a) or, if an agreement was made under clause (2) (b), public holiday pay for the public holiday plus premium pay for each hour worked on the public holiday. However, if the employee also fails, without reasonable cause, to work all of his or her last regularly scheduled day of work before the public holiday or all of his or her first regularly scheduled day of work after the public holiday, the employer shall give the employee premium pay for each hour worked on the public holiday but the employee has no other entitlement under subsection (2).

5.  If the employee performs all of the work that he or she agreed to perform on the public holiday but fails, without reasonable cause, to work all of his or her last regularly scheduled day of work before or all of his or her first regularly scheduled day of work after the public holiday, the employer shall give the employee premium pay for each hour worked on the public holiday but the employee has no other entitlement under subsection (2). 2000, c. 41, s. 30 (4); 2002, c. 18, Sched. J, s. 3 (17).

Premium pay hours not overtime hours

**31.** If an employee receives premium pay for working on a public holiday, the hours worked shall not be taken into consideration in calculating overtime pay to which the employee

may be entitled.  2000, c. 41, s. 31.

If employment ends

**32.**  If the employment of an employee ends before a day that has been substituted for a public holiday under this Part, the employer shall pay the employee public holiday pay for that day in accordance with subsection 11 (5).  2000, c. 41, s. 32.

PART xi
VACATION WITH PAY

Right to vacation

**33.**  (1)  An employer shall give an employee a vacation of at least two weeks after each vacation entitlement year that he or she completes.  2002, c. 18, Sched. J, s. 3 (18).

Active and inactive employment

(2)  Both active employment and inactive employment shall be included for the purposes of subsection (1).  2002, c. 18, Sched. J, s. 3 (18).

Where vacation not taken in complete weeks

(3)  If an employee does not take his or her vacation in complete weeks and the 12-month period of employment to which the vacation relates begins on or after the day on which section 3 of Schedule J to the *Government Efficiency Act, 2002* comes into force, the employer shall base the number of days of vacation that the employee is entitled to on,

(a)    the number of days in the employee's regular work week;

(b)    if the employee does not have a regular work week, the average number of days the employee worked per week during the most recently completed vacation entitlement year.  2002, c. 18, Sched. J, s. 3 (18).

Same

(4)  If an employee does not take his or her vacation in complete weeks and the 12-month period of employment to which the vacation relates begins before the day on which section 3 of Schedule J to the *Government Efficiency Act, 2002* comes into force, the number of vacation days to which the employee is entitled shall be determined as follows:

1.    If the 12-month period of employment ends before the day on which section 3 of Schedule J to the *Government Efficiency Act, 2002* comes into force, the number of days of vacation to which the employee is entitled shall be determined under subsection (3) of this section as it read before the day on which section 3 of Schedule J to the *Government Efficiency Act, 2002* comes into force.

2.    If the 12-month period of employment had begun but not ended before the day on which section 3 of Schedule J to the *Government Efficiency Act, 2002* comes into force, the number of days of vacation to which the employee is entitled shall be the greater of,

i.    the number of days to which he or she would have been entitled under subsection (3) of this section as it read before the day on which section 3 of Schedule J to the *Government Efficiency Act, 2002* comes into force, and

ii.    the number of days to which he or she would be entitled under subsection (3) of this section as re-enacted by section 3 of Schedule J to the *Government Efficiency Act, 2002*. 2002, c. 18, Sched. J, s. 3 (18).

Alternative vacation entitlement year

Application

**34.**  (1)  This section applies if the employer establishes for an employee an alternative vacation entitlement year that starts on or after the day on which section 3 of Schedule J to the *Government*

*Efficiency Act, 2002* comes into force.  2002, c. 18, Sched. J, s. 3 (18).

Vacation for stub period

(2)  The employer shall do the following with respect to the stub period:

1.    The employer shall calculate the ratio between the stub period and 12 months.

2.    If the employee has a regular work week, the employer shall give him or her a vacation for the stub period that is equal to two weeks multiplied by the ratio calculated under paragraph 1.

3.    If the employee does not have a regular work week, the employer shall give him or her a vacation for the stub period that is equal to $2 \times A \times$ the ratio calculated under paragraph 1, where,

$A$ = the average number of days the employee worked per work week in the stub period.

2002, c. 18, Sched. J, s. 3 (18).

Active and inactive employment

(3)  Both active employment and inactive employment shall be included for the purposes of subsection (2).  2002, c. 18, Sched. J, s. 3 (18).

Timing of vacation

**35.** The employer shall determine when an employee shall take his or her vacation for a vacation entitlement year, subject to the following rules:

1.    The vacation shall be completed no later than 10 months after the end of the vacation entitlement year for which it is given.

2.    The vacation shall be a two-week period or two periods

of one week each, unless the employee requests in writing that the vacation be taken in shorter periods and the employer agrees to that request.  2002, c. 18, Sched. J, s. 3 (18).

Timing of vacation, alternative vacation entitlement year

**35.1** (1) This section applies if the employer establishes for an employee an alternative vacation entitlement year that starts on or after the day on which section 3 of Schedule J to the *Government Efficiency Act, 2002* comes into force.  2002, c. 18, Sched. J, s. 3 (18).

Same

(2) The employer shall determine when the employee shall take his or her vacation for the stub period, subject to the following rules:

1.   The vacation shall be completed no later than 10 months after the start of the first alternative vacation entitlement year.

2.   Subject to paragraphs 3 and 4, if the vacation entitlement is equal to two or more days, the vacation shall be taken in a period of consecutive days.

3.   Subject to paragraph 4, if the vacation entitlement is equal to more than five days, at least five vacation days shall be taken in a period of consecutive days and the remaining vacation days may be taken in a separate period of consecutive days.

4.   Paragraphs 2 and 3 do not apply if the employee requests in writing that the vacation be taken in shorter periods and the employer agrees to that request.  2002, c. 18, Sched. J, s. 3 (18).

Vacation pay

**35.2** An employer shall pay vacation pay to an employee who is entitled to vacation under section 33 or 34 equal to at least 4 per cent of the wages, excluding vacation pay, that the employee

earned during the period for which the vacation is given.  2002, c. 18, Sched. J, s. 3 (18).

When to pay vacation pay

**36.**  (1)  Subject to subsections (2) to (4), the employer shall pay vacation pay to the employee in a lump sum before the employee commences his or her vacation.  2000, c. 41, s. 36 (1); 2001, c. 9, Sched. I, s. 1 (5).

Same

(2)  If the employer pays the employee his or her wages in accordance with subsection 11 (4) or the employee does not take his or her vacation in complete weeks, the employer may pay the employee his or her vacation pay on or before the pay day for the period in which the vacation falls.  2000, c. 41, s. 36 (2).

Same

(3)  The employer may pay the employee vacation pay that accrues during a pay period on the pay day for that period if the employee agrees that it may be paid in that manner and,

(a)    the statement of wages provided for that period under subsection 12 (1) sets out, in addition to the information required by that subsection, the amount of vacation pay that is being paid separately from the amount of other wages that is being paid; or

(b)    a separate statement setting out the amount of vacation pay that is being paid is provided to the employee at the same time that the statement of wages is provided under subsection 12 (1).  2000, c. 41, s. 36 (3); 2001, c. 9, Sched. I, s. 1 (6); 2002, c. 18, Sched. J, s. 3 (19, 20).

Same

(4)  The employer may pay the employee vacation pay at a time agreed to by the employee.  2001, c. 9, Sched. I, s. 1 (7).

Payment during labour dispute

**37.** (1) If the employer has scheduled vacation for an employee and subsequently the employee goes on strike or is locked out during a time for which the vacation had been scheduled, the employer shall pay to the employee the vacation pay that would have been paid to him or her with respect to that vacation. 2000, c. 41, s. 37 (1).

Cancellation

(2) Subsection (1) applies despite any purported cancellation of the vacation. 2000, c. 41, s. 37 (2).

If employment ends

**38.** If an employee's employment ends at a time when vacation pay has accrued with respect to the employee, the employer shall pay the vacation pay that has accrued to the employee in accordance with subsection 11 (5). 2000, c. 41, s. 38.

Multi-employer plans

**39.** Sections 36, 37 and 38 do not apply with respect to an employee and his or her employer if,

    (a) the employee is represented by a trade union; and

    (b) the employer makes contributions for vacation pay to the trustees of a multi-employer vacation benefit plan. 2000, c. 41, s. 39; 2001, c. 9, Sched. I, s. 1 (8).

Vacation pay in trust

**40.** (1) Every employer shall be deemed to hold vacation pay accruing due to an employee in trust for the employee whether or not the employer has kept the amount for it separate and apart. 2000, c. 41, s. 40 (1).

Same

(2) An amount equal to vacation pay becomes a lien and charge upon the assets of the employer that in the ordinary course

of business would be entered in books of account, even if it is not entered in the books of account.  2000, c. 41, s. 40 (2).

Approval to forego vacation

**41.** (1) If the Director approves and an employee's employer agrees, an employee may be allowed to forego taking vacation to which he or she is entitled under this part.  2000, c. 41, s. 41 (1).

Vacation pay

(2) Nothing in subsection (1) allows the employer to forego paying vacation pay.  2000, c. 41, s. 41 (2).

Vacation statements

**41.1** (1) An employee is entitled to receive the following statements on making a written request:

1.   After the end of a vacation entitlement year, a statement in writing that sets out the information contained in the record the employer is required to keep under subsection 15.1 (2).

2.   After the end of a stub period, a statement in writing that sets out the information contained in the record the employer is required to keep under subsection 15.1 (3).  2002, c. 18, Sched. J, s. 3 (21).

When statement to be provided

(2) Subject to subsection (3), the statement shall be provided to the employee not later than the later of,

(a)   seven days after the employee makes his or her request; and

(b)   the first pay day after the employee makes his or her request.  2002, c. 18, Sched. J, s. 3 (21).

Same

(3)  If the request is made during the vacation entitlement year or stub period to which it relates, the statement shall be provided to the employee not later than the later of,

(a)    seven days after the start of the next vacation entitlement year or the first vacation entitlement year, as the case may be; and

(b)    the first pay day of the next vacation entitlement year or of the first vacation entitlement year, as the case may be.  2002, c. 18, Sched. J, s. 3 (21).

Restriction re frequency

(4)  The employer is not required to provide a statement to an employee more than once with respect to a vacation entitlement year or stub period.  2002, c. 18, Sched. J, s. 3 (21).

Exception

(5)  This section does not apply with respect to an employee whose employer pays vacation pay in accordance with subsection 36 (3).  2002, c. 18, Sched. J, s. 3 (21).

Transition

(6)  This section does not apply with respect to a vacation entitlement year that is completed before the day on which section 3 of Schedule J to the *Government Efficiency Act, 2002* comes into force.  2002, c. 18, Sched. J, s. 3 (21).

PART Xii
EQUAL PAY FOR EQUAL WORK

Equal pay for equal work

**42.**  (1)  No employer shall pay an employee of one sex at a rate of pay less than the rate paid to an employee of the other sex when,

(a)    they perform substantially the same kind of work in the

same establishment;

    (b)   their performance requires substantially the same skill, effort and responsibility; and

    (c)   their work is performed under similar working conditions.  2000, c. 41, s. 42 (1).

## Exception

    (2)  Subsection (1) does not apply when the difference in the rate of pay is made on the basis of,

    (a)   a seniority system;

    (b)   a merit system;

    (c)   a system that measures earnings by quantity or quality of production; or

    (d)   any other factor other than sex.  2000, c. 41, s. 42 (2).

## Reduction prohibited

    (3)  No employer shall reduce the rate of pay of an employee in order to comply with subsection (1).  2000, c. 41, s. 42 (3).

## Organizations

    (4)  No trade union or other organization shall cause or attempt to cause an employer to contravene subsection (1).  2000, c. 41, s. 42 (4).

## Deemed wages

    (5)  If an employment standards officer finds that an employer has contravened subsection (1), the officer may determine the amount owing to an employee as a result of the contravention and that amount shall be deemed to be unpaid wages for that employee.  2000, c. 41, s. 42 (5).

PART Xiii
BENEFIT plans

Definition

**43.** In this Part,

"employer" means an employer as defined in subsection 1 (1), and includes a group or number of unaffiliated employers or an association of employers acting for an employer in relation to a pension plan, a life insurance plan, a disability insurance plan, a disability benefit plan, a health insurance plan or a health benefit plan. 2000, c. 41, s. 43.

Differentiation prohibited

**44.** (1) Except as prescribed, no employer or person acting directly on behalf of an employer shall provide, offer or arrange for a benefit plan that treats any of the following persons differently because of the age, sex or marital status of employees:

1. Employees.

2. Beneficiaries.

3. Survivors.

4. Dependants. 2000, c. 41, s. 44 (1); 2004, c. 15, s. 1.

Causing contravention prohibited

(2) No organization of employers or employees and no person acting directly on behalf of such an organization shall, directly or indirectly, cause or attempt to cause an employer to contravene subsection (1). 2000, c. 41, s. 44 (2).

PART XIv
LEAVES OF ABSENCE

Definitions

**45.** In this Part,

"parent" includes a person with whom a child is placed for adoption and a person who is in a relationship of some permanence with a parent of a child and who intends to treat the child as his or her own, and "child" has a corresponding meaning; ("père ou mère")

"spouse" means,

(a)    a spouse as defined in section 1 of the *Family Law Act*, or

(b)    either of two persons who live together in a conjugal relationship outside marriage. ("conjoint")  2000, c. 41, s. 45; 2001, c. 9, Sched. I, s. 1 (9); 2004, c. 15, s. 2; 2005, c. 5, s. 23.

Pregnancy Leave

Pregnancy leave

**46.**  (1)  A pregnant employee is entitled to a leave of absence without pay unless her due date falls fewer than 13 weeks after she commenced employment.  2000, c. 41, s. 46 (1).

When leave may begin

(2)  An employee may begin her pregnancy leave no earlier than the earlier of,

(a)    the day that is 17 weeks before her due date; and

(b)    the day on which she gives birth.  2000, c. 41, s. 46 (2).

Exception

(3)  Clause (2) (b) does not apply with respect to a pregnancy that ends with a still-birth or miscarriage.  2000, c. 41, s. 46 (3).

Latest day for beginning pregnancy leave

(3.1)  An employee may begin her pregnancy leave no later

than the earlier of,

(a)   her due date; and

(b)   the day on which she gives birth.  2001, c. 9, Sched. I, s. 1 (10).

Notice

(4)  An employee wishing to take pregnancy leave shall give the employer,

(a)   written notice at least two weeks before the day the leave is to begin; and

(b)   if the employer requests it, a certificate from a legally qualified medical practitioner stating the due date.  2000, c. 41, s. 46 (4).

Notice to change date

(5)  An employee who has given notice to begin pregnancy leave may begin the leave,

(a)   on an earlier day than was set out in the notice, if the employee gives the employer a new written notice at least two weeks before that earlier day; or

(b)   on a later day than was set out in the notice, if the employee gives the employer a new written notice at least two weeks before the day set out in the original notice.  2000, c. 41, s. 46 (5).

Same, complication, etc.

(6)  If an employee stops working because of a complication caused by her pregnancy or because of a birth, still-birth or miscarriage that occurs earlier than the due date, subsection (4) does not apply and the employee shall, within two weeks after stopping work, give the employer,

(a)    written notice of the day the pregnancy leave began or is to begin; and

(b)    if the employer requests it, a certificate from a legally qualified medical practitioner stating,

(i)    in the case of an employee who stops working because of a complication caused by her pregnancy, that she is unable to perform the duties of her position because of the complication and stating her due date,

(ii)    in any other case, the due date and the actual date of the birth, still-birth or miscarriage.  2000, c. 41, s. 46 (6).

End of pregnancy leave

**47.** (1)  An employee's pregnancy leave ends,

(a)    if she is entitled to parental leave, 17 weeks after the pregnancy leave began;

(b)    if she is not entitled to parental leave, on the day that is the later of,

(i)    17 weeks after the pregnancy leave began, and

(ii)    six weeks after the birth, still-birth or miscarriage.  2000, c. 41, s. 47 (1).

Ending leave early

(2)  An employee may end her leave earlier than the day set out in subsection (1) by giving her employer written notice at least four weeks before the day she wishes to end her leave.  2000, c. 41, s. 47 (2).

Changing end date

(3)  An employee who has given notice under subsection (2) to end her pregnancy leave may end the leave,

(a)   on an earlier day than was set out in the notice, if the employee gives the employer a new written notice at least four weeks before the earlier day; or

(b)   on a later day than was set out in the notice, if the employee gives the employer a new written notice at least four weeks before the day indicated in the original notice.  2000, c. 41, s. 47 (3).

Employee not returning

(4)  An employee who takes pregnancy leave shall not terminate her employment before the leave expires or when it expires without giving the employer at least four weeks' written notice of the termination.  2000, c. 41, s. 47 (4).

Exception

(5)  Subsection (4) does not apply if the employer constructively dismisses the employee.  2000, c. 41, s. 47 (5).

Parental Leave

Parental leave

**48.**  (1)  An employee who has been employed by his or her employer for at least 13 weeks and who is the parent of a child is entitled to a leave of absence without pay following the birth of the child or the coming of the child into the employee's custody, care and control for the first time.  2000, c. 41, s. 48 (1).

When leave may begin

(2)  An employee may begin parental leave no later than 52 weeks after the day the child is born or comes into the employee's custody, care and control for the first time.  2000, c. 41, s. 48 (2).

Restriction if pregnancy leave taken

(3)  An employee who has taken pregnancy leave must begin her parental leave when her pregnancy leave ends unless the child

has not yet come into her custody, care and control for the first time.  2000, c. 41, s. 48 (3).

Notice

(4)  Subject to subsection (6), an employee wishing to take parental leave shall give the employer written notice at least two weeks before the day the leave is to begin.  2000, c. 41, s. 48 (4).

Notice to change date

(5)  An employee who has given notice to begin parental leave may begin the leave,

(a)   on an earlier day than was set out in the notice, if the employee gives the employer a new written notice at least two weeks before that earlier day; or

(b)   on a later day than was set out in the notice, if the employee gives the employer a new written notice at least two weeks before the day set out in the original notice.  2000, c. 41, s. 48 (5).

If child earlier than expected

(6)  If an employee stops working because a child comes into the employee's custody, care and control for the first time earlier than expected,

(a)   the employee's parental leave begins on the day he or she stops working; and

(b)   the employee must give the employer written notice that he or she is taking parental leave within two weeks after stopping work.  2000, c. 41, s. 48 (6).

End of parental leave

**49.**  (1)  An employee's parental leave ends 35 weeks after it began, if the employee also took pregnancy leave and 37 weeks after it began, otherwise.  2000, c. 41, s. 49 (1).

Ending leave early

(2)  An employee may end his or her parental leave earlier than the day set out in subsection (1) by giving the employer written notice at least four weeks before the day he or she wishes to end the leave.  2000, c. 41, s. 49 (2).

Changing end date

(3)  An employee who has given notice to end his or her parental leave may end the leave,

(a)   on an earlier day than was set out in the notice, if the employee gives the employer a new written notice at least four weeks before the earlier day; or

(b)   on a later day than was set out in the notice, if the employee gives the employer a new written notice at least four weeks before the day indicated in the original notice.  2000, c. 41, s. 49 (3).

Employee not returning

(4)  An employee who takes parental leave shall not terminate his or her employment before the leave expires or when it expires without giving the employer at least four weeks' written notice of the termination.  2000, c. 41, s. 49 (4).

Exception

(5)  Subsection (4) does not apply if the employer constructively dismisses the employee.  2000, c. 41, s. 49 (5).

Family Medical Leave

Family medical leave

**49.1**  (1)  In this section,

"qualified health practitioner" means a person who is qualified to practise medicine under the laws of the jurisdiction in which care or

treatment is provided to the individual described in subsection (3) or, in the prescribed circumstances, a member of a prescribed class of health practitioners; ("practicien de la santé qualifié")

"week" means a period of seven consecutive days beginning on Sunday and ending on Saturday. ("semaine")  2004, c. 15, s. 3.

Entitlement to leave

   (2)  An employee is entitled to a leave of absence without pay of up to eight weeks to provide care or support to an individual described in subsection (3) if a qualified health practitioner issues a certificate stating that the individual has a serious medical condition with a significant risk of death occurring within a period of 26 weeks or such shorter period as may be prescribed.  2004, c. 15, s. 3.

Application of subs. (2)

   (3)  Subsection (2) applies in respect of the following individuals:

   1.   The employee's spouse.

   2.   A parent, step-parent or foster parent of the employee.

   3.   A child, step-child or foster child of the employee or the employee's spouse.

   4.   Any individual prescribed as a family member for the purpose of this section.  2004, c. 15, s. 3.

Earliest date leave can begin

   (4)  The employee may begin a leave under this section no earlier than the first day of the week in which the period referred to in subsection (2) begins.  2004, c. 15, s. 3.

Latest date employee can remain on leave

   (5)  The employee may not remain on a leave under this section after the earlier of the following dates:

1.  The last day of the week in which the individual described in subsection (3) dies.

2.  The last day of the week in which the period referred to in subsection (2) ends.  2004, c. 15, s. 3.

Two or more employees

(6)  If two or more employees take leaves under this section in respect of a particular individual, the total of the leaves taken by all the employees shall not exceed eight weeks during the period referred to in subsection (2) that applies to the first certificate issued for the purpose of this section.  2004, c. 15, s. 3.

Full-week periods

(7)  An employee may take a leave under this section only in periods of entire weeks.  2004, c. 15, s. 3.

Advising employer

(8)  An employee who wishes to take leave under this section shall advise his or her employer in writing that he or she will be doing so.  2004, c. 15, s. 3.

Same

(9)  If the employee must begin the leave before advising the employer, the employee shall advise the employer of the leave in writing as soon as possible after beginning it.  2004, c. 15, s. 3.

Copy of certificate

(10)  If requested by the employer, the employee shall provide the employer with a copy of the certificate referred to in subsection (2) as soon as possible.  2004, c. 15, s. 3.

Further leave

(11)  If an employee takes a leave under this section and the individual referred to in subsection (3) does not die within the period

referred to in subsection (2), the employee may, in accordance with this section, take another leave and, for that purpose, the reference in subsection (6) to "the first certificate" shall be deemed to be a reference to the first certificate issued after the end of that period. 2004, c. 15, s. 3.

Leave under s. 50

(12)  An employee's entitlement to leave under this section is in addition to any entitlement to leave under section 50.  2004, c. 15, s. 3.

Emergency Leave

Emergency leave

**50.**  (1)  An employee whose employer regularly employs 50 or more employees is entitled to a leave of absence without pay because of any of the following:

1.   A personal illness, injury or medical emergency.

2.   The death, illness, injury or medical emergency of an individual described in subsection (2).

3.   An urgent matter that concerns an individual described in subsection (2).  2000, c. 41, s. 50 (1).

Same

(2)  Paragraphs 2 and 3 of subsection (1) apply with respect to the following individuals:

1.   The employee's spouse.

2.   A parent, step-parent or foster parent of the employee or the employee's spouse.

3.   A child, step-child or foster child of the employee or the employee's spouse.

    4.    A grandparent, step-grandparent, grandchild or step-grandchild of the employee or of the employee's spouse.

    5.    The spouse of a child of the employee.

    6.    The employee's brother or sister.

    7.    A relative of the employee who is dependent on the employee for care or assistance.  2000, c. 41, s. 50 (2); 2004, c. 15, s. 4.

Advising employer

    (3)  An employee who wishes to take leave under this section shall advise his or her employer that he or she will be doing so.  2000, c. 41, s. 50 (3).

Same

    (4)  If the employee must begin the leave before advising the employer, the employee shall advise the employer of the leave as soon as possible after beginning it.  2000, c. 41, s. 50 (4).

Limit

    (5)  An employee is entitled to take a total of 10 days' leave under this section in each calendar year.  2000, c. 41, s. 50 (5); 2004, c. 21, s. 8.

Leave deemed to be taken in entire days

    (6)  If an employee takes any part of a day as leave under this section, the employer may deem the employee to have taken one day's leave on that day for the purposes of subsection (5).  2000, c. 41, s. 50 (6).

Evidence

    (7)  An employer may require an employee who takes leave under this section to provide evidence reasonable in the circumstances that the employee is entitled to the leave.  2000,

c. 41, s. 50 (7).

General Provisions Concerning Leaves

Rights during leave

**51.** (1)  During any leave under this Part, an employee continues to participate in each type of benefit plan described in subsection (2) that is related to his or her employment unless he or she elects in writing not to do so.  2000, c. 41, s. 51 (1).

Benefit plans

(2)  Subsection (1) applies with respect to pension plans, life insurance plans, accidental death plans, extended health plans, dental plans and any prescribed type of benefit plan.  2000, c. 41, s. 51 (2).

Employer contributions

(3)  During an employee's leave under this Part, the employer shall continue to make the employer's contributions for any plan described in subsection (2) unless the employee gives the employer a written notice that the employee does not intend to pay the employee's contributions, if any.  2000, c. 41, s. 51 (3).

Leave and vacation conflict

**51.1** (1)  An employee who is on leave under this Part may defer taking vacation until the leave expires or, if the employer and employee agree to a later date, until that later date if,

(a)   under the terms of the employee's employment contract, the employee may not defer taking vacation that would otherwise be forfeited or the employee's ability to do so is restricted; and

(b)   as a result, in order to exercise his or her right to leave under this Part, the employee would have to,

(i)   forfeit vacation or vacation pay, or

(ii)    take less than his or her full leave entitlement. 2001, c. 9, Sched. I, s. 1 (11).

Leave and completion of vacation conflict

(2)  If an employee is on leave under this Part on the day by which his or her vacation must be completed under paragraph 1 of section 35 or paragraph 1 of subsection 35.1 (2), the uncompleted part of the vacation shall be completed immediately after the leave expires or, if the employer and employee agree to a later date, beginning on that later date.  2001, c. 9, Sched. I, s. 1 (11); 2002, c. 18, Sched. J, s. 3 (22).

Alternative right, vacation pay

(3)  An employee to whom this section applies may forego vacation and receive vacation pay in accordance with section 41 rather than completing his or her vacation under this section.  2001, c. 9, Sched. I, s. 1 (11).

Length of employment

**52.**  (1)  The period of an employee's leave under this Part shall be included in calculating any of the following for the purpose of determining his or her rights under an employment contract:

1.    The length of his or her employment, whether or not it is active employment.

2.    The length of the employee's service whether or not that service is active.

3.    The employee's seniority.  2000, c. 41, s. 52 (1).

Exception

(2)  The period of an employee's leave shall not be included in determining whether he or she has completed a probationary period under an employment contract.  2000, c. 41, s. 52 (2).

Reinstatement

**53.** (1) Upon the conclusion of an employee's leave under this Part, the employer shall reinstate the employee to the position the employee most recently held with the employer, if it still exists, or to a comparable position, if it does not. 2000, c. 41, s. 53 (1).

Exception

(2) Subsection (1) does not apply if the employment of the employee is ended solely for reasons unrelated to the leave. 2000, c. 41, s. 53 (2).

Wage rate

(3) The employer shall pay a reinstated employee at a rate that is equal to the greater of,

(a)   the rate that the employee most recently earned with the employer; and

(b)   the rate that the employee would be earning had he or she worked throughout the leave. 2000, c. 41, s. 53 (3).

PART Xv
TERMINATION and severance OF EMPLOYMENT

Termination of Employment

No termination without notice

**54.** No employer shall terminate the employment of an employee who has been continuously employed for three months or more unless the employer,

(a)   has given to the employee written notice of termination in accordance with section 57 or 58 and the notice has expired; or

(b)   has complied with section 61. 2000, c. 41, s. 54.

Prescribed employees not entitled

**55.** Prescribed employees are not entitled to notice of

termination or termination pay under this Part.  2000, c. 41, s. 55.

What constitutes termination

**56.**  (1)  An employer terminates the employment of an employee for purposes of section 54 if,

(a)   the employer dismisses the employee or otherwise refuses or is unable to continue employing him or her;

(b)   the employer constructively dismisses the employee and the employee resigns from his or her employment in response to that within a reasonable period; or

(c)   the employer lays the employee off for a period longer than the period of a temporary lay-off.  2000, c. 41, s. 56 (1).

Temporary lay-off

(2)  For the purpose of clause (1) (c), a temporary layoff is,

(a)   a lay-off of not more than 13 weeks in any period of 20 consecutive weeks;

(b)   a lay-off of more than 13 weeks in any period of 20 consecutive weeks, if the lay-off is less than 35 weeks in any period of 52 consecutive weeks and,

(i)   the employee continues to receive substantial payments from the employer,

(ii)   the employer continues to make payments for the benefit of the employee under a legitimate retirement or pension plan or a legitimate group or employee insurance plan,

(iii)   the employee receives supplementary unemployment benefits,

(iv)   the employee is employed elsewhere during the lay-off and would be entitled to receive supplementary unemployment benefits if that were not so,

(v)   the employer recalls the employee within the time approved by the Director, or

(vi)   in the case of an employee who is not represented by a trade union, the employer recalls the employee within the time set out in an agreement between the employer and the employee; or

(c)   in the case of an employee represented by a trade union, a lay-off longer than a lay-off described in clause (b) where the employer recalls the employee within the time set out in an agreement between the employer and the trade union.  2000, c. 41, s. 56 (2); 2001, c. 9, Sched. I, s. 1 (12).

Definition

(3)  In subsections (3.1) to (3.6),

"excluded week" means a week during which, for one or more days, the employee is not able to work, is not available for work, is subject to a disciplinary suspension or is not provided with work because of a strike or lock-out occurring at his or her place of employment or elsewhere.  2002, c. 18, Sched. J, s. 3 (23).

Lay-off, regular work week

(3.1)  For the purpose of subsection (2), an employee who has a regular work week is laid off for a week if,

(a)   in that week, the employee earns less than one-half the amount he or she would earn at his or her regular rate in a regular work week; and

(b)   the week is not an excluded week.  2002, c. 18, Sched. J, s. 3 (23).

Effect of excluded week

(3.2)  For the purpose of clauses (2) (a) and (b), an excluded week shall be counted as part of the periods of 20 and 52 weeks. 2002, c. 18, Sched. J, s. 3 (23).

Lay-off, no regular work week

(3.3)  For the purposes of clauses (1) (c) and (2) (a), an employee who does not have a regular work week is laid off for a period longer than the period of a temporary lay-off if for more than 13 weeks in any period of 20 consecutive weeks he or she earns less than one-half the average amount he or she earned per week in the period of 12 consecutive weeks that preceded the 20-week period.  2002, c. 18, Sched. J, s. 3 (23).

Effect of excluded week

(3.4)  For the purposes of subsection (3.3),

(a)    an excluded week shall not be counted as part of the 13 or more weeks but shall be counted as part of the 20-week period; and

(b)    if the 12-week period contains an excluded week, the average amount earned shall be calculated based on the earnings in weeks that were not excluded weeks and the number of weeks that were not excluded.  2002, c. 18, Sched. J, s. 3 (23).

Lay-off, no regular work week

(3.5)  For the purposes of clauses (1) (c) and (2) (b), an employee who does not have a regular work week is laid off for a period longer than the period of a temporary lay-off if for 35 or more weeks in any period of 52 consecutive weeks he or she earns less than one-half the average amount he or she earned per week in the period of 12 consecutive weeks that preceded the 52-week period.  2002, c. 18, Sched. J, s. 3 (23).

Effect of excluded week

(3.6)  For the purposes of subsection (3.5),

(a)    an excluded week shall not be counted as part of the 35 or more weeks but shall be counted as part of the 52-week period; and

(b)   if the 12-week period contains an excluded week, the average amount earned shall be calculated based on the earnings in weeks that were not excluded weeks and the number of weeks that were not excluded.  2002, c. 18, Sched. J, s. 3 (23).

Temporary lay-off not termination

(4)  An employer who lays an employee off without specifying a recall date shall not be considered to terminate the employment of the employee, unless the period of the lay-off exceeds that of a temporary lay-off.  2000, c. 41, s. 56 (4).

Deemed termination date

(5)  If an employer terminates the employment of an employee under clause (1) (c), the employment shall be deemed to be terminated on the first day of the lay-off.  2000, c. 41, s. 56 (5).

Employer notice period

**57.**  The notice of termination under section 54 shall be given,

(a)   at least one week before the termination, if the employee's period of employment is less than one year;

(b)   at least two weeks before the termination, if the employee's period of employment is one year or more and fewer than three years;

(c)   at least three weeks before the termination, if the employee's period of employment is three years or more and fewer than four years;

(d)   at least four weeks before the termination, if the employee's period of employment is four years or more and fewer than five years;

(e)   at least five weeks before the termination, if the employee's period of employment is five years or more and fewer than six years;

(f)    at least six weeks before the termination, if the employee's period of employment is six years or more and fewer than seven years;

(g)    at least seven weeks before the termination, if the employee's period of employment is seven years or more and fewer than eight years; or

(h)    at least eight weeks before the termination, if the employee's period of employment is eight years or more.  2000, c. 41, s. 57.

Notice, 50 or more employees

**58.** (1)  Despite section 57, the employer shall give notice of termination in the prescribed manner and for the prescribed period if the employer terminates the employment of 50 or more employees at the employer's establishment in the same four-week period.  2000, c. 41, s. 58 (1).

Information

(2)  An employer who is required to give notice under this section,

(a)    shall provide to the Director the prescribed information in a form approved by the Director; and

(b)    shall, on the first day of the notice period, post in the employer's establishment the prescribed information in a form approved by the Director.  2000, c. 41, s. 58 (2).

Content

(3)  The information required under subsection (2) may include,

(a)    the economic circumstances surrounding the terminations;

(b)    any consultations that have been or are proposed to take place with communities in which the terminations will take

place or with the affected employees or their agent in connection with the terminations;

(c)   any proposed adjustment measures and the number of employees expected to benefit from each; and

(d)   a statistical profile of the affected employees.  2000, c. 41, s. 58 (3).

When notice effective

(4)  The notice required under subsection (1) shall be deemed not to have been given until the Director receives the information required under clause (2) (a).  2000, c. 41, s. 58 (4).

Posting

(5)  The employer shall post the information required under clause (2) (b) in at least one conspicuous place in the employer's establishment where it is likely to come to the attention of the affected employees and the employer shall keep that information posted throughout the notice period required under this section. 2000, c. 41, s. 58 (5).

Employee notice

(6)  An employee to whom notice has been given under this section shall not terminate his or her employment without first giving the employer written notice,

(a)   at least one week before doing so, if his or her period of employment is less than two years; or

(b)   at least two weeks before doing so, if his or her period of employment is two years or more.  2000, c. 41, s. 58 (6).

Exception

(7)  Subsection (6) does not apply if the employer constructively dismisses the employee or breaches a term of the employment contract, whether or not such a breach would constitute a

constructive dismissal.  2000, c. 41, s. 58 (7).

Period of employment: included, excluded time

**59.** (1)  Time spent by an employee on leave or other inactive employment is included in determining his or her period of employment.  2000, c. 41, s. 59 (1).

Exception

(2)  Despite subsection (1), if an employee's employment was terminated as a result of a lay-off, no part of the lay-off period after the deemed termination date shall be included in determining his or her period of employment.  2000, c. 41, s. 59 (2).

Requirements during notice period

**60.** (1)  During a notice period under section 57 or 58, the employer,

(a)    shall not reduce the employee's wage rate or alter any other term or condition of employment;

(b)    shall in each week pay the employee the wages the employee is entitled to receive, which in no case shall be less than his or her regular wages for a regular work week; and

(c)    shall continue to make whatever benefit plan contributions would be required to be made in order to maintain the employee's benefits under the plan until the end of the notice period.  2000, c. 41, s. 60 (1).

No regular work week

(2)  For the purposes of clause (1) (b), if the employee does not have a regular work week or if the employee is paid on a basis other than time, the employer shall pay the employee an amount equal to the average amount of regular wages earned by the employee per week for the weeks in which the employee worked in the period of 12 weeks immediately preceding the day on which notice was given.  2001, c. 9, Sched. I, s. 1 (13).

Benefit plan contributions

(3)  If an employer fails to contribute to a benefit plan contrary to clause (1) (c), an amount equal to the amount the employer should have contributed shall be deemed to be unpaid wages for the purpose of section 103.  2000, c. 41, s. 60 (3).

Same

(4)  Nothing in subsection (3) precludes the employee from an entitlement that he or she may have under a benefit plan.  2000, c. 41, s. 60 (4).

Pay instead of notice

**61.**  (1)  An employer may terminate the employment of an employee without notice or with less notice than is required under section 57 or 58 if the employer,

(a)   pays to the employee termination pay in a lump sum equal to the amount the employee would have been entitled to receive under section 60 had notice been given in accordance with that section; and

(b)   continues to make whatever benefit plan contributions would be required to be made in order to maintain the benefits to which the employee would have been entitled had he or she continued to be employed during the period of notice that he or she would otherwise have been entitled to receive.  2000, c. 41, s. 61 (1); 2001, c. 9, Sched. I, s. 1 (14).

No regular work week

(1.1)  For the purposes of clause (1) (a), if the employee does not have a regular work week or is paid on a basis other than time, the amount the employee would have been entitled to receive under section 60 shall be calculated as if the period of 12 weeks referred to in subsection 60 (2) were the 12-week period immediately preceding the day of termination.  2001, c. 9, Sched. I, s. 1 (15).

Information to Director

(2)  An employer who terminates the employment of employees under this section and would otherwise be required to provide notices of termination under section 58 shall comply with clause 58 (2) (a).  2000, c. 41, s. 61 (2).

Deemed active employment

**62.**  (1)  If an employer terminates the employment of employees without giving them part or all of the period of notice required under this Part, the employees shall be deemed to have been actively employed during the period for which there should have been notice for the purposes of any benefit plan under which entitlement to benefits might be lost or affected if the employees cease to be actively employed.  2000, c. 41, s. 62 (1).

Benefit plan contributions

(2)  If an employer fails to contribute to a benefit plan contrary to clause 61 (1) (b), an amount equal to the amount the employer should have contributed shall be deemed to be unpaid wages for the purpose of section 103.  2000, c. 41, s. 62 (2).

Same

(3)  Nothing in subsection (2) precludes the employee from an entitlement he or she may have under a benefit plan.  2000, c. 41, s. 62 (3).

Severance of Employment

What constitutes severance

**63.**  (1)  An employer severs the employment of an employee if,

(a)   the employer dismisses the employee or otherwise refuses or is unable to continue employing the employee;

(b)   the employer constructively dismisses the employee and the employee resigns from his or her employment in response

within a reasonable period;

(c)    the employer lays the employee off for 35 weeks or more in any period of 52 consecutive weeks;

(d)    the employer lays the employee off because of a permanent discontinuance of all of the employer's business at an establishment; or

(e)    the employer gives the employee notice of termination in accordance with section 57 or 58, the employee gives the employer written notice at least two weeks before resigning and the employee's notice of resignation is to take effect during the statutory notice period.  2000, c. 41, s. 63 (1); 2002, c. 18, Sched. J, s. 3 (24).

Definition

(2)  In subsections (2.1) to (2.4),

"excluded week" means a week during which, for one or more days, the employee is not able to work, is not available for work, is subject to a disciplinary suspension or is not provided with work because of a strike or lock-out occurring at his or her place of employment or elsewhere.  2002, c. 18, Sched. J, s. 3 (25).

Lay-off, regular work week

(2.1)  For the purpose of clause (1) (c), an employee who has a regular work week is laid off for a week if,

(a)    in that week, the employee earns less than one-quarter the amount he or she would earn at his or her regular rate in a regular work week; and

(b)    the week is not an excluded week.  2002, c. 18, Sched. J, s. 3 (25).

Effect of excluded week

(2.2)  For the purposes of clause (1) (c), an excluded week shall

be counted as part of the period of 52 weeks.  2002, c. 18, Sched. J, s. 3 (25).

Lay-off, no regular work week

(2.3)  For the purpose of clause (1) (c), an employee who does not have a regular work week is laid off for 35 or more weeks in any period of 52 consecutive weeks if for 35 or more weeks in any period of 52 consecutive weeks he or she earns less than one-quarter the average amount he or she earned per week in the period of 12 consecutive weeks that preceded the 52-week period.  2002, c. 18, Sched. J, s. 3 (25).

Effect of excluded week

(2.4)  For the purposes of subsection (2.3),

(a)   an excluded week shall not be counted as part of the 35 or more weeks, but shall be counted as part of the 52-week period; and

(b)   if the 12-week period contains an excluded week, the average amount earned shall be calculated based on the earnings in weeks that were not excluded weeks and the number of weeks that were not excluded.  2002, c. 18, Sched. J, s. 3 (25).

Resignation

(3)  An employee's employment that is severed under clause (1) (e) shall be deemed to have been severed on the day the employer's notice of termination would have taken effect if the employee had not resigned.  2000, c. 41, s. 63 (3).

Entitlement to severance pay

**64.** (1)  An employer who severs an employment relationship with an employee shall pay severance pay to the employee if the employee was employed by the employer for five years or more and,

(a)   the severance occurred because of a permanent

discontinuance of all or part of the employer's business at an establishment and the employee is one of 50 or more employees who have their employment relationship severed within a six-month period as a result; or

(b) the employer has a payroll of $2.5 million or more. 2000, c. 41, s. 64 (1).

Payroll

(2) For the purposes of subsection (1), an employer shall be considered to have a payroll of $2.5 million or more if,

(a) the total wages earned by all of the employer's employees in the four weeks that ended with the last day of the last pay period completed prior to the severance of an employee's employment, when multiplied by 13, was $2.5 million or more; or

(b) the total wages earned by all of the employer's employees in the last or second-last fiscal year of the employer prior to the severance of an employee's employment was $2.5 million or more. 2000, c. 41, s. 64 (2); 2001, c. 9, Sched. I, s. 1 (16).

Exceptions

(3) Prescribed employees are not entitled to severance pay under this section. 2000, c. 41, s. 64 (3).

Location deemed an establishment

(4) A location shall be deemed to be an establishment under subsection (1) if,

(a) there is a permanent discontinuance of all or part of an employer's business at the location;

(b) the location is part of an establishment consisting of two or more locations; and

(c) the employer severs the employment relationship of 50

or more employees within a six-month period as a result.  2000, c. 41, s. 64 (4).

Calculating severance pay

**65.**  (1)  Severance pay under this section shall be calculated by multiplying the employee's regular wages for a regular work week by the sum of,

(a)  the number of years of employment the employee has completed; and

(b)  the number of months of employment not included in clause (a) that the employee has completed, divided by 12.  2000, c. 41, s. 65 (1).

Non-continuous employment

(2)  All time spent by the employee in the employer's employ, whether or not continuous and whether or not active, shall be included in determining whether he or she is eligible for severance pay under subsection 64 (1) and in calculating his or her severance pay under subsection (1).  2000, c. 41, s. 65 (2).

Where employee resigns

(3)  If an employee's employment is severed under clause 63 (1) (e), the period between the day the employee's notice of resignation took effect and the day the employer's notice of termination would have taken effect shall not be considered in calculating the amount of severance pay to which the employee is entitled.  2000, c. 41, s. 65 (3).

Termination without notice

(4)  If an employer terminates the employment of an employee without providing the notice, if any, required under section 57 or 58, the amount of severance pay to which the employee is entitled shall be calculated as if the employee continued to be employed for a period equal to the period of notice that should have been given and was not.  2000, c. 41, s. 65 (4).

Limit

(5)  An employee's severance pay entitlement under this section shall not exceed an amount equal to the employee's regular wages for a regular work week for 26 weeks.  2000, c. 41, s. 65 (5).

Where no regular work week

(6)  For the purposes of subsections (1) and (5), if the employee does not have a regular work week or if the employee is paid on a basis other than time, the employee's regular wages for a regular work week shall be deemed to be the average amount of regular wages earned by the employee for the weeks in which the employee worked in the period of 12 weeks preceding the date on which,

(a)    the employee's employment was severed; or

(b)    if the employee's employment was severed under clause 63 (1) (c) or (d), the date on which the lay-off began.  2000, c. 41, s. 65 (6); 2002, c. 18, Sched. J, s. 3 (26).

In addition to other amounts

(7)  Subject to subsection (8), severance pay under this section is in addition to any other amount to which an employee is entitled under this Act or his or her employment contract.  2000, c. 41, s. 65 (7).

Set-off, deduction

(8)  Only the following set-offs and deductions may be made in calculating severance pay under this section:

1.    Supplementary unemployment benefits the employee receives after his or her employment is severed and before the severance pay becomes payable to the employee.

2.    An amount paid to an employee for loss of employment under a provision of the employment contract if it is based upon length of employment, length of service or seniority.

3. Severance pay that was previously paid to the employee under this Act, a predecessor of this Act or a contractual provision described in paragraph 2. 2000, c. 41, s. 65 (8).

Instalments

**66.** (1) An employer may pay severance pay to an employee who is entitled to it in instalments with the agreement of the employee or the approval of the Director. 2001, c. 9, Sched. I, s. 1 (17).

Restriction

(2) The period over which instalments can be paid must not exceed three years. 2000, c. 41, s. 66 (2).

Default

(3) If the employer fails to make an instalment payment, all severance pay not previously paid shall become payable immediately. 2000, c. 41, s. 66 (3).

Election re Recall rights

Where election may be made

**67.** (1) This section applies if an employee who has a right to be recalled for employment under his or her employment contract is entitled to,

(a) termination pay under section 61 because of a lay-off of 35 weeks or more; or

(b) severance pay. 2000, c. 41, s. 67 (1).

Exception

(2) Clause (1) (b) does not apply if the employer and employee have agreed that the severance pay shall be paid in instalments under section 66. 2000, c. 41, s. 67 (2).

Nature of election

(3)  The employee may elect to be paid the termination pay or severance pay forthwith or to retain the right to be recalled.  2000, c. 41, s. 67 (3).

Consistency

(4)  An employee who is entitled to both termination pay and severance pay shall make the same election in respect of each. 2000, c. 41, s. 67 (4).

Deemed abandonment

(5)  An employee who elects to be paid shall be deemed to have abandoned the right to be recalled.  2000, c. 41, s. 67 (5).

Employee not represented by trade union

(6)  If an employee who is not represented by a trade union elects to retain the right to be recalled or fails to make an election, the employer shall pay the termination pay and severance pay to which the employee is entitled to the Director in trust.  2000, c. 41, s. 67 (6).

Employee represented by trade union

(7)  If an employee who is represented by a trade union elects to retain the right to be recalled or fails to make an election,

(a)   the employer and the trade union shall attempt to negotiate an arrangement for holding the money in trust, and, if the negotiations are successful, the money shall be held in trust in accordance with the arrangement agreed upon; and

(b)   if the trade union advises the Director and the employer in writing that efforts to negotiate such an arrangement have been unsuccessful, the employer shall pay the termination pay and severance pay to which the employee is entitled to the Director in trust.  2000, c. 41, s. 67 (7).

Where employee accepts recall

(8)  If the employee accepts employment made available under the right of recall, the amount held in trust shall be paid out of trust to the employer and the employee shall be deemed to have abandoned the right to termination pay and severance pay paid into trust.  2000, c. 41, s. 67 (8).

Recall rights expired or renounced

(9)  If the employee renounces the right to be recalled or the right expires, the amount held in trust shall be paid to the employee and, if the right to be recalled had not expired, the employee shall be deemed to have abandoned the right.  2000, c. 41, s. 67 (9).

PART Xvi
LIE DETECTORS

Definitions

**68.**  In this Part, and for purposes of Part XVIII (Reprisal), Part XXI (Who Enforces this Act and What They Can Do), Part XXII (Complaints and Enforcement), Part XXIII (Reviews by the Board), Part XXIV (Collection), Part XXV (Offences and Prosecutions), Part XXVI (Miscellaneous Evidentiary Provisions), Part XXVII (Regulations) and Part XXVIII (Transition, Amendment, Repeals, Commencement and Short Title), insofar as matters concerning this Part are concerned,

"employee" means an employee as defined in subsection 1 (1) and includes an applicant for employment, a police officer and a person who is an applicant to be a police officer; ("employé")

"employer" means an employer as defined in subsection 1 (1) and includes a prospective employer and a police governing body; ("employeur")

"lie detector test" means an analysis, examination, interrogation or test that is taken or performed,

(a)    by means of or in conjunction with a device, instrument

or machine, and

(b)    for the purpose of assessing or purporting to assess the credibility of a person. ("test du détecteur de mensonges")  2000, c. 41, s. 68.

Right to refuse test

**69.**  Subject to section 71, an employee has a right not to,

(a)    take a lie detector test;

(b)    be asked to take a lie detector test; or

(c)    be required to take a lie detector test.  2000, c. 41, s. 69.

Prohibition: testing

**70.**  (1)  Subject to section 71, no person shall, directly or indirectly, require, request, enable or influence an employee to take a lie detector test.  2000, c. 41, s. 70 (1).

Prohibition: disclosure

(2)  No person shall disclose to an employer that an employee has taken a lie detector test or disclose to an employer the results of a lie detector test taken by an employee.  2000, c. 41, s. 70 (2).

Consent to test by police

**71.**  This Part shall not be interpreted to prevent a person from being asked by a police officer to take, consenting to take and taking a lie detector test administered on behalf of a police force in Ontario or by a member of a police force in Ontario in the course of the investigation of an offence.  2000, c. 41, s. 71.

PART XVii
RETAIL BUSINESS ESTABLISHMENTS

Application of Part

**72.** (1) This Part applies with respect to,

(a)    retail business establishments as defined in subsection 1 (1) of the *Retail Business Holidays Act*;

(b)    employees employed to work in those establishments; and

(c)    employers of those employees. 2000, c. 41, s. 72 (1).

Exception

(2)  This Part does not apply with respect to retail business establishments in which the primary retail business is one that,

(a)    sells prepared meals;

(b)    rents living accommodations;

(c)    is open to the public for educational, recreational or amusement purposes; or

(d)    sells goods or services incidental to a business described in clause (a), (b) or (c) and is located in the same premises as that business. 2000, c. 41, s. 72 (2).

Right to refuse work

**73.** (1)  An employee may refuse to work on a public holiday or a day declared by proclamation of the Lieutenant Governor to be a holiday for the purposes of the *Retail Business Holidays Act*. 2000, c. 41, s. 73 (1).

Same

(2)  An employee may refuse to work on a Sunday. 2000, c. 41, s. 73 (2).

Notice of refusal

(3)  An employee who agrees to work on a day referred to in

subsection (1) or (2) may then decline to work on that day, but only if he or she gives the employer notice that he or she declines at least 48 hours before he or she was to commence work on that day.  2000, c. 41, s. 73 (3).

PART XVIII
REPRISAL

Reprisal prohibited

**74.**  (1)  No employer or person acting on behalf of an employer shall intimidate, dismiss or otherwise penalize an employee or threaten to do so,

(a)    because the employee,

(i)    asks the employer to comply with this Act and the regulations,

(ii)    makes inquiries about his or her rights under this Act,

(iii)    files a complaint with the Ministry under this Act,

(iv)    exercises or attempts to exercise a right under this Act,

(v)    gives information to an employment standards officer,

(vi)    testifies or is required to testify or otherwise participates or is going to participate in a proceeding under this Act,

(vii)    participates in proceedings respecting a by-law or proposed by-law under section 4 of the *Retail Business Holidays Act*,

(viii)    is or will become eligible to take a leave, intends to take a leave or takes a leave under Part XIV; or

(b)    because the employer is or may be required, because of

a court order or garnishment, to pay to a third party an amount owing by the employer to the employee.  2000, c. 41, s. 74 (1).

Onus of proof

(2)  Subject to subsection 122 (4), in any proceeding under this Act, the burden of proof that an employer did not contravene a provision set out in this section lies upon the employer.  2000, c. 41, s. 74 (2).

PART XIx
BUILDING SERVICES PROVIDERS

New provider

**75.**  (1)  This Part applies if a building services provider for a building is replaced by a new provider.  2000, c. 41, s. 75 (1).

Termination and severance pay

(2)  The new provider shall comply with Part XV (Termination and Severance of Employment) with respect to every employee of the replaced provider who is engaged in providing services at the premises and whom the new provider does not employ as if the new provider had terminated and severed the employee's employment.  2000, c. 41, s. 75 (2).

Same

(3)  The new provider shall be deemed to have been the employee's employer for the purpose of subsection (2).  2000, c. 41, s. 75 (3).

Exception

(4)  The new provider is not required to comply with subsection (2) with respect to,

(a)    an employee who is retained by the replaced provider; or

(b)   any prescribed employees.  2000, c. 41, s. 75 (4).

Vacation pay

**76.** (1)  A provider who ceases to provide services at a premises and who ceases to employ an employee shall pay to the employee the amount of any accrued vacation pay.  2000, c. 41, s. 76 (1).

Same

(2)  A payment under subsection (1) shall be made within the later of,

(a)   seven days after the day the employee's employment with the provider ceases; or

(b)   the day that would have been the employee's next regular pay day.  2000, c. 41, s. 76 (2).

Information request, possible new provider

**77.** (1)  Where a person is seeking to become the new provider at a premises, the owner or manager of the premises shall upon request give to that person the prescribed information about the employees who on the date of the request are engaged in providing services at the premises.  2000, c. 41, s. 77 (1).

Same, new provider

(2)  Where a person becomes the new provider at a premises, the owner or manager of the premises shall upon request give to that person the prescribed information about the employees who on the date of the request are engaged in providing services for the premises.  2000, c. 41, s. 77 (2).

Request by owner or manager

(3)  If an owner or manager requests a provider or former provider to provide information to the owner or manager so that the owner or manager can fulfil a request made under subsection (1) or

(2), the provider or former provider shall provide the information. 2000, c. 41, s. 77 (3).

## Use of information

**78.** (1)  A person who receives information under this Part shall use that information only for the purpose of complying with this Part or determining the person's obligations or potential obligations under this Part.  2000, c. 41, s. 78 (1).

## Confidentiality

(2)  A person who receives information under section 77 shall not disclose it, except as authorized under this Part.  2000, c. 41, s. 78 (2).

## PART Xx
## LIABILITY OF DIRECTORS

## Definition

**79.**  In this Part,

"director" means a director of a corporation and includes a shareholder who is a party to a unanimous shareholder agreement.  2000, c. 41, s. 79.

## Application of Part

**80.** (1)  This Part applies with respect to shareholders described in section 79 only to the extent that the directors are relieved, under subsection 108 (5) of the *Business Corporations Act* or subsection 146 (5) of the *Canada Business Corporations Act*, of their liability to pay wages to the employees of the corporation. 2000, c. 41, s. 80 (1).

## Non-application

(2)  This Part does not apply with respect to directors of corporations to which Part III of the *Corporations Act* applies or to which the *Co-operative Corporations Act* applies.  2000, c. 41, s. 80

(2).

Same

(3)  This Part does not apply with respect to directors, or persons who perform functions similar to those of a director, of a college of a health profession or a group of health professions that is established or continued under an Act of the Legislature.  2000, c. 41, s. 80 (3).

Same

(4)  This Part does not apply with respect to directors of corporations,

(a)    that have been incorporated in another jurisdiction;

(b)    that have objects that are similar to the objects of corporations to which Part III of the *Corporations Act* applies or to which the *Co-operative Corporations Act* applies; and

(c)    that are carried on without the purpose of gain.  2000, c. 41, s. 80 (4).

Directors' liability for wages

**81.**  (1)  The directors of an employer are jointly and severally liable for wages as provided in this Part if,

(a)    the employer is insolvent, the employee has caused a claim for unpaid wages to be filed with the receiver appointed by a court with respect to the employer or with the employer's trustee in bankruptcy and the claim has not been paid;

(b)    an employment standards officer has made an order that the employer is liable for wages, unless the amount set out in the order has been paid or the employer has applied to have it reviewed;

(c)    an employment standards officer has made an order that a director is liable for wages, unless the amount set out in the order

has been paid or the employer or the director has applied to have it reviewed; or

(d)  the Board has issued, amended or affirmed an order under section 119, the order, as issued, amended or affirmed, requires the employer or the directors to pay wages and the amount set out in the order has not been paid.  2000, c. 41, s. 81 (1).

Employer primarily responsible

(2)  Despite subsection (1), the employer is primarily responsible for an employee's wages but proceedings against the employer under this Act do not have to be exhausted before proceedings may be commenced to collect wages from directors under this Part.  2000, c. 41, s. 81 (2).

Wages

(3)  The wages that directors are liable for under this Part are wages, not including termination pay and severance pay as they are provided for under this Act or an employment contract and not including amounts that are deemed to be wages under this Act.  2000, c. 41, s. 81 (3).

Vacation pay

(4)  The vacation pay that directors are liable for is the greater of the minimum vacation pay provided in Part XI (Vacation With Pay) and the amount contractually agreed to by the employer and the employee.  2000, c. 41, s. 81 (4).

Holiday pay

(5)  The amount of holiday pay that directors are liable for is the greater of the amount payable for holidays at the rate as determined under this Act and the regulations and the amount for the holidays at the rate as contractually agreed to by the employer and the employee.  2000, c. 41, s. 81 (5).

Overtime wages

(6)  The overtime wages that directors are liable for are the greater of the amount of overtime pay provided in Part VIII (Overtime Pay) and the amount contractually agreed to by the employer and the employee.  2000, c. 41, s. 81 (6).

Directors' maximum liability

(7)  The directors of an employer corporation are jointly and severally liable to the employees of the corporation for all debts not exceeding six months' wages, as described in subsection (3), that become payable while they are directors for services performed for the corporation and for the vacation pay accrued while they are directors for not more than 12 months under this Act and the regulations made under it or under any collective agreement made by the corporation.  2000, c. 41, s. 81 (7).

Interest

(8)  A director is liable to pay interest, at the rate and calculated in the manner determined by the Director under subsection 88 (5), on outstanding wages for which the director is liable.  2000, c. 41, s. 81 (8).

Contribution from other directors

(9)  A director who has satisfied a claim for wages is entitled to contribution in relation to the wages from other directors who are liable for the claim.  2000, c. 41, s. 81 (9).

Limitation periods

(10)  A limitation period set out in section 114 prevails over a limitation period in any other Act, unless the other Act states that it is to prevail over this Act.  2000, c. 41, s. 81 (10).

No relief by contract, etc.

**82.**  (1)  No provision in a contract, in the articles of incorporation or the by-laws of a corporation or in a resolution of a corporation relieves a director from the duty to act according to this Act or relieves him or her from liability for breach of it.  2000, c. 41,

s. 82 (1).

Indemnification of directors

(2)  An employer may indemnify a director, a former director and the heirs or legal representatives of a director or former director against all costs, charges and expenses, including an amount paid to satisfy an order under this Act, including an order which is the subject of a filing under section 126, reasonably incurred by the director with respect to any civil or administrative action or proceeding to which he or she is a party by reason of being or having been a director of the employer if,

(a)   he or she has acted honestly and in good faith with a view to the best interests of the employer; and

(b)   in the case of a proceeding or action that is enforced by a monetary penalty, he or she had reasonable grounds for believing that his or her conduct was lawful.  2000, c. 41, s. 82 (2).

Civil remedies protected

**83.**  No civil remedy that a person may have against a director or that a director may have against a person is suspended or affected by this Part.  2000, c. 41, s. 83.

PART XXi
who enforces this act and what they can do

Minister responsible

**84.**  The Minister is responsible for the administration of this Act.  2000, c. 41, s. 84.

Director

**85.**  (1)  The Minister shall appoint a person to be the Director of Employment Standards to administer this Act and the regulations.  2000, c. 41, s. 85 (1).

Acting Director

(2)  The Director's powers may be exercised and the Director's duties may be performed by an employee of the Ministry appointed as Acting Director if,

(a)    the Director is absent or unable to act; or

(b)    an individual who was appointed Director has ceased to be the Director and no new Director has been appointed.  2000, c. 41, s. 85 (2).

Same

(3)  An Acting Director shall be appointed by the Director or, in the Director's absence, the Deputy Minister of Labour.  2000, c. 41, s. 85 (3).

Employment standards officers

**86.** (1)  Persons to enforce this Act and the regulations may be appointed as employment standards officers under the *Public Service Act*.  2000, c. 41, s. 86 (1).

Certificate of appointment

(2)  The Deputy Minister of Labour shall issue a certificate of appointment bearing his or her signature or a facsimile of it to every employment standards officer.  2000, c. 41, s. 86 (2).

Delegation

**87.** (1)  The Minister may, in writing, delegate to any person any of the Minister's powers or duties under this Act, subject to the limitations or conditions set out in the delegation.  2000, c. 41, s. 87 (1).

Same: residual powers

(2)  The Minister may exercise a power or perform a duty under this Act even if he or she has delegated it to a person under this section.  2000, c. 41, s. 87 (2).

Powers and duties of Director

**88.** (1)  The Director may exercise the powers conferred upon the Director under this Act and shall perform the duties imposed upon the Director under this Act.  2000, c. 41, s. 88 (1).

Policies

(2)  The Director may establish policies respecting the interpretation, administration and enforcement of this Act.  2000, c. 41, s. 88 (2).

Authorization

(3)  The Director may authorize an employment standards officer to exercise a power or to perform a duty conferred upon the Director under this Act, either orally or in writing.  2000, c. 41, s. 88 (3).

Same: residual powers

(4)  The Director may exercise a power conferred upon the Director under this Act even if he or she has delegated it to a person under subsection (3).  2000, c. 41, s. 88 (4).

Interest

(5)  The Director may, with the approval of the Minister, determine the rate of interest and the manner of calculating interest for the purposes of this Act.  2000, c. 41, s. 88 (5).

Determinations not regulations

(6)  A determination under subsection (5) is not a regulation within the meaning of the *Regulations Act*.  2000, c. 41, s. 88 (6).

Other circumstances

(7)  Where money has been paid to the Director in trust and no provision is made for paying it out elsewhere in this Act, it shall be paid out to the person entitled to receive it together with interest at

the rate and calculated in the manner determined by the Director under subsection (5).  2000, c. 41, s. 88 (7).

Surplus interest

(8)  If the interest earned on money held by the Director in trust exceeds the interest paid to the person entitled to receive the money, the Director may use the difference to pay any service charges for the management of the money levied by the financial institution with which the money was deposited.  2000, c. 41, s. 88 (8).

Hearing not required

(9)  The Director is not required to hold a hearing in exercising any power or making any decision under this Act.  2000, c. 41, s. 88 (9).

Powers and duties of officers

**89.**  (1)  An employment standards officer may exercise the powers conferred upon employment standards officers under this Act and shall perform the duties imposed upon employment standards officers under this Act.  2000, c. 41, s. 89 (1).

Officers to follow policies

(2)  An employment standards officer shall follow any policies established by the Director under subsection 88 (2).  2000, c. 41, s. 89 (2).

Hearing not required

(3)  An employment standards officer is not required to hold a hearing in exercising any power or making any decision under this Act.  2000, c. 41, s. 89 (3).

Officers not compellable

**90.**  (1)  An employment standards officer is not a competent or compellable witness in a civil proceeding respecting any

information given or obtained, statements made or received, or records or other things produced or received under this Act except for the purpose of carrying out his or her duties under it.  2000, c. 41, s. 90 (1).

Records

(2)  An employment standards officer shall not be compelled in a civil proceeding to produce any record or other thing he or she has made or received under this Act except for the purpose of carrying out his or her duties under this Act.  2000, c. 41, s. 90 (2).

Investigation and inspection powers

**91.**  (1)  An employment standards officer may, without a warrant, enter and inspect any place in order to investigate a possible contravention of this Act or to perform an inspection to ensure that this Act is being complied with.  2000, c. 41, s. 91 (1).

Time of entry

(2)  The power to enter and inspect a place without a warrant may be exercised only during the place's regular business hours or, if it does not have regular business hours, during daylight hours.  2000, c. 41, s. 91 (2).

Dwellings

(3)  The power to enter and inspect a place without a warrant shall not be exercised to enter and inspect a part of the place that is used as a dwelling unless the occupier of the dwelling consents or a warrant has been issued under section 92.  2000, c. 41, s. 91 (3).

Use of force

(4)  An employment standards officer is not entitled to use force to enter and inspect a place.  2000, c. 41, s. 91 (4).

Identification

(5)  An employment standards officer shall produce, on request,

evidence of his or her appointment.  2000, c. 41, s. 91 (5).

Powers of officer

(6)  An employment standards officer conducting an investigation or inspection may,

(a)   examine a record or other thing that is relevant to the investigation or inspection;

(b)   require the production of a record or other thing that the officer thinks may be relevant to the investigation or inspection;

(c)   remove for review and copying a record or other thing that the officer thinks may be relevant to the investigation or inspection;

(d)   in order to produce a record in readable form, use data storage, information processing or retrieval devices or systems that are normally used in carrying on business in the place; and

(e)   question any person on matters the officer thinks may be relevant to the investigation or inspection.  2000, c. 41, s. 91 (6).

Written demand

(7)  A demand that a record or other thing be produced must be in writing and must include a statement of the nature of the record or thing required.  2000, c. 41, s. 91 (7).

Obligation to produce and assist

(8)  If an employment standards officer demands that a record or other thing be produced, the person who has custody of the record or thing shall produce it and, in the case of a record, shall on request provide any assistance that is reasonably necessary to interpret the record or to produce it in a readable form.  2000, c. 41, s. 91 (8).

Records and things removed from place

(9)  An employment standards officer who removes a record or other thing under clause (6) (c) shall provide a receipt and return the record or thing to the person within a reasonable time.  2000, c. 41, s. 91 (9).

Copy admissible in evidence

(10)  A copy of a record that purports to be certified by an employment standards officer as being a true copy of the original is admissible in evidence to the same extent as the original, and has the same evidentiary value.  2000, c. 41, s. 91 (10).

Obstruction

(11)  No person shall hinder, obstruct or interfere with or attempt to hinder, obstruct or interfere with an employment standards officer conducting an investigation or inspection.  2000, c. 41, s. 91 (11).

Same

(12)  No person shall,

(a)  refuse to answer questions on matters that an employment standards officer thinks may be relevant to an investigation or inspection; or

(b)  provide an employment standards officer with information on matters the officer thinks may be relevant to an investigation or inspection that the person knows to be false or misleading.  2000, c. 41, s. 91 (12).

Separate inquiries

(13)  No person shall prevent or attempt to prevent an employment standards officer from making inquiries of any person separate and apart from another person under clause (6) (e). 2000, c. 41, s. 91 (13).

Warrant

**92.** (1)  A justice of the peace may issue a warrant authorizing an employment standards officer named in the warrant to enter premises specified in the warrant and to exercise any of the powers mentioned in subsection 91 (6), if the justice of the peace is satisfied on information under oath that,

(a)   the officer has been prevented from exercising a right of entry to the premises under subsection 91 (1) or has been prevented from exercising a power under subsection 91 (6); or

(b)   there are reasonable grounds to believe that the officer will be prevented from exercising a right of entry to the premises under subsection 91 (1) or will be prevented from exercising a power under subsection 91 (6).  2000, c. 41, s. 92 (1).

Expiry of warrant

(2)  A warrant issued under this section shall name a date on which it expires, which date shall not be later than 30 days after the warrant is issued.  2000, c. 41, s. 92 (2).

Extension of time

(3)  Upon application without notice by the employment standards officer named in a warrant issued under this section, a justice of the peace may extend the date on which the warrant expires for an additional period of no more than 30 days.  2000, c. 41, s. 92 (3).

Use of force

(4)  An employment standards officer named in a warrant issued under this section may call upon a police officer for assistance in executing the warrant.  2000, c. 41, s. 92 (4).

Time of execution

(5)  A warrant issued under this section may be executed only between 8 a.m. and 8 p.m., unless the warrant specifies otherwise.  2000, c. 41, s. 92 (5).

Other matters

(6)  Subsections 91 (4) to (13) apply with necessary modifications to an officer executing a warrant issued under this section.  2000, c. 41, s. 92 (6); 2002, c. 18, Sched. J, s. 3 (27).

Posting of notices

**93.**  An employment standards officer may require an employer to post and to keep posted in or upon the employer's premises in a conspicuous place or places where it is likely to come to the attention of the employer's employees,

(a)    any notice relating to the administration or enforcement of this Act or the regulations that the officer considers appropriate; or

(b)    a copy of a report or part of a report made by the officer concerning the results of an investigation or inspection.  2000, c. 41, s. 93.

Powers under the *Canada Labour Code*

**94.**  If a regulation is made under the *Canada Labour Code* incorporating by reference all or part of this Act or a regulation under it, the Board and any person having powers under this Act may exercise the powers conferred under the *Canada Labour Code* regulation.  2000, c. 41, s. 94.

Service of documents

**95.**  (1)  Where this Act requires or permits service of a document in accordance with this section, it may be served,

(a)    by mail addressed to the person's last known business or residential address using any method of mail delivery that permits the delivery to be verified;

(b)    by telephonic transmission of a facsimile of the document or by electronic mail if the person is equipped to receive such transmissions or mail.  2000, c. 41, s. 95 (1).

Same

(2)  A document that is served by a means described in clause (1) (b) on a Saturday, Sunday or a public holiday or on any other day after 5 p.m. shall be deemed to have been served on the next day that is not a Saturday, Sunday or public holiday.  2000, c. 41, s. 95 (2).

part xxii
complaints and enforcement

Complaints

Complaints

**96.**  (1)  A person alleging that this Act has been or is being contravened may file a complaint with the Ministry in a written or electronic form approved by the Director.  2000, c. 41, s. 96 (1).

Effect of failure to use form

(2)  A complaint that is not filed in a form approved by the Director shall be deemed not to have been filed.  2000, c. 41, s. 96 (2).

Limitation

(3)  A complaint regarding a contravention that occurred more than two years before the day on which the complaint was filed shall be deemed not to have been filed.  2001, c. 9, Sched. I, s. 1 (18).

When civil proceeding not permitted

**97.**  (1)  An employee who files a complaint under this Act with respect to an alleged failure to pay wages or comply with Part XIII (Benefit Plans) may not commence a civil proceeding with respect to the same matter.  2000, c. 41, s. 97 (1).

Same, wrongful dismissal

(2) An employee who files a complaint under this Act alleging an entitlement to termination pay or severance pay may not commence a civil proceeding for wrongful dismissal if the complaint and the proceeding would relate to the same termination or severance of employment. 2000, c. 41, s. 97 (2).

Amount in excess of order

(3) Subsections (1) and (2) apply even if,

(a) the amount alleged to be owing to the employee is greater than the amount for which an order can be issued under this Act; or

(b) in the civil proceeding, the employee is claiming only that part of the amount alleged to be owing that is in excess of the amount for which an order can be issued under this Act. 2000, c. 41, s. 97 (3).

Withdrawal of complaint

(4) Despite subsections (1) and (2), an employee who has filed a complaint may commence a civil proceeding with respect to a matter described in those subsections if he or she withdraws the complaint within two weeks after it is filed. 2000, c. 41, s. 97 (4).

When complaint not permitted

**98.** (1) An employee who commences a civil proceeding with respect to an alleged failure to pay wages or to comply with Part XIII (Benefit Plans) may not file a complaint with respect to the same matter or have such a complaint investigated. 2000, c. 41, s. 98 (1).

Same, wrongful dismissal

(2) An employee who commences a civil proceeding for wrongful dismissal may not file a complaint alleging an entitlement to termination pay or severance pay or have such a complaint investigated if the proceeding and the complaint relate to the same termination or severance of employment. 2000, c. 41, s. 98 (2).

## Enforcement under Collective Agreement

### When collective agreement applies

**99.** (1) If an employer is or has been bound by a collective agreement, this Act is enforceable against the employer as if it were part of the collective agreement with respect to an alleged contravention of this Act that occurs,

(a)   when the collective agreement is or was in force;

(b)   when its operation is or was continued under subsection 58 (2) of the *Labour Relations Act, 1995*; or

(c)   during the period that the parties to the collective agreement are or were prohibited by subsection 86 (1) of the *Labour Relations Act, 1995* from unilaterally changing the terms and conditions of employment.  2000, c. 41, s. 99 (1).

### Complaint not permitted

(2)  An employee who is represented by a trade union that is or was a party to a collective agreement may not file a complaint alleging a contravention of this Act that is enforceable under subsection (1) or have such a complaint investigated.  2000, c. 41, s. 99 (2).

### Employee bound

(3)  An employee who is represented by a trade union that is or was a party to a collective agreement is bound by any decision of the trade union with respect to the enforcement of this Act under the collective agreement, including a decision not to seek that enforcement.  2000, c. 41, s. 99 (3).

### Membership status irrelevant

(4)  Subsections (2) and (3) apply even if the employee is not a member of the trade union.  2000, c. 41, s. 99 (4).

### Unfair representation

(5)  Nothing in subsection (3) or (4) prevents an employee from filing a complaint with the Board alleging that a decision of the trade union with respect to the enforcement of this Act contravenes section 74 of the *Labour Relations Act, 1995*.  2000, c. 41, s. 99 (5).

Exception

(6)  Despite subsection (2), the Director may permit an employee to file a complaint and may direct an employment standards officer to investigate it if the Director considers it appropriate in the circumstances.  2000, c. 41, s. 99 (6).

If arbitrator finds contravention

**100.**  (1)  If an arbitrator finds that an employer has contravened this Act, the arbitrator may make any order against the employer that an employment standards officer could have made with respect to that contravention but the arbitrator may not issue a notice of contravention.  2000, c. 41, s. 100 (1).

Same: Part XIII

(2)  If an arbitrator finds that an employer has contravened Part XIII (Benefit Plans), the arbitrator may make any order that the Board could make under section 121.  2000, c. 41, s. 100 (2).

Directors and collective agreement

(3)  An arbitrator shall not require a director to pay an amount, take an action or refrain from taking an action under a collective agreement that the director could not be ordered to pay, take or refrain from taking in the absence of the collective agreement.  2000, c. 41, s. 100 (3).

Conditions respecting orders under this section

(4)  The following conditions apply with respect to an arbitrator's order under this section:

1.    In an order requiring the payment of wages or compensation, the arbitrator may require that the amount of the

wages or compensation be paid,

      i.   to the trade union that represents the employee or employees concerned, or

      ii.   directly to the employee or employees.

   2.   If the order requires the payment of wages, the order may be made for an amount greater than is permitted under subsection 103 (4).

   3.   The order is not subject to review under section 116. 2000, c. 41, s. 100 (4).

Copy of decision to Director

   (5)  When an arbitrator makes a decision with respect to an alleged contravention of this Act, the arbitrator shall provide a copy of it to the Director.  2000, c. 41, s. 100 (5).

Arbitration and s. 4

   **101.**  (1)  This section applies if, during a proceeding before an arbitrator, other than the Board, concerning an alleged contravention of this Act, an issue is raised concerning whether the employer to whom the collective agreement applies or applied and another person are to be treated as one employer under section 4. 2000, c. 41, s. 101 (1).

Restriction

   (2)  The arbitrator shall not decide the question of whether the employer and the other person are to be treated as one employer under section 4.  2000, c. 41, s. 101 (2).

Reference to Board

   (3)  If the arbitrator finds it is necessary to make a finding concerning the application of section 4, the arbitrator shall refer that question to the Board by giving written notice to the Board.  2000, c. 41, s. 101 (3).

Content of notice

(4)  The notice to the Board shall,

(a)    state that an issue has arisen in an arbitration proceeding with respect to whether the employer and another person are to be treated as one employer under section 4; and

(b)    set out the decisions made by the arbitrator on the other matters in dispute.  2000, c. 41, s. 101 (4).

Decision by Board

(5)  The Board shall decide whether the employer and the other person are one employer under section 4, but shall not vary any decision of the arbitrator concerning the other matters in dispute. 2000, c. 41, s. 101 (5).

Order

(6)  Subject to subsection (7), the Board may make an order against the employer and, if it finds that the employer and the other person are one employer under section 4, it may make an order against the other person.  2000, c. 41, s. 101 (6).

Exception

(7)  The Board shall not require the other person to pay an amount or take or refrain from taking an action under a collective agreement that the other person could not be ordered to pay, take or refrain from taking in the absence of the collective agreement. 2000, c. 41, s. 101 (7).

Application

(8)  Section 100 applies, with necessary modifications, with respect to an order under this section.  2000, c. 41, s. 101 (8).

Enforcement by Employment Standards Officer

Meeting may be required

**102.** (1) An employment standards officer may, after giving at least 15 days written notice, require any of the persons referred to in subsection (2) to attend a meeting with the officer in either of the following circumstances:

    1.   The officer is investigating a complaint against an employer.

    2.   The officer, while inspecting a place under section 91 or 92, comes to have reasonable grounds to believe that an employer has contravened this Act or the regulations with respect to an employee.  2000, c. 41, s. 102 (1).

Attendees

    (2) Any of the following persons may be required to attend the meeting:

    1.   The employee.

    2.   The employer.

    3.   If the employer is a corporation, a director or employee of the corporation.  2000, c. 41, s. 102 (2).

Documents

    (3) The employment standards officer may also require the person to bring to the meeting any records or other documents specified in the notice.  2000, c. 41, s. 102 (3).

Content of notice

    (4) The notice shall specify the time and place at which the person is to attend.  2000, c. 41, s. 102 (4).

Delivery of notice

    (5) The notice may be delivered personally or in accordance with section 95.  2000, c. 41, s. 102 (5).

Compliance

(6) A person who receives a notice under this section shall comply with it. 2000, c. 41, s. 102 (6).

Order to pay wages

**103.** (1) If an employment standards officer finds that an employer owes wages to an employee, the officer may,

(a) arrange with the employer that the employer pay the wages directly to the employee; or

(b) order the employer to pay the amount of wages to the Director in trust. 2000, c. 41, s. 103 (1).

Administrative costs

(2) An order issued under clause (1) (b) shall also require the employer to pay to the Director in trust an amount for administrative costs equal to the greater of $100 and 10 per cent of the wages owing. 2000, c. 41, s. 103 (2).

If more than one employee

(3) A single order may be issued with respect to wages owing to more than one employee. 2000, c. 41, s. 103 (3).

Maximum amount

(4) An employment standards officer shall not issue an order under this section for more than $10,000 in wages with respect to any one employee. 2000, c. 41, s. 103 (4).

Contents of order

(5) The order shall contain information setting out the nature of the amount found to be owing to the employee or be accompanied by that information. 2000, c. 41, s. 103 (5).

Service

(6)  The order shall be served on the employer,

    (a)    if the employer is an individual, either personally or in accordance with section 95; or

    (b)    if the employer is a corporation,

        (i)    on the corporation in accordance with section 95, or

        (ii)    on an officer of the corporation or a person in charge of any location at which the corporation carries on business, personally or in accordance with section 95.  2000, c. 41, s. 103 (6).

Proof of service

(7)  A certificate of the employment standards officer who issued the order is evidence of its issuance, the service of the order on the person and the receipt of the order by the person if the officer,

    (a)    certifies in it that the copy of the order is a true copy of it;

    (b)    certifies in it that the order was served on the person; and

    (c)    sets out in it the method of service used.  2000, c. 41, s. 103 (7); 2001, c. 9, Sched. I, s. 1 (19).

Notice to employee

(7.1)  An employment standards officer who issues an order with respect to an employee under this section shall advise the employee of its issuance by letter served personally or in accordance with section 95.  2001, c. 9, Sched. I, s. 1 (20).

Proof of service

(7.2)  A certificate of the employment standards officer who served a letter on an employee under subsection (7.1) is evidence of the issuance of the order, service of the letter on the person and

the receipt of it by the person if the officer,

    (a)   certifies in it that the letter was served on the person; and

    (b)   sets out in it the method of service used.  2001, c. 9, Sched. I, s. 1 (20).

Compliance

    (8)  Every employer to whom an order is issued under this section shall comply with it according to its terms.  2000, c. 41, s. 103 (8).

Effect of order

    (9)  If an employer fails to apply under section 116 for a review of an order issued under this section within the time allowed for applying for that review, the order becomes final and binding against the employer.  2000, c. 41, s. 103 (9).

Same

    (10)  Subsection (9) applies even if a review hearing is held under this Act to determine another person's liability for the wages that are the subject of the order.  2000, c. 41, s. 103 (10).

Orders for compensation or reinstatement

    **104.**  (1)  If an employment standards officer finds that an employer has contravened any of the following Parts with respect to an employee, the officer may order that the employee be compensated for any loss he or she incurred as a result of the contravention or that he or she be reinstated or that he or she be both compensated and reinstated:

    1.   Part XIV (Leaves of Absence).

    2.   Part XVI (Lie Detectors).

    3.   Part XVII (Retail Business Establishments).

4.   Part XVIII (Reprisal).  2000, c. 41, s. 104 (1).

Order to hire

(2)  An employment standards officer who finds a contravention of Part XVI may order that an applicant for employment or an applicant to be a police officer be hired by an employer as defined in that Part or may order that he or she be compensated by an employer as defined in that Part or that he or she be both hired and compensated.  2000, c. 41, s. 104 (2).

Terms of orders

(3)  If an order made under this section requires a person to compensate an employee, it shall also require the person to pay to the Director in trust,

(a)   the amount of the compensation; and

(b)   an amount for administration costs equal to the greater of $100 and 10 per cent of the amount of compensation.  2000, c. 41, s. 104 (3).

How orders apply

(4)  Subsections 103 (3) and (5) to (9) apply, with necessary modifications, with respect to orders issued under this section. 2000, c. 41, s. 104 (4).

Employee cannot be found

**105.**  (1)  If an employment standards officer has arranged with an employer that the employer pay wages under clause 103 (1) (a) directly to the employee and the employer is unable to locate the employee despite having made reasonable efforts to do so, the employer shall pay the wages to the Director in trust.  2000, c. 41, s. 105 (1).

Settlements

(2)  If an employment standards officer has received money for

an employee under a settlement but the employee cannot be located, the money shall be paid to the Director in trust.  2000, c. 41, s. 105 (2).

When money vests in Crown

(3)  Money paid to or held by the Director in trust under this section vests in the Crown but may, without interest, be paid out to the employee, the employee's estate or such other person as the Director considers is entitled to it.  2000, c. 41, s. 105 (3).

Order against director, Part XX

**106.**  (1)  If an employment standards officer makes an order against an employer that wages be paid, he or she may make an order to pay wages for which directors are liable under Part XX against some or all of the directors of the employer and may serve a copy of the order on them together with a copy of the order to pay against the employer.  2000, c. 41, s. 106 (1).

Effect of order

(2)  If the directors do not comply with the order or do not apply to have it reviewed, the order becomes final and binding against those directors even though a review hearing is held to determine another person's liability under this Act.  2000, c. 41, s. 106 (2).

Orders, insolvent employer

(3)  If an employer is insolvent and the employee has caused a claim for unpaid wages to be filed with the receiver appointed by a court with respect to the employer or with the employer's trustee in bankruptcy, and the claim has not been paid, the employment standards officer may issue an order to pay wages for which directors are liable under Part XX against some or all of the directors and shall serve it on them.  2000, c. 41, s. 106 (3).

Procedure

(4)  Subsection (2) applies with necessary modifications to an order made under subsection (3).  2000, c. 41, s. 106 (4).

Maximum liability

(5) Nothing in this section increases the maximum liability of a director beyond the amounts set out in section 81.  2000, c. 41, s. 106 (5).

Payment to Director

(6) At the discretion of the Director, a director who is subject to an order under this section may be ordered to pay the wages in trust to the Director.  2000, c. 41, s. 106 (6).

Service of orders on directors

(7) An order issued against a director under this section may be served personally or in accordance with section 95.  2001, c. 9, Sched. I, s. 1 (21).

If returned

(8) If an order served by mail under section 95 is returned and the director is not served personally, the Director may direct the Board to consider the manner of service.  2000, c. 41, s. 106 (8).

Board powers

(9) If the Board is directed to consider the manner of service, it may order that service be effected in such manner as it considers appropriate in the circumstances.  2000, c. 41, s. 106 (9).

Further order, Part XX

**107.** (1) An employment standards officer may make an order to pay wages for which directors are liable under Part XX against some or all of the directors of an employer who were not the subject of an order under section 106, and may serve it on them,

(a)   after an employment standards officer has made an order against the employer under section 103 that wages be paid and they have not been paid and the employer has not applied to have the order reviewed;

(b)   after an employment standards officer has made an order against directors under subsection 106 (1) or (3) and the amount has not been paid and the employer or the directors have not applied to have it reviewed;

(c)   after the Board has issued, amended or affirmed an order under section 119 if the order, as issued, amended or affirmed, requires the employer or the directors to pay wages and the amount set out in the order has not been paid.  2000, c. 41, s. 107 (1).

Payment to Director

(2)  At the discretion of the Director, a director who is subject to an order under this section may be ordered to pay the wages in trust to the Director.  2000, c. 41, s. 107 (2).

Service

(3)  Subsections 106 (7) to (9) apply, with necessary modifications, to an order issued under this section.  2000, c. 41, s. 107 (3).

Compliance order

**108.**  (1)  If an employment standards officer finds that a person has contravened a provision of this Act or the regulations, the officer may,

(a)   order that the person cease contravening the provision;

(b)   order what action the person shall take or refrain from taking in order to comply with the provision; and

(c)   specify a date by which the person must do so.  2000, c. 41, s. 108 (1).

Payment cannot be required

(2)  No order issued under this section shall require the payment of wages or compensation to an employee.  2000, c. 41,

s. 108 (2).

Other means not a bar

(3)  Nothing in subsection (2) precludes an employment standards officer from issuing an order under section 103, 104, 106 or 107 and an order under this section in respect of the same contravention.  2000, c. 41, s. 108 (3).

Service, effect, etc.

(4)  Subsections 103 (6), (7), (8) and (9) apply, with necessary modifications, with respect to an order issued under this section. 2000, c. 41, s. 108 (4).

Injunction proceeding

(5)  At the instance of the Director, the contravention of an order made under subsection (1) may be restrained upon an application, made without notice, to a judge of the Superior Court of Justice. 2000, c. 41, s. 108 (5).

Same

(6)  Subsection (5) applies with respect to a contravention of an order in addition to any other remedy or penalty for its contravention.  2000, c. 41, s. 108 (6).

Money paid when no review

**109.**  (1)  Money paid to the Director under any of the following orders shall be paid to the employee with respect to whom the order was issued unless an application for review is made under section 116 within the period required under that section:

1.    Money with respect to wages or compensation under an order issued under section 103 or 104.

2.    Money with respect to wages paid to the Director in trust under an order made under section 106 or 107.  2000, c. 41, s. 109 (1).

Money distributed rateably

(2)  If the money paid to the Director under one of those orders is not enough to pay all of the employees entitled to it under the order the full amount to which they are entitled, the Director shall distribute that money, including money received with respect to administrative costs, to the employees in proportion to their entitlement.  2000, c. 41, s. 109 (2).

No proceeding against Director

(3)  No proceeding shall be instituted against the Director for acting in compliance with this section.  2000, c. 41, s. 109 (3).

Refusal to issue order

**110.**  (1)  If, after an employee files a complaint alleging a contravention of this Act in respect of which an order could be issued under section 103, 104 or 108, an employment standards officer assigned to investigate the complaint refuses to issue such an order, the officer shall advise the employee of the refusal by letter served personally or in accordance with section 95.  2000, c. 41, s. 110 (1).

Deemed refusal

(2)  If no order is issued with respect to a complaint described in subsection (1) within two years after it was filed, an employment standards officer shall be deemed to have refused to issue an order and to have served on the employee a letter advising the employee of the refusal on the last day of the second year.  2000, c. 41, s. 110 (2).

Time limit on recovery, employee's complaint

**111.**  (1)  If an employee files a complaint alleging a contravention of this Act or the regulations, the employment standards officer investigating the complaint may not issue an order for wages that became due to the employee under the provision that was the subject of the complaint or any other provision of this

Act or the regulations if the wages became due more than six months before the complaint was filed.  2001, c. 9, Sched. I, s. 1 (22).

Same, another employee's complaint

(2)  If, in the course of investigating a complaint, an employment standards officer finds that an employer has contravened this Act or the regulations with respect to an employee who did not file a complaint, the officer may not issue an order for wages that became due to that employee as a result of that contravention if the wages became due more than six months before the complaint was filed.  2001, c. 9, Sched. I, s. 1 (22).

Same, inspection

(3)  If an employment standards officer finds during an inspection that an employer has contravened this Act or the regulations with respect to an employee, the officer may not issue an order for wages that became due to the employee more than six months before the officer commenced the inspection.  2001, c. 9, Sched. I, s. 1 (22).

Vacation pay

(3.1)  Despite subsections (1) to (3), the time limit within which vacation pay must have become due under those subsections is 12 months, rather than six months.  2002, c. 18, Sched. J, s. 3 (28).

Repeated contraventions

(4)  Despite subsections (1) to (3), the time limit within which wages must have become due under those subsections is 12 months, rather than six months, if,

(a)    the employment standards officer investigating the complaint or performing the inspection finds that the employer has contravened the same provision of this Act or the regulations more than once with respect to the employee;

(b)    the contraventions were in each case with respect to

wages to which the employee became entitled under the same provision of this Act or the regulations or under provisions of the employee's employment contract that are identical or are virtually identical; and

(c)   at least one of the contraventions occurred within the six-month period referred to under those subsections. 2001, c. 9, Sched. I, s. 1 (22).

Same

(5)  Subsection (4) applies with respect to repeated contraventions of section 11 or 13 only if,

(a)   none of those contraventions are also contraventions of another provision of this Act or the regulations; or

(b)   all of those contraventions are also contraventions of the same provision of this Act or the regulations, other than section 11 or 13, or of provisions of the employee's employment contract that are identical or virtually identical.  2001, c. 9, Sched. I, s. 1 (22).

Complaints from different employees

(6)  If two or more employees file complaints alleging contraventions of this Act or the regulations and at least one of the contraventions in each of the complaints arose under the same provision of this Act or the regulations or under identical or virtually identical provisions of their employment contracts, subsections (1) and (2) apply with respect to all of the complaints, as if all of them had been filed on the day the first complaint was filed.  2001, c. 9, Sched. I, s. 1 (22).

Same

(7)  Subsection (6) applies with respect to contraventions of section 11 or 13 with respect to different employees only if,

(a)   none of those contraventions are also contraventions of another provision of this Act or the regulations; or

(b)   all of those contraventions are also contraventions of the same provision of this Act or the regulations, other than section 11 or 13, or of provisions of the employees' employment contracts that are identical or virtually identical.  2001, c. 9, Sched. I, s. 1 (22).

Same

(8)  Subsection (6) does not apply with respect to a complaint filed after an employment standards officer has issued an order under subsection (6) with respect to an earlier complaint or advised an earlier complainant of his or her refusal to issue such an order. 2001, c. 9, Sched. I, s. 1 (22).

Settlements

Settlement

**112.**  (1)  Subject to subsection (8), if an employee and an employer who have agreed to a settlement respecting a contravention or alleged contravention of this Act inform an employment standards officer in writing of the terms of the settlement and do what they agreed to do under it,

(a)   the settlement is binding on the parties;

(b)   any complaint filed by the employee respecting the contravention or alleged contravention is deemed to have been withdrawn;

(c)   any order made in respect of the contravention or alleged contravention is void; and

(d)   any proceeding, other than a prosecution, respecting the contravention or alleged contravention is terminated.  2000, c. 41, s. 112 (1).

Compliance orders

(2)  Clause (1) (c) does not apply with respect to an order issued under section 108.  2000, c. 41, s. 112 (2).

Notices of contravention

(3)  This section does not apply with respect to a notice of contravention.  2000, c. 41, s. 112 (3).

Payment by officer

(4)  If an employment standards officer receives money for an employee under this section, the officer may pay it directly to the employee or to the Director in trust.  2000, c. 41, s. 112 (4).

Same

(5)  If money is paid in trust to the Director under subsection (4), the Director shall pay it to the employee.  2000, c. 41, s. 112 (5).

Administrative costs

(6)  If the settlement concerns an order to pay, the Director is, despite clause (1) (c), entitled to be paid that proportion of the administrative costs that were ordered to be paid that is the same as the proportion of the amount of wages or compensation ordered to be paid that the employee is entitled to receive under the settlement.  2000, c. 41, s. 112 (6).

Restrictions on settlements

(7)  No person shall enter into a settlement which would permit or require that person or any other person to engage in future contraventions of this Act.  2000, c. 41, s. 112 (7).

Application to void settlement

(8)  If, upon application to the Board, the employee demonstrates that he or she entered into the settlement as a result of fraud or coercion,

(a)   the settlement is void;

(b)   the complaint is deemed never to have been withdrawn;

(c)   any order made in respect of the contravention or alleged contravention is reinstated;

(d)   any proceedings respecting the contravention or alleged contravention that were terminated shall be resumed.  2000, c. 41, s. 112 (8).

Notices of Contravention

Notice of contravention

**113.** (1)  If an employment standards officer believes that a person has contravened a provision of this Act, the officer may issue a notice to the person setting out the officer's belief and the prescribed penalty for that contravention.  2000, c. 41, s. 113 (1).

Information

(2)  The notice shall contain or be accompanied by information setting out the nature of the contravention.  2000, c. 41, s. 113 (2).

Service

(3)  A notice issued under this section shall be served on the person,

(a)   if the person is an individual, personally or in accordance with section 95; or

(b)   if the person is a corporation,

(i)   on the corporation, in accordance with section 95, or

(ii)   on an officer of the corporation or a person in charge of any location at which the corporation carries on business, personally or in accordance with section 95.  2000, c. 41, s. 113 (3).

Proof of service

(4)  A certificate of the employment standards officer who

issued a notice under this section is evidence of its issuance, service of it on the person and the receipt of it by the person if the officer,

    (a)   certifies in it that the copy of the notice is a true copy of it;

    (b)   certifies in it that the notice was served on the person; and

    (c)   sets out in it the method of service used.  2000, c. 41, s. 113 (4).

Deemed contravention

    (5)  The person shall be deemed to have contravened the provision set out in the notice if,

    (a)   the person fails to apply to the Board for a review of the notice within the period set out in subsection 122 (1); or

    (b)   the person applies to the Board for a review of the notice and the Board finds that the person contravened the provision set out in the notice.  2001, c. 9, Sched. I, s. 1 (23).

Penalty

    (6)  A person who is deemed to have contravened this Act shall pay to the Minister of Finance the penalty for the deemed contravention and the amount of any collector's fees and disbursements added to the amount under subsection 128 (2). 2001, c. 9, Sched. I, s. 1 (23).

Same

    (6.1)  The payment under subsection (6) shall be made within 30 days after the day the notice of contravention was served or, if the notice of contravention is appealed, within 30 days after the Board finds that there was a contravention.  2001, c. 9, Sched. I, s. 1 (23); 2002, c. 18, Sched. J, s. 3 (29).

Other means not a bar

(7)  An employment standards officer may issue a notice to a person under this section even though an order has been or may be issued against the person under section 103, 104 or 108 or the person has been or may be prosecuted for or convicted of an offence with respect to the same contravention.  2000, c. 41, s. 113 (7).

Trade union

(8)  This section does not apply with respect to a contravention of this Act with respect to an employee who is represented by a trade union.  2000, c. 41, s. 113 (8).

Director

(9)  This section does not apply with respect to a contravention of this Act by a director or officer of an employer that is a corporation.  2000, c. 41, s. 113 (9).

Limitation Period

Limitation period re orders and notices

**114.** (1)  An employment standards officer shall not issue an order to pay wages or compensation or a notice of contravention with respect to a contravention of this Act concerning an employee,

(a)    if the employee filed a complaint about the contravention, more than two years after the complaint was filed;

(b)    if the employee did not file a complaint but another employee of the same employer did file a complaint, more than two years after the other employee filed his or her complaint if the officer discovered the contravention with respect to the employee while investigating the complaint; or

(c)    if the employee did not file a complaint and clause (b) does not apply, more than two years after an employment standards officer commenced an inspection with respect to the

employee's employer for the purpose of determining whether a contravention occurred.  2000, c. 41, s. 114 (1).

Complaints from different employees

(2)  If an employee files a complaint about a contravention of this Act by his or her employer and another employee of the same employer has previously filed a complaint about substantially the same contravention, subsection (1) shall be applied as if the employee who filed the subsequent complaint did not file a complaint.  2000, c. 41, s. 114 (2).

Exception

(3)  Subsection (2) does not apply if, prior to the day on which the subsequent complaint was filed, an employment standards officer had, with respect to the earlier complaint, already issued an order or advised the complainant that he or she was refusing to issue an order.  2000, c. 41, s. 114 (3).

Restriction on rescission or amendment

(4)  An employment standards officer shall not amend or rescind an order to pay wages or compensation after the last day on which he or she could have issued that order under subsection (1) unless the employer against whom the order was issued and the employee with respect to whom it was issued consent to the rescission or amendment.  2001, c. 9, Sched. I, s. 1 (24).

Same

(5)  An employment standards officer shall not amend or rescind a notice of contravention after the last day on which he or she could have issued that notice under subsection (1) unless the employer against whom the notice was issued consents to the rescission or amendment.  2001, c. 9, Sched. I, s. 1 (24).

Meaning of "substantially the same"

**115.**  (1)  For the purposes of section 114, contraventions with respect to two employees are substantially the same if both

employees became entitled to recover money under this Act as a result of the employer's failure to comply with the same provision of this Act or the regulations or with identical or virtually identical provisions of their employment contracts.  2000, c. 41, s. 115 (1).

Exception, payment of wages, deductions

(2)  Despite subsection (1), contraventions with respect to two employees are not substantially the same merely because both employees became entitled to recover money under this Act as a result of a contravention of section 11 or 13 if the contravention of the section was with respect to wages due under different provisions of this Act or the regulations or under provisions of their employment contracts which are not identical or virtually identical. 2000, c. 41, s. 115 (2).

part xxiII
reviews by the board

Reviews of Orders

Review

**116.**  (1)  A person against whom an order has been issued under section 103, 104, 106, 107 or 108 is entitled to a review of the order by the Board if, within the period set out in subsection (4), the person,

(a)    applies to the Board in writing for a review;

(b)    in the case of an order under section 103, pays the amount owing under the order to the Director in trust or provides the Director with an irrevocable letter of credit acceptable to the Director in that amount; and

(c)    in the case of an order under section 104, pays the lesser of the amount owing under the order and $10,000 to the Director in trust or provides the Director with an irrevocable letter of credit acceptable to the Director in that amount.  2000, c. 41, s. 116 (1); 2001, c. 9, Sched. I, s. 1 (25).

Employee seeks review of order

(2)  If an order has been issued under section 103 or 104 with respect to an employee, the employee is entitled to a review of the order by the Board if, within the period set out in subsection (4), the employee applies to the Board in writing for a review.  2001, c. 9, Sched. I, s. 1 (26).

Employee seeks review of refusal

(3)  If an employee has filed a complaint alleging a contravention of this Act or the regulations and an order could be issued under section 103, 104 or 108 with respect to such a contravention, the employee is entitled to a review of an employment standards officer's refusal to issue such an order if, within the period set out in subsection (4), the employee applies to the Board in writing for such a review.  2001, c. 9, Sched. I, s. 1 (26).

Period for applying for review

(4)  An application for a review under subsection (1), (2) or (3) shall be made within 30 days after the day on which the order, letter advising of the order or letter advising of the refusal to issue an order, as the case may be, is served.  2001, c. 9, Sched. I, s. 1 (26).

Extension of time

(5)  The Board may extend the time for applying for a review under this section if it considers it appropriate in the circumstances to do so and, in the case of an application under subsection (1),

(a)    the Board has enquired of the Director whether the Director has paid to the employee the wages or compensation that were the subject of the order and is satisfied that the Director has not done so; and

(b)    the Board has enquired of the Director whether a collector's fees or disbursements have been added to the amount

of the order under subsection 128 (2) and, if so, the Board is satisfied that fees and disbursements were paid by the person to whom the order was issued.  2001, c. 9, Sched. I, s. 1 (26).

Hearing

(6)  Subject to subsection 118 (2), the Board shall hold a hearing for the purposes of the review.  2000, c. 41, s. 116 (6).

Parties

(7)  The following are parties to the review:

1.    The applicant.

2.    If the employer applies for the review, the employee with respect to whom the order was issued.

3.    If the employee applies for the review, the employee's employer.

4.    If a director of a corporation applies for the review, the applicant and each director, other than the applicant, on whom the order was served.

5.    The Director.

6.    Any other persons specified by the Board.  2000, c. 41, s. 116 (7).

Parties given full opportunity

(8)  The Board shall give the parties full opportunity to present their evidence and make their submissions.  2000, c. 41, s. 116 (8).

Practice and procedure for review

(9)  The Board shall determine its own practice and procedure with respect to a review under this section.  2000, c. 41, s. 116 (9).

Money held in trust pending review

**117.** (1)  This section applies if money with respect to an order to pay wages or compensation is paid to the Director in trust and the employer applies to the Board for a review of the order.  2000, c. 41, s. 117 (1).

Interest-bearing account

(2)  The money held in trust shall be held in an interest-bearing account while the application for review is pending.  2000, c. 41, s. 117 (2).

If settlement

(3)  If the matter is settled under section 112 or 120, the amount held in trust shall, subject to subsection 112 (6) or 120 (6), be paid out in accordance with the settlement, with interest, calculated at the rate and in the manner determined by the Director under subsection 88 (5).  2000, c. 41, s. 117 (3).

If no settlement

(4)  If the matter is not settled under section 112 or 120, the amount paid into trust shall be paid out in accordance with the Board's decision together with interest calculated at the rate and in the manner determined by the Director under subsection 88 (5).  2000, c. 41, s. 117 (4).

Rules of practice

**118.** (1)  The chair of the Board may make rules,

(a)   governing the Board's practice and procedure and the exercise of its powers; and

(b)   providing for forms and their use.  2000, c. 41, s. 118 (1); 2001, c. 9, Sched. I, s. 1 (27).

Expedited decisions

(2)  The chair of the Board may make rules to expedite decisions about the Board's jurisdiction, and those rules,

(a)   may provide that the Board is not required to hold a hearing; and

(b)   despite subsection 116 (8), may limit the extent to which the Board is required to give full opportunity to the parties to present their evidence and to make their submissions.  2000, c. 41, s. 118 (2).

Effective date of rules

(3)  A rule made under this section comes into force on the day determined by order of the Lieutenant Governor in Council.  2000, c. 41, s. 118 (3).

Conflict with *Statutory Powers Procedure Act*

(4)  If there is a conflict between the rules made under this section and the *Statutory Powers Procedure Act*, the rules under this section prevail.  2000, c. 41, s. 118 (4).

Rules not regulations

(5)  Rules made under this section are not regulations within the meaning of the *Regulations Act*.  2000, c. 41, s. 118 (5).

Powers of Board

**119.**  (1)  This section sets out the Board's powers in a review under section 116.  2000, c. 41, s. 119 (1).

Persons to represent groups

(2)  If a group of parties have the same interest or substantially the same interest, the Board may designate one or more of the parties in the group to represent the group.  2000, c. 41, s. 119 (2).

Quorum

(3)  The chair or a vice-chair of the Board constitutes a quorum for the purposes of this section and is sufficient for the exercise of the jurisdiction and powers of the Board under it.  2000, c. 41,

s. 119 (3).

Posting of notices

(4)  The Board may require a person to post and to keep posted any notices that the Board considers appropriate even if the person is not a party to the review.  2000, c. 41, s. 119 (4).

Same

(5)  If the Board requires a person to post and keep posted notices, the person shall post the notices and keep them posted in a conspicuous place or places in or upon the person's premises where it is likely to come to the attention of other persons having an interest in the review.  2000, c. 41, s. 119 (5).

Powers of Board

(6)  The Board may, with necessary modifications, exercise the powers conferred on an employment standards officer under this Act and may substitute its findings for those of the officer who issued the order or refused to issue the order.  2000, c. 41, s. 119 (6).

Dealing with order

(7)  Without restricting the generality of subsection (6),

(a)    on a review of an order, the Board may amend, rescind or affirm the order or issue a new order; and

(b)    on a review of a refusal to issue an order, the Board may issue an order or affirm the refusal.  2000, c. 41, s. 119 (7).

Labour relations officers

(8)  Any time after an application for review is made, the Board may direct a labour relations officer to examine any records or other documents and make any inquiries it considers appropriate, but it shall not direct an employment standards officer to do so.  2000, c. 41, s. 119 (8).

Powers of labour relations officers

(9)  Sections 91 and 92 apply with necessary modifications with respect to a labour relations officer acting under subsection (8). 2000, c. 41, s. 119 (9).

Wages or compensation owing

(10)  Subsection (11) applies if, during a review of an order requiring the payment of wages or compensation or a review of a refusal to issue such an order,

(a)   the Board finds that a specified amount of wages or compensation is owing; or

(b)   there is no dispute that a specified amount of wages or compensation is owing.  2000, c. 41, s. 119 (10).

Interim order

(11)  The Board shall affirm the order to the extent of the specified amount or issue an order to the extent of that amount, even though the review is not yet completed.  2000, c. 41, s. 119 (11).

Interest

(12)  If the Board issues, amends or affirms an order or issues a new order requiring the payment of wages or compensation, the Board may order the person against whom the order was issued to pay interest at the rate and calculated in the manner determined by the Director under subsection 88 (5).  2000, c. 41, s. 119 (12).

Decision final

(13)  A decision of the Board is final and binding upon the parties to the review and any other parties as the Board may specify.  2000, c. 41, s. 119 (13).

Judicial review

(14)  Nothing in subsection (13) prevents a court from reviewing a decision of the Board under this section, but a decision of the Board concerning the interpretation of this Act shall not be overturned unless the decision is unreasonable.  2000, c. 41, s. 119 (14).

Settlement through labour relations officer

**120.** (1)  The Board may authorize a labour relations officer to attempt to effect a settlement of the matters raised in an application for review under section 116.  2000, c. 41, s. 120 (1).

Certain matters not bar to settlement

(2)  A settlement may be effected under this section even if,

(a)   the employment standards officer who issued the order or refused to issue the order does not participate in the settlement discussions or is not advised of the discussions or settlement; or

(b)   the review under section 116 has started.  2000, c. 41, s. 120 (2).

Compliance orders

(3)  A settlement respecting a compliance order shall not be made if the Director has not approved the terms of the settlement. 2000, c. 41, s. 120 (3).

Effect of settlement

(4)  If the parties to a settlement under this section do what they agreed to do under the settlement,

(a)   the settlement is binding on the parties;

(b)   if the review concerns an order, the order is void; and

(c)   the review is terminated.  2000, c. 41, s. 120 (4).

Application to void settlement

(5) If, upon application to the Board, the employee demonstrates that he or she entered into the settlement as a result of fraud or coercion,

    (a)   the settlement is void;

    (b)   if the review concerned an order, the order is reinstated; and

    (c)   the review shall be resumed.  2000, c. 41, s. 120 (5).

Distribution

(6) If the order that was the subject of the application required the payment of money to the Director in trust, the Director,

    (a)   shall distribute the amount held in trust with respect to wages or compensation in accordance with the settlement; and

    (b)   despite clause (4) (b), is entitled to be paid that proportion of the administrative costs that were ordered to be paid that is the same as the proportion of the amount of wages or compensation ordered to be paid that the employee is entitled to receive under the settlement.  2000, c. 41, s. 120 (6).

Referral of Matter under Part XIII

Referral

**121.** (1) If, as a result of a complaint or otherwise, the Director comes to believe that an employer, an organization of employers, an organization of employees or a person acting directly on behalf of any of them may have contravened Part XIII (Benefit Plans), the Director may refer the matter to the Board.  2000, c. 41, s. 121 (1).

Hearing

(2) If a matter is referred to the Board under subsection (1), the Board shall hold a hearing and determine whether the employer, organization or person contravened Part XIII.  2000, c. 41, s. 121 (2).

Powers of Board

(3)  If the Board determines that the employer, organization or person acting directly on behalf of an employer or organization contravened Part XIII, the Board may order the employer, organization or person,

(a)   to cease contravening that Part and to take whatever action the Board considers necessary to that end; and

(b)   to compensate any person or persons who may have suffered loss or been disadvantaged as a result of the contravention.  2000, c. 41, s. 121 (3).

Certain review provisions applicable

(4)  Subsections 116 (8) and (9), 118 (1) and (3) to (5), 119 (1) to (5), (8), (9), (13) and (14) and 120 (1), (4) and (5) apply, with necessary modifications, with respect to a proceeding under this section.  2000, c. 41, s. 121 (4).

Review of Notice of Contravention

Review of notice of contravention

**122.**  (1)  A person against whom a notice of contravention has been issued under section 113 may dispute the notice if the person makes a written application to the Board for a review,

(a)   within 30 days after the date of service of the notice; or

(b)   if the Board considers it appropriate in the circumstances to extend the time for applying, within the period specified by the Board.  2000, c. 41, s. 122 (1).

Hearing

(2)  The Board shall hold a hearing for the purposes of the review.  2000, c. 41, s. 122 (2).

Parties

(3)  The parties to the review are the person against whom the notice was issued and the Director.  2000, c. 41, s. 122 (3).

Onus

(4)  On a review under this section, the onus is on the Director to establish, on a balance of probabilities, that the person against whom the notice of contravention was issued contravened the provision of this Act indicated in the notice.  2000, c. 41, s. 122 (4).

Decision

(5)  The Board may,

(a)    find that the person did not contravene the provision and rescind the notice;

(b)    find that the person did contravene the provision and affirm the notice; or

(c)    find that the person did contravene the provision but amend the notice by reducing the penalty.  2001, c. 9, Sched. I, s. 1 (28).

Collector's fees and disbursements

(6)  If the Board finds that the person contravened the provision and if it extended the time for applying for a review under clause (1) (b),

(a)    before issuing its decision, it shall enquire of the Director whether a collector's fees and disbursements have been added to the amount set out in the notice under subsection 128 (2); and

(b)    if they have been added to that amount, the Board shall advise the person of that fact and of the total amount, including the collector's fees and disbursements, when it issues its decision. 2001, c. 9, Sched. I, s. 1 (28).

Certain provisions applicable

(7)  Subsections 116 (8) and (9), 118 (1), (3), (4) and (5) and 119 (3), (4), (5), (13) and (14) apply, with necessary modifications, to a review under this section.  2001, c. 9, Sched. I, s. 1 (28).

General Provisions Respecting the Board

Persons from Board not compellable

**123.**  (1)  Except with the consent of the Board, none of the following persons may be compelled to give evidence in a civil proceeding or in a proceeding before the Board or another board or tribunal with respect to information obtained while exercising his or her powers or performing his or her duties under this Act:

1.   A Board member.

2.   The registrar of the Board.

3.   An employee of the Board.  2000, c. 41, s. 123 (1).

Non-disclosure

(2)  A labour relations officer who receives information or material under this Act shall not disclose it to any person or body other than the Board unless the Board authorizes the disclosure.  2000, c. 41, s. 123 (2).

When no decision after six months

**124.**  (1)  This section applies if the Board has commenced a hearing to review an order, refusal to issue an order or notice of contravention, six months or more have passed since the last day of hearing and a decision has not been made.  2000, c. 41, s. 124 (1).

Termination of proceeding

(2)  On the application of a party in the proceeding, the chair may terminate the proceeding.  2000, c. 41, s. 124 (2).

Re-institution of proceeding

(3)  If a proceeding is terminated according to subsection (2), the chair shall re-institute the proceeding upon such terms and conditions as the chair considers appropriate.  2000, c. 41, s. 124 (3).

PART XXIV
COLLECTION

Third party demand

**125.** (1)  If the Director believes or suspects that a person owes money to or is holding money for an employer or a director who is liable to make a payment under this Act, the Director may demand that the person pay all or part of the money otherwise payable to the employer or director to the Director in trust on account of the liability under this Act.  2000, c. 41, s. 125 (1).

Notice

(2)  The Director shall serve notice of the demand either personally or in accordance with section 95.  2000, c. 41, s. 125 (2).

Discharge

(3)  A person who pays money to the Director in accordance with a demand under this section is relieved from liability for the amount owed to or held for the employer or director to the extent of that payment.  2000, c. 41, s. 125 (3).

Liability

(4)  If a person who receives a demand under this section makes a payment to the employer or director with respect to whom the demand was made without complying with the demand, the person shall pay to the Director an amount equal to the lesser of,

(a)   the amount paid to the employer or director; and

(b)   the amount of the demand.  2000, c. 41, s. 125 (4).

Filing of order

**126.** (1) If an order to pay money has been made under this Act, the Director may cause a copy of the order, certified by the Director to be a true copy, to be filed in a court of competent jurisdiction. 2000, c. 41, s. 126 (1).

Advice to person against whom order was made

(2) If the Director files a copy of the order, he or she shall serve a letter in accordance with section 95 upon the person against whom the order was issued advising the person of the filing. 2000, c. 41, s. 126 (2).

Certificate enforceable

(3) The Director may enforce an order filed under subsection (1) in the same manner as a judgment or order of the court. 2000, c. 41, s. 126 (3).

Notices of contravention

(4) Subsections (1), (2) and (3) apply, with necessary modifications, to a notice of contravention. 2000, c. 41, s. 126 (4).

Collectors

Director may authorize collector

**127.** (1) The Director may authorize a collector to exercise those powers that the Director specifies in the authorization to collect amounts owing under this Act or under an order made by a reciprocating state to which section 130 applies. 2000, c. 41, s. 127 (1).

Same

(2) The Director may specify his or her powers under sections 125, 126, 130 and subsection 135 (3) and the Board's powers under section 19 of the *Statutory Powers Procedure Act* in an authorization under subsection (1). 2000, c. 41, s. 127 (2).

Costs of collection

(3)  Despite clause 22 (a) of the *Collection Agencies Act*, the Director may also authorize the collector to collect a reasonable fee or reasonable disbursements or both from each person from whom the collector seeks to collect amounts owing under this Act.  2000, c. 41, s. 127 (3).

Same

(4)  The Director may impose conditions on an authorization under subsection (3) and may determine what constitutes a reasonable fee or reasonable disbursements for the purposes of that subsection.  2000, c. 41, s. 127 (4).

Exception re disbursements

(5)  The Director shall not authorize a collector who is required to be registered under the *Collection Agencies Act* to collect disbursements.  2000, c. 41, s. 127 (5).

Collector's powers

**128.**  (1)  A collector may exercise any of the powers specified in an authorization of the Director under section 127.  2000, c. 41, s. 128 (1).

Fees and disbursements part of order

(2)  If a collector is seeking to collect an amount owing under an order or notice of contravention, any fees and disbursements authorized under subsection 127 (3) shall be deemed to be owing under and shall be deemed to be added to the amount of the order or notice of contravention.  2000, c. 41, s. 128 (2).

Distribution of money collected re wages or compensation

(3)  Subject to subsection (4), a collector,

(a)    shall pay any amount collected with respect to wages or compensation,

(i)    to the Director in trust, or

(ii)   with the written consent of the Director, to the person entitled to the wages or compensation;

(b)   shall pay any amount collected with respect to administrative costs to the Director;

(c)   shall pay any amount collected with respect to a notice of contravention to the Minister of Finance; and

(d)   may retain any amount collected with respect to the fees and disbursements.  2000, c. 41, s. 128 (3).

Apportionment

(4)  If the money collected is less than the full amount owing to all persons, including the Director and the collector, the money shall be apportioned among those to whom it is owing in the proportion each is owed and paid to them.  2000, c. 41, s. 128 (4).

Settlement by collector

**129.**  (1)  A collector may agree to a settlement with the person from whom he or she seeks to collect money, but only with the written agreement of,

(a)   the person to whom the money is owed; or

(b)   in the case of a notice of contravention, the Director. 2000, c. 41, s. 129 (1).

Restriction

(2)  A collector shall not agree to a settlement under clause (1) (a) without the Director's written approval if the person to whom the money is owed would receive less than,

(a)   75 per cent of the money to which he or she was entitled; or

(b)   if another percentage is prescribed, the prescribed percentage of the money to which he or she was entitled.  2000,

c. 41, s. 129 (2).

Orders void where settlement

(3)  If an order to pay has been made with respect to an employee under section 103, 104, 106 or 107 and a settlement respecting the money that was found to be owing to the employee is made under this section, the order is void and the settlement is binding on the employee if the person against whom the order was issued does what the person agreed to do under the settlement unless, on application to the Board, the employee demonstrates that the settlement was entered into as a result of fraud or coercion.  2000, c. 41, s. 129 (3).

Notice of contravention

(4)  If a settlement respecting money that is owing under a notice of contravention is made under this section, the notice is void if the person against whom the notice was issued does what the person agreed to do under the settlement.  2000, c. 41, s. 129 (4).

Payment

(5)  The person who owes money under a settlement shall pay the amount agreed upon to the collector, who shall pay it out in accordance with section 128.  2000, c. 41, s. 129 (5).

Reciprocal Enforcement of Orders

Definitions

**130.**  (1)  In this section,

"order" includes a judgment and, in the case of a state whose employment standards legislation contains a provision substantially similar to subsection 126 (1), includes a certificate of an order for the payment of money owing under that legislation; ("ordonnance")

"state" includes another province or territory of Canada, a foreign state and a political subdivision of a state. ("État")  2000, c. 41, s. 130 (1).

Reciprocating states

(2)  The prescribed states are reciprocating states for the purposes of this section and the prescribed authorities with respect to those states are the authorities who may make applications under this section.  2000, c. 41, s. 130 (2).

Application for enforcement

(3)  The designated authority of a reciprocating state may apply to the Director for enforcement of an order for the payment of money issued under the employment standards legislation of that state.  2000, c. 41, s. 130 (3).

Copy of order

(4)  The application shall be accompanied by a copy of the order, certified as a true copy,

(a)   by the court in which the order was filed, if the employment standards legislation of the reciprocating state provides for the filing of the order in a court; or

(b)   by the designated authority, if the employment standards legislation of the reciprocating state does not provide for the filing of the order in a court.  2000, c. 41, s. 130 (4).

Enforcement

(5)  The Director may file a copy of the order in a court of competent jurisdiction and, upon its filing, the order is enforceable as a judgment or order of the court,

(a)   at the instance and in favour of the Director; or

(b)   at the instance and in favour of the designated authority.  2000, c. 41, s. 130 (5).

Costs

(6)  The Director or the designated authority, as the case may

be,

(a)    is entitled to the costs of enforcing the order as if it were an order of the court in which the copy of it was filed; and

(b)    may recover those costs in the same manner as sums payable under such an order may be recovered.  2000, c. 41, s. 130 (6).

PART XXV
OFFENCES and prosecutions

Offences

Offence to keep false records

**131.** (1)  No person shall make, keep or produce false records or other documents that are required to be kept under this Act or participate or acquiesce in the making, keeping or production of false records or other documents that are required to be kept under this Act.  2000, c. 41, s. 131 (1).

False or misleading information

(2)  No person shall provide false or misleading information under this Act.  2000, c. 41, s. 131 (2).

General offence

**132.**  A person who contravenes this Act or the regulations or fails to comply with an order, direction or other requirement under this Act or the regulations is guilty of an offence and on conviction is liable,

(a)    if the person is an individual, to a fine of not more than $50,000 or to imprisonment for a term of not more than 12 months or to both;

(b)    subject to clause (c), if the person is a corporation, to a fine of not more than $100,000; and

(c)   if the person is a corporation that has previously been convicted of an offence under this Act or a predecessor to it,

(i)   if the person has one previous conviction, to a fine of not more than $250,000, and

(ii)   if the person has more than one previous conviction, to a fine of not more than $500,000.  2000, c. 41, s. 132.

Additional orders re s. 74

**133.** (1)  If an employer is convicted under section 132 of contravening section 74, the court shall, in addition to any fine or term of imprisonment that is imposed, order that the employer take specific action or refrain from taking specific action to remedy the contravention.  2000, c. 41, s. 133 (1).

Reinstatement or compensation

(2)  Without restricting the generality of subsection (1), the order made by the court may require that an employee be paid any wages that are owing to him or her or that an employee be reinstated or he or she be compensated for any loss incurred by him or her as a result of the contravention or may require that the employee be both reinstated and compensated.  2000, c. 41, s. 133 (2).

Part XVI

(3)  If the contravention of section 74 was in relation to Part XVI (Lie Detectors) and the contravention affected an applicant for employment or an applicant to be a police officer, the court may require that the employer hire the applicant or compensate him or her or both hire and compensate him or her.  2000, c. 41, s. 133 (3).

Offence re order for reinstatement

**134.**  An employer who fails to comply with an order issued under section 133 is guilty of an offence and on conviction is liable,

(a)    if the employer is an individual, to a fine of not more than $2,000 for each day during which the failure to comply continues or to imprisonment for a term of not more than six months or to both; and

(b)    if the employer is a corporation, to a fine of not more than $4,000 for each day during which the failure to comply continues.  2000, c. 41, s. 134.

Additional orders re other contraventions

**135.** (1)  If an employer is convicted under section 132 of contravening a provision of this Act other than section 74, the court shall, in addition to any fine or term of imprisonment that is imposed, assess any amount owing to an employee affected by the contravention and order the employer to pay the amount assessed to the Director.  2000, c. 41, s. 135 (1).

Collection by Director

(2)  The Director shall attempt to collect the amount ordered to be paid under subsection (1) and if he or she is successful shall distribute it to the employee.  2000, c. 41, s. 135 (2).

Enforcement of order

(3)  An order under subsection (1) may be filed by the Director in a court of competent jurisdiction and upon filing shall be deemed to be an order of that court for the purposes of enforcement.  2000, c. 41, s. 135 (3).

Offence re directors' liability

**136.** (1)  A director of a corporation is guilty of an offence if the director,

(a)    fails to comply with an order of an employment standards officer under section 106 or 107 and has not applied for a review of that order; or

(b)    fails to comply with an order issued under section 106 or

107 that has been amended or affirmed by the Board on a review of the order under section 116 or with a new order issued by the Board on such a review. 2000, c. 41, s. 136 (1).

Penalty

(2) A director convicted of an offence under subsection (1) is liable to a fine of not more than $50,000. 2000, c. 41, s. 136 (2).

Offence re permitting offence by corporation

**137.** (1) If a corporation contravenes this Act or the regulations, an officer, director or agent of the corporation or a person acting or claiming to act in that capacity who authorizes or permits the contravention or acquiesces in it is a party to and guilty of the offence and is liable on conviction to the fine or imprisonment provided for the offence. 2000, c. 41, s. 137 (1).

Same

(2) Subsection (1) applies whether or not the corporation has been prosecuted or convicted of the offence. 2000, c. 41, s. 137 (2).

Onus of proof

(3) In a trial of an individual who is prosecuted under subsection (1), the onus is on the individual to prove that he or she did not authorize, permit or acquiesce in the contravention. 2000, c. 41, s. 137 (3).

Additional penalty

(4) If an individual is convicted under this section, the court may, in addition to any other fine or term of imprisonment that is imposed, assess any amount owing to an employee affected by the contravention and order the individual to pay the amount assessed to the Director. 2000, c. 41, s. 137 (4).

Collection by Director

(5)  The Director shall attempt to collect the amount ordered to be paid under subsection (4) and if he or she is successful shall distribute it to the employee.  2000, c. 41, s. 137 (5).

No prosecution without consent

(6)  No prosecution shall be commenced under this section without the consent of the Director.  2000, c. 41, s. 137 (6).

Proof of consent

(7)  The production of a document that appears to show that the Director has consented to a prosecution under this section is admissible as evidence of the Director's consent.  2000, c. 41, s. 137 (7).

Prosecution of employment standards officer

**137.1**  (1)  No prosecution of an employment standards officer shall be commenced with respect to an alleged contravention of subsection 89 (2) without the consent of the Deputy Attorney General.  2001, c. 9, Sched. I, s. 1 (29).

Proof of consent

(2)  The production of a document that appears to show that the Deputy Attorney General has consented to a prosecution of an employment standards officer is admissible as evidence of his or her consent.  2001, c. 9, Sched. I, s. 1 (29).

Where prosecution may be heard

**138.**  (1)  Despite section 29 of the *Provincial Offences Act*, the prosecution of an offence under this Act may be heard and determined by the Ontario Court of Justice sitting in the area where the accused is resident or carries on business, if the prosecutor so elects.  2000, c. 41, s. 138 (1).

Election to have judge preside

(2)  The Attorney General or an agent for the Attorney General

may by notice to the clerk of the court require that a judge of the court hear and determine the prosecution.  2000, c. 41, s. 138 (2).

Publication re convictions

**138.1**  (1)  If a person, including an individual, is convicted of an offence under this Act, the Director may publish or otherwise make available to the general public the name of the person, a description of the offence, the date of the conviction and the person's sentence.  2004, c. 21, s. 9.

Internet publication

(2)  Authority to publish under subsection (1) includes authority to publish on the Internet.  2004, c. 21, s. 9.

Disclosure

(3)  Any disclosure made under subsection (1) shall be deemed to be in compliance with clause 42 (e) of the *Freedom of Information and Protection of Privacy Act*.  2004, c. 21, s. 9.

Limitation period

**139.**  No prosecution shall be commenced under this Act more than two years after the date on which the offence was committed or alleged to have been committed.  2000, c. 41, s. 139.

PART XXVI
MISCELLANEOUS EVIDENTIARY PROVISIONS

Copy constitutes evidence

**140.**  (1)  In a prosecution or other proceeding under this Act, a copy of an order or notice of contravention that appears to be made under this Act or the regulations and signed by an employment standards officer or the Board is evidence of the order or notice and of the facts appearing in it without proof of the signature or office of the person appearing to have signed the order or notice.  2000, c. 41, s. 140 (1).

Same

(2)  In a prosecution or other proceeding under this Act, a copy of a record or other document or an extract from a record or other document that appears to be certified as a true copy or accurate extract by an employment standards officer is evidence of the record or document or the extracted part of the record or document and of the facts appearing in the record, document or extract without proof of the signature or office of the person appearing to have certified the copy or extract or any other proof.  2000, c. 41, s. 140 (2).

Certificate of Director constitutes evidence

(3)  In a prosecution or other proceeding under this Act, a certificate that appears to be signed by the Director setting out that the records of the ministry indicate that an employer has failed to make a payment required by an order or a notice of contravention issued under this Act is evidence of the failure to make that payment without further proof.  2000, c. 41, s. 140 (3).

Same, collector

(4)  In a prosecution or other proceeding under this Act, a certificate shown by a collector that appears to be signed by the Director setting out any of the following facts is evidence of the fact without further proof:

1.    The Director has authorized the collector to collect amounts owing under this Act.

2.    The Director has authorized the collector to collect a reasonable fee or reasonable disbursements or both.

3.    The Director has, or has not, imposed conditions on an authorization described in paragraph 2 and has, or has not, determined what constitutes a reasonable fee or reasonable disbursements.

4.    Any conditions imposed by the Director on an

authorization described in paragraph 2.

5.    The Director has approved a settlement under subsection 129 (2).  2000, c. 41, s. 140 (4).

Same, date of complaint

(5)  In a prosecution or other proceeding under this Act, a certificate that appears to be signed by the Director setting out the date on which the records of the ministry indicate that a complaint was filed is evidence of that date without further proof.  2000, c. 41, s. 140 (5).

part xxvll
regulations

Regulations

**141.**  (1)  The Lieutenant Governor in Council may make regulations for carrying out the purposes of this Act and, without restricting the generality of the foregoing, may make the following regulations:

1.    Prescribing anything for the purposes of any provision of this Act that makes reference to a thing that is prescribed.

2.    Establishing minimum wage rates for employees or classes of employees.

2.1    Establishing a maximum pay period, a maximum period within which payments made to an employee shall be reconciled with wages earned by the employee or both.

3.    Exempting any class of employees or employers from the application of this Act or any Part, section or other provision of it.

4.    Prescribing what constitutes the performance of work.

5.    Prescribing what information concerning the terms of an employment contract should be provided to an employee in writing.

6. Defining an industry and prescribing for that industry one or more terms or conditions of employment that apply to employers and employees in the industry or one or more requirements or prohibitions that apply to employers and employees in the industry.

7. Providing that any term, condition, requirement or prohibition prescribed under paragraph 6 applies in place of or in addition to one or more provisions of this Act or the regulations.

8. Providing that a regulation made under paragraph 6 or 7 applies only in respect of workplaces in the defined industry that have characteristics specified in the regulation, including but not limited to characteristics related to location.

9. Providing that an agreement under subsection 17 (2) to work hours in excess of those referred to in clause 17 (1) (a) that was made at the time of the employee's hiring and that has been approved by the Director is, despite subsection 17 (6), irrevocable unless both the employer and the employee agree to its revocation.

10. Providing a formula for the determination of an employee's regular rate that applies instead of the formula that would otherwise be applicable under the definition of "regular rate" in section 1 in such circumstances as are set out in the regulation.

11. Providing for the establishment of committees to advise the Minister on any matters relating to the application or administration of this Act.

12. Prescribing the manner and form in which notice of termination must or may be given and the content of such notice.

13. Prescribing what constitutes a constructive dismissal.

14. Providing that the common law doctrine of frustration does not apply to an employment contract and that an employer is not relieved of any obligation under Part XV because of the occurrence of an event that would frustrate an employment contract at common law except as prescribed.

14.1    Providing that payments to an employee by way of pension benefits, insurance benefits, workplace safety and insurance benefits, bonus, employment insurance benefits, supplementary employment insurance benefits or similar arrangements shall or shall not be taken into account in determining the amount that an employer is required to pay to an employee under clause 60 (1) (b), section 61 or section 64.

15.    Providing for and governing the consolidation of hearings under this Act.

16.    Prescribing the minimum number of hours in a day or week for which an employee is entitled to be paid the minimum wage or a contractual wage rate and imposing conditions in respect of that entitlement.

17.    Defining any word or expression used in this Act that is not defined in it.

18.    Prescribing the manner in which the information required by subsection 58 (2) shall be given to the Director.

19.    Respecting any matter necessary or advisable to carry out effectively the intent and purpose of this Act.  2000, c. 41, s. 141 (1); 2001, c. 9, Sched. I, s. 1 (30); 2002, c. 18, Sched. J, s. 3 (30); 2004, c. 21, s. 10 (1, 2).

Regulations re Part XIII

(2)  The Lieutenant Governor in Council may make regulations respecting any matter or thing necessary or advisable to carry out the intent and purpose of Part XIII (Benefit Plans), and without restricting the generality of the foregoing, may make regulations,

(a)    exempting a benefit plan, part of a benefit plan or the benefits under such a plan or part from the application of Part XIII;

(b)    permitting a differentiation in a benefit plan between employees or their beneficiaries, survivors or dependants because of the age, sex or marital status of the employees;

(c)    suspending the application of Part XIII to a benefit plan, part of a benefit plan or benefits under such a plan or part for the periods of time specified in the regulation;

(d)    prohibiting a reduction in benefits to an employee in order to comply with Part XIII; and

(e)    providing the terms under which an employee may be entitled or disentitled to benefits under a benefit plan.  2000, c. 41, s. 141 (2); 2004, c. 15, s. 5.

Regulations re Part XIX

(3)  The Lieutenant Governor in Council may make regulations prescribing information for the purposes of section 77.  2000, c. 41, s. 141 (3).

Regulations re Part XXII

(3.1)  A regulation prescribing penalties for contraventions for the purposes of subsection 113 (1) may,

(a)    provide for greater penalties for the second contravention and for the third or subsequent contravention of a provision of the Act in a three-year period or in such other period as may be prescribed;

(b)    provide that the penalty for a contravention is the prescribed amount multiplied by the number of employees affected by the contravention.  2001, c. 9, Sched. I, s. 1 (31).

Regulations re Part XXV

(4)  If the Lieutenant Governor in Council is satisfied that laws are or will be in effect in the state for the enforcement of orders made under this Act on a basis substantially similar to that set out in section 126, the Lieutenant Governor in Council may by regulation,

(a)    declare a state to be a reciprocating state for the purposes of section 130; and

   (b)   designate an authority of that state as the authority who may make applications under section 130.  2000, c. 41, s. 141 (4).

Classes

   (5)  A regulation made under this section may be restricted in its application to any class of employee or employer and may treat different classes of employee or employer in different ways.  2000, c. 41, s. 141 (5).

Regulations may be conditional

   (5.1)  A regulation made under this section may provide that it applies only if one or more conditions specified in it are met.  2004, c. 21, s. 10 (3).

Terms and conditions of employment for an industry

   (6)  Without restricting the generality of paragraphs 6 and 7 of subsection (1), a regulation made under paragraph 6 or 7 may establish requirements for the industry respecting such matters as a minimum wage, the scheduling of work, maximum hours of work, eating periods and other breaks from work, posting of work schedules, conditions under which the maximum hours of work set out in the regulation may be exceeded, overtime thresholds and overtime pay, vacations, vacation pay, working on public holidays and public holiday pay and treating some public holidays differently than others for those purposes.  2000, c. 41, s. 141 (6); 2004, c. 21, s. 10 (4).

   (7)  Repealed:  2004, c. 21, s. 10 (5).

Conditions, revocability of approval

   (8)  A regulation made under paragraph 9 of subsection (1) may authorize the Director to impose conditions in granting an approval and may authorize the Director to rescind an approval.  2000, c. 41, s. 141 (8).

Restriction where excess hours agreements approved

(9)  An employer may not require an employee who has made an agreement approved by the Director under a regulation made under paragraph 9 of subsection (1) to work more than 10 hours in a day, except in the circumstances described in section 19.  2000, c. 41, s. 141 (9).

Revocability of part of approved excess hours agreement

(10)  If an employee has agreed to work hours in excess of those referred to in clause 17 (1) (a) and hours in excess of those referred to in clause 17 (1) (b), the fact that the Director has approved the agreement in accordance with a regulation made under paragraph 9 of subsection (1) does not prevent the employee from revoking, in accordance with subsection 17 (6), that part of the agreement dealing with the hours in excess of those referred to in clause 17 (1) (b).  2000, c. 41, s. 141 (10); 2004, c. 21, s. 10 (6).

part xxViil
Transition

Transition

**142.**  (1)  Part XIV.1 of the *Employment Standards Act*, as it read immediately before its repeal by this Act, continues to apply only with respect to wages that became due and owing before the Employee Wage Protection Program was discontinued and only if the employee to whom the wages were owed provided a certificate of claim, on a form prepared by the Ministry, to the Program Administrator before the day on which this section comes into force.  2000, c. 41, s. 142 (1).

Parental leave

(2)  If subsection 143 (2) of this Act is not proclaimed in force before subsection 144 (1), an employee who commenced parental leave under the *Employment Standards Act* before its repeal by this Act may, if the child was born or came into the employee's custody, care and control for the first time on or after December 31, 2000, extend the leave without notice to the employee's employer,

(a)    if the employee took pregnancy leave, to the day that is 35 weeks after the parental leave began; or

(b)    if the employee did not take pregnancy leave, to the day that is 37 weeks after the parental leave began.  2000, c. 41, s. 142 (2).

(3)  Repealed:  2001, c. 9, Sched. I, s. 1 (32).

(4)  Repealed:  2001, c. 9, Sched. I, s. 1 (32).

(5)  Repealed:  2001, c. 9, Sched. I, s. 1 (32).

**143, 144.**  Omitted (amends or repeals other Acts).  2000, c. 41, ss. 143, 144.

**145.**  Omitted (provides for coming into force of provisions of this Act).  2000, c. 41, s. 145.

**146.**  Omitted (enacts short title of this Act).  2000, c. 41, s. 146.

————————————

The Ontario e-Laws Web site contains additional conditions to the CanLII Conditions of Use. Please refer to the Disclaimer and the Copyright information sections on the e-Laws Web site for further information.

[About CanLII] [Conditions of Use] [Advanced Search] [Help] [Français]
[Privacy Policy] [Mailing Lists] [Technical Library]
[Contact CanLII]

by  **LexUM**  ———————————————— for the Federation of Law Societies of Canada 🍁





FRANÇAIS

Ontario >> Statutes and Regulations >> O. Reg. 288/01 >> Complete text

**Citation**: TERMINATION AND SEVERANCE OF EMPLOYMENT, O. Reg. 288/01
**Version available as of 2006-06-14** (Last update on CanLII: 2006-06-14)
**URL**: http://www.canlii.org/on/laws/regu/2001r.288/20060614/whole.html
**Enabling Statute**:Employment Standards Act, 2000, S.O. 2000, c. 41

Employment Standards Act, 2000

ONTARIO REGULATION 288/01

Amended to O. Reg. 549/05

TERMINATION AND SEVERANCE OF EMPLOYMENT

**Notice of Currency:\***  This document is up to date.

within two business days of accessing this document. For more current amendment information, see the Table of Regulations – Legislative History Overview.

This is the English version of a bilingual regulation.

Definitions

    **1.**  In this Regulation,

"construction employee" has the same meaning as in Ontario Regulation 285/01 (Exemptions, Special Rules and Establishment of Minimum Wage); ("employé de la construction")

"disability benefit plan" has the same meaning as in Ontario Regulation 286/01 (Benefit Plans). ("régime de prestations d'invalidité")  O. Reg. 288/01, s. 1.

Termination of Employment

Employees not entitled to notice of termination or termination pay

**2.** (1)  The following employees are prescribed for the purposes of section 55 of the Act as employees who are not entitled to notice of termination or termination pay under Part XV of the Act:

1.    Subject to subsection (2), an employee who is hired on the basis that his or her employment is to terminate on the expiry of a definite term or the completion of a specific task.

2.    An employee on a temporary lay-off.

3.    An employee who has been guilty of wilful misconduct, disobedience or wilful neglect of duty that is not trivial and has not been condoned by the employer.

4.    An employee whose contract of employment has become impossible to perform or has been frustrated by a fortuitous or unforeseeable event or circumstance.

5.    An employee whose employment is terminated after refusing an offer of reasonable alternative employment with the employer.

6.    An employee whose employment is terminated after refusing alternative employment made available through a seniority system.

7.    An employee who is on a temporary lay-off and does not return to work within a reasonable time after having been requested by his or her employer to do so.

8.    An employee whose employment is terminated during or as a result of a strike or lock-out at the place of employment.

9.    A construction employee.

10.    An employee who is employed under an arrangement whereby he or she may elect to work or not to work when requested so to do.

11.    An employee who, having reached the age of retirement

according to the employer's established practice, has his or her employment terminated in accordance with that practice.

    12.   An employee,

        i.   whose employer is engaged in the building, alteration or repair of a ship or vessel with a gross tonnage of over ten tons designed for or used in commercial navigation,

        ii.   to whom a legitimate supplementary unemployment benefit plan agreed on by the employee or his or her agent applies, and

        iii.   who agrees or whose agent agrees to the application of this exemption.  O. Reg. 288/01, s. 2 (1); O. Reg. 549/05, s. 1 (1).

    (2) Paragraph 1 of subsection (1) does not apply if,

    (a)   the employment terminates before the expiry of the term or the completion of the task;

    (b)   the term expires or the task is not yet completed more than 12 months after the employment commences; or

    (c)   the employment continues for three months or more after the expiry of the term or the completion of the task.  O. Reg. 288/01, s. 2 (2).

    (3) Paragraph 4 of subsection (1) does not apply if the impossibility or frustration is the result of an illness or injury suffered by the employee.  O. Reg. 549/05, s. 1 (2).

Notice, 50 or more employees

    **3.**  (1) The following periods are prescribed for the purposes of subsection 58 (1) of the Act:

    1.   Notice shall be given at least eight weeks before termination if the number of employees whose employment is terminated is 50 or more but fewer than 200.

2.    Notice shall be given at least 12 weeks before termination if the number of employees whose employment is terminated is 200 or more but fewer than 500.

3.    Notice shall be given at least 16 weeks before termination, if the number of employees whose employment is terminated is 500 or more.  O. Reg. 288/01, s. 3 (1).

(2)  The following information is prescribed as the information to be provided to the Director under clause 58 (2) (a) of the Act and to be posted under clause 58 (2) (b) of the Act:

1.    The employer's name and mailing address.

2.    The location or locations where the employees whose employment is being terminated work.

3.    The number of employees working at each location who are paid,

      i.    on an hourly basis,

      ii.    on a salaried basis, and

      iii.    on some other basis.

4.    The number of employees whose employment is being terminated at each location who are paid,

      i.    on an hourly basis,

      ii.    on a salaried basis, and

      iii.    on some other basis.

5.    The date or dates on which it is anticipated that the employment of the employees referred to in paragraph 4 will be terminated.

6.    The name of any trade union local representing any of the employees whose employment is being terminated.

7.    The economic circumstances surrounding the terminations.

8.    The name, title and telephone number of the individual who completed the form on behalf of the employer.  O. Reg. 288/01, s. 3 (2).

(3)  The employer shall provide the information referred to in subsection (2) to the Director by setting it out in the form approved by the Director under clause 58 (2) (a) of the Act and delivering the form to the Employment Practices Branch of the Ministry of Labour between 9 a.m. and 5 p.m. on any day other than a Saturday, Sunday or other day on which the offices of the Branch are closed.  O. Reg. 288/01, s. 3 (3).

(4)  Section 58 of the Act does not apply to the employer and employees if,

(a)    the number of employees whose employment is terminated at the establishment is not more than 10 per cent of the number of employees who have been employed there for at least three months; and

(b)    the terminations were not caused by the permanent discontinuance of part of the employer's business at the establishment.  O. Reg. 288/01, s. 3 (4).

Manner of giving notice

**4.** (1) Subject to section 5, a notice of termination shall be,

(a)    given in writing;

(b)    addressed to the employee whose employment is to be terminated; and

(c)    served personally or in accordance with section 95 of the Act.  O. Reg. 288/01, s. 4 (1).

(2)  If an employer bound by a collective agreement is or will be laying off an employee for a period that will or may be longer than a

temporary lay-off and the employer would be or might be in breach of the collective agreement if the employer advised the employee that his or her employment was to be terminated, the employer may provide the employee with a written notice of indefinite lay-off and the employer shall be deemed as of the date on which that notice was given to have provided the employee with a notice of termination.  O. Reg. 288/01, s. 4 (2).

Notice of termination where seniority rights apply

**5.** (1)  This section applies with respect to employees whose employment contracts provide seniority rights by which an employee who is to be laid off or whose employment is to be terminated may displace another employee.  O. Reg. 288/01, s. 5 (1).

(2)  If an employer who proposes to terminate the employment of an employee described in subsection (1) posts a notice in a conspicuous part of the workplace setting out the name, seniority, job classification and proposed lay-off or termination date of the employee, the notice shall constitute notice of termination as of the day of posting to any employee whom the employee named in the notice displaces.  O. Reg. 288/01, s. 5 (2).

(3)  Clause 60 (1) (a) of the Act does not apply to an employee who displaces another employee in the circumstances described in this section.  O. Reg. 288/01, s. 5 (3).

Temporary work, 13-week period

**6.** (1)  An employer who has given an employee notice of termination in accordance with the Act and the regulations may provide temporary work to the employee without providing a further notice of termination in respect of the day on which the employee's employment is finally terminated if that day occurs not later than 13 weeks after the termination date specified in the original notice.  O. Reg. 288/01, s. 6 (1).

(2)  The provision of temporary work to an employee in the circumstances described in subsection (1) does not affect the

termination date as specified in the notice or the employee's period of employment.  O. Reg. 288/01, s. 6 (2).

Inclusion of vacation time in notice period

**7.**  The period of a notice of termination given to an employee shall not include any vacation time unless the employee, after receiving the notice, agrees to the inclusion of the vacation time in the notice period of the notice.  O. Reg. 288/01, s. 7.

Period of employment

**8.**  (1)  For the purposes of this Regulation and sections 54 to 62 of the Act, an employee's period of employment is the period beginning on the day he or she most recently commenced employment and ending on,

    (a)    if notice of termination is given in accordance with Part XV of the Act, the day it is given; and

    (b)    if notice of termination is not given in accordance with Part XV of the Act, the day the employee's employment is terminated.  O. Reg. 288/01, s. 8 (1).

    (2)  For the purposes of subsection (1), two successive periods of employment that are not more than 13 weeks apart shall be added together and treated as one period of employment.  O. Reg. 288/01, s. 8 (2).

Severance of Employment

Employees not entitled to severance pay

**9.**  (1)  The following employees are prescribed for the purposes of subsection 64 (3) of the Act as employees who are not entitled to severance pay under section 64 of the Act:

    1.    An employee whose employment is severed as a result of a permanent discontinuance of all or part of the employer's business that the employer establishes was caused by the economic consequences of a strike.

2.    Subject to subsection (2), an employee whose contract of employment has become impossible to perform or has been frustrated.

3.    An employee who, on having his or her employment severed, retires and receives an actuarially unreduced pension benefit that reflects any service credits which the employee, had the employment not been severed, would have been expected to have earned in the normal course of events for purposes of the pension plan.

4.    An employee whose employment is severed after refusing an offer of reasonable alternative employment with the employer.

5.    An employee whose employment is severed after refusing reasonable alternative employment made available through a seniority system.

6.    An employee who has been guilty of wilful misconduct, disobedience or wilful neglect of duty that is not trivial and has not been condoned by the employer.

7.    A construction employee.

8.    An employee engaged in the on-site maintenance of buildings, structures, roads, sewers, pipelines, mains, tunnels or other works.

9.    An employee who is employed under an arrangement whereby he or she may elect to work or not to work when requested so to do.  O. Reg. 288/01, s. 9 (1).

(2)  Paragraph 2 of subsection (1) does not apply if,

(a)    the impossibility or frustration is the result of,

(i)    a permanent discontinuance of all or part of the employer's business because of a fortuitous or unforeseen event,

(ii)    the employer's death, or

       (iii)   the employee's death, if the employee received a notice of termination before his or her death; or

     (b)   the impossibility or frustration is the result of an illness or injury suffered by the employee.  O. Reg. 288/01, s. 9 (2); O. Reg. 549/05, s. 2.

   **10.**  Omitted (revokes other Regulations).  O. Reg. 288/01, s. 10.

   **11.**  Omitted (provides for coming into force of provisions of this Regulation).  O. Reg. 288/01, s. 11.

The Ontario e-Laws Web site contains additional conditions to the CanLII Conditions of Use. Please refer to the Disclaimer and the Copyright information sections on the e-Laws Web site for further information.

[About CanLII] [Conditions of Use] [Advanced Search] [Help] [Français] [Privacy Policy] [Mailing Lists] [Technical Library] [Contact CanLII]

by **LexUM** _____ for the Federation of Law Societies of Canada

# TAB C

Case Name:

# Machtinger v. HOJ Industries Ltd.

Gilles Lefebvre, appellant;
v.
HOJ Industries Ltd., respondent.
And between
Marek Machtinger, appellant;
v.
HOJ Industries Ltd., respondent.

[1992] S.C.J. No. 41
File No.: 21586.
Also reported at: [1992] 1 S.C.R. 986

## Supreme Court of Canada

1991: November 5.

Rehearing: 1992: March 2 / 1992: April 30.

## Present: La Forest, L'Heureux-Dubé, Sopinka, Gonthier, Cory, McLachlin and Iacobucci JJ.

## ON APPEAL FROM THE COURT OF APPEAL FOR ONTARIO
### (57 paras.)

*Employment law — Dismissal without cause — Notice — Employment contracts providing for notice periods less than statutory minimum — Contractual provisions null and void — Whether employees entitled to reasonable notice or to statutory minimum — Employment Standards Act, R.S.O. 1980, c. 137, ss. 3, 4, 6, 40(1)(c), (7)(a).*

Both appellants began working for the respondent, a car dealer, in 1978, and were discharged in 1985 without cause. At the time they were dismissed M was credit manager and rust-proofing sales manager and L was sales manager. Each had entered into a contract for employment for an indefinite period which contained a clause allowing the respondent to terminate his employment without cause, in M's case without notice and in L's case on two weeks' notice. Under the provincial Employment Standards Act the appellants were entitled to a minimum notice period of four weeks. After they were dismissed, the respondent paid each of them the equivalent of four weeks' salary. The trial judge awarded the appellants damages for wrongful dismissal. He found that they were entitled to reasonable notice of termination, and that the period of reasonable notice for M was 7 months and for L, 7 1/2 months. The Court of Appeal reversed the judgments. It found that the contractual notice provisions were null and void, but held that the provisions could nonetheless be used as evidence of the parties' intention. Since a term that the contracts could only be terminated on reasonable notice was contrary to the parties' expressed intention, the Court of Appeal found that the appellants were limited to the benefits conferred by the Act and that the respondent had complied with the Act by giving them four weeks' pay in lieu of notice.

**Held:** The appeal should be allowed.

Per La Forest, L'Heureux-Dubé, Sopinka, Gonthier, Cory and Iacobucci JJ.: Employment contracts for an indefinite period require the employer, absent express contractual language to the contrary, to give reasonable notice of an intention to terminate the contract if the dismissal is without cause. For purposes of this appeal, this common law principle of termination only on reasonable notice should be characterized as a presumption, rebuttable if the contract clearly specifies some other period of notice, whether expressly or impliedly. What constitutes reasonable notice will vary with the circumstances of each case and will depend on the character of the employment, the length of service, the employee's age and the availability of similar employment having regard to the employee's experience, training and qualifications.

Neither the minimum notice periods set out in the Employment Standards Act nor the terms of the two employment contracts operate to displace the common law presumption of reasonable notice. Section 6 states that the Act does not affect the right of an employee to seek a civil remedy from his or her employer, and under s. 4(2) a "right, benefit, term or condition of employment under a contract" that provides a greater benefit to an employee prevails over the standards in the Act. The effect of ss. 3 and 4 of the Act is to make any attempt to contract out of the minimum employment standards of the Act by providing for lesser benefits "null and void". The two contracts at issue here specify notice periods shorter than the statutory minimum, and the termination clauses are thus null and void, and cannot be used as evidence of the parties' intention.

Policy considerations support the conclusion that where an employment contract fails to comply with the minimum notice periods set out in the Act, the employee can only be dismissed without cause if he or she is given reasonable notice of termination. An interpretation of the Act which encourages employers to comply with its minimum requirements, and so extends the Act's protection to as many employees as possible, is to be favoured over one that does not. If the only sanction which employers potentially face for failure to respect the minimum notice periods is an order that they comply with the Act, they will have little incentive to make contracts with their employees that meet the statutory standards. Many individual employees are unaware of their legal rights, and employers can rely on the fact that they will not challenge contractual notice periods below the statutory minimum. It is more consistent with the objects of the Act to take the approach that, if an employment contract fails to comply with the minimum statutory notice provisions, then the presumption of reasonable notice will not have been rebutted.

Per McLachlin J.: Iacobucci J.'s reasons were substantially agreed with, subject to the following comments. Resolution of this case necessarily involves an examination of the principles of law governing implied contractual terms and, in particular, the role to be assigned to the intention of the parties in determining the term to be implied. To succeed in an action for breach of a contract of employment, a plaintiff must establish the existence of a term of the contract entitling him to reasonable notice of termination, and that the term was breached by the employer. A presumption is simply an evidentiary technique and in this case must operate so as to presume the existence of a term of reasonable notice in the contract. The intention of the contracting parties is relevant to terms implied as a matter of fact, but not to those implied as a matter of law, and requirements for reasonable notice in employment contracts fall into the category of terms implied by law. The employer's legal obligation to give reasonable notice of termination can be displaced only by an express contrary agreement, and there is no contrary agreement here, the Act having rendered the notice provisions in the contracts null and void.

**Cases Cited**

By Iacobucci J.

*Referred to*: Collins v. Kappele (1983), 3 C.C.E.L. 228; Pickup v. Litton Business Equipment Ltd. (1983), 3 C.C.E.L. 266; Bardal v. Globe & Mail Ltd. (1960), 24 D.L.R. (2d) 140; Carter v. Bell & Sons (Canada) Ltd., [1936] O.R. 290; Prozak v. Bell Telephone Co. of Canada (1984), 46 O.R. (2d) 385; Rover International Ltd. v. Cannon Film Sales Ltd., [1989] 1 W.L.R. 912; Erlund v. Quality Communication Products Ltd. (1972), 29 D.L.R. (3d) 476; James v. Thomas H. Kent & Co., [1950] 2 All E.R. 1099; Suleman v. British Columbia Research Council (1989), 38 B.C.L.R. (2d) 208; Reference Re Public Service Employee Relations Act (Alta.), [1987] 1 S.C.R. 313; Canadian Pacific Hotels Ltd. v. Bank of Montreal, [1987] 1 S.C.R. 711.

By McLachlin J.

*Considered*: Canadian Pacific Hotels Ltd. v. Bank of Montreal, [1987] 1 S.C.R. 711; Liverpool City Council v. Irwin, [1977] A.C. 239, varying [1976] 1 Q.B. 319; *referred to*: Allison v. Amoco Production Co., [1975] 5 W.W.R. 501; Bardal v. Globe & Mail Ltd. (1960), 24 D.L.R. (2d) 140; Tai Hing Cotton Mill Ltd. v. Liu Chong Hing Bank Ltd., [1986] A.C. 80, rev'g [1984] 1 Lloyd's Rep. 555; Lister v. Romford Ice and Cold Storage Co., [1957] A.C. 55; Sterling Engineering Co. v. Patchett, [1955] A.C. 534.

## Statutes and Regulations Cited

Employment Standards Act, R.S.O. 1980, c. 137, ss. 1, 2, 3, 4, 6, 40(1)(c), (7)(a) [rep. & sub. 1981, c. 22, s. 1(3)].
Interpretation Act, R.S.O. 1980, c. 219, s. 10.
Statute of Artificers (U.K.), 5 Eliz. 1, c. 4.

## Authors Cited

Christie, Innis. Employment Law in Canada. Toronto:
    Butterworths, 1980.
Etherington, Brian. "The Enforcement of Harsh Termination Provisions in Personal Employment Contracts: The Rebirth of Freedom of Contract in Ontario" (1990), 35 McGill L.J. 459.
Freedland, M.R. The Contract of Employment. Oxford:
    Clarendon Press, 1976.
Jacoby, Sanford M. "The Duration of Indefinite Employment Contracts in the United States and England: An Historical Analysis" (1982), 5 Comp. Lab. L.J. 85.
Swinton, Katherine. "Contract Law and the Employment Relationship: The Proper Forum for Reform". In Barry J. Reiter and John Swan, eds., Studies in Contract Law. Toronto: Butterworths, 1980, 357.
Treitel, G.H. The Law of Contract, 7th ed. London:

    Stevens: Sweet & Maxwell, 1987.

APPEAL from a judgment of the Ontario Court of Appeal (1988), 66 O.R. (2d) 545, 55 D.L.R. (4th) 401, 31 O.A.C. 1, 23 C.C.E.L. 77, reversing judgments of Hollingworth J. awarding appellants damages for wrongful dismissal. Appeal allowed.

Howard A. Levitt, Constance C. Olsheski and Stacey R. Ball, for the appellants.

John R. Sproat, for the respondent.
Solicitors for the appellants: Howard Levitt & Associates, Toronto.
Solicitors for the respondent: Miller, Thomson, Toronto.

The judgment of La Forest, L'Heureux-Dubé, Sopinka, Gonthier, Cory and Iacobucci JJ. was delivered by

¶ 1    **IACOBUCCI J.**:— This appeal concerns the contractual rights of employees who are dismissed without cause by their employers. Specifically, where a contract of employment provides for notice periods less than the minimum prescribed by the applicable employment standards legislation, which in this case is the Employment Standards Act, R.S.O. 1980, c. 137 (the "Act"), and absent any claims of unconscionability or oppression, is an employee entitled to reasonable notice of dismissal, or to the minimum statutory notice period? The answer to this question is of considerable importance to employees.

¶ 2    Indeed, it has been pointed out that the law governing the termination of employment significantly affects the economic and psychological welfare of employees. See K. Swinton, "Contract Law and the Employment Relationship: The Proper Forum for Reform", in B. J. Reiter and J. Swan, eds., Studies in Contract Law (1980) 357, at pp. 360-61 (footnotes omitted):

> The law governing termination of employment is obviously of significant importance to an individual worker, for the degree of job security which he is assured depends upon the ease with which the law allows his employer to terminate his employment. Discharge has serious financial ramifications for the individual in that it puts an end to remuneration, as well as to less quantifiable economic benefits such as accrued seniority. Discharge can have ongoing financial effects, as well, for the reason given for termination (if any) may affect accessibility to future jobs as well as entitlement to government benefits such as unemployment insurance. The psychological effects of discharge are also important, because of the disruption in the individual's life caused by seeking new employment and establishing himself in a new environment.

1. Facts

¶ 3    The two appellants were employed by the respondent Hoj Industries Ltd., which was a new and used car dealer. The appellant Marek Machtinger ("Machtinger") began working as a car salesperson for the respondent in 1978. Machtinger was continuously employed by the respondent except for a three-month period in 1980. On June 24, 1985, Machtinger was dismissed by the respondent, which has not alleged that it had cause for dismissal. At the time Machtinger was dismissed, he was credit manager and rust-proofing sales manager for the respondent. His earnings in his last full year of employment were $85,342.36. The appellant Gilles Lefebvre ("Lefebvre") also began working for the respondent in 1978. He also was discharged on June 24, 1985, and again the respondent has not alleged that it had cause to dismiss him. Lefebvre was sales manager for the respondent at the time of his dismissal. In his last full year of employment his earnings were $74,220.79.

¶ 4    At issue in this case are the contracts of employment entered into between the appellants and the respondent. Machtinger entered into two contracts with the respondent. The second contract, dated January 11, 1985, was for employment for an indefinite period. The relevant portion of the contract is the termination provision, which reads as follows:

Termination -- Employer may terminate employment at any time without notice for cause. Otherwise, Employer may terminate employment on giving Employee 0 weeks notice or salary (which does not include bonus) in lieu of notice. Bonus, if any, will be calculated and payable only to the date of the giving of notice of termination.

The contract is on a preprinted form, with a blank space left for the notice period. The digit zero has been handwritten in the blank space.

¶ 5     The relevant contract between the respondent and Lefebvre was dated January 10, 1985, and was also for an indefinite period. The termination clause is in every respect identical to that in the document signed by Machtinger, except that the period of notice for termination without cause is two weeks, that is, the word "two" has been handwritten into the space left blank for the notice period.

¶ 6     The appellants acknowledged at trial that, save for the effect of the provisions of the Act, the termination provisions were valid. The appellants make no allegations of unconscionability or oppressive acts on behalf of the respondent. After Lefebvre and Machtinger were dismissed, the respondent paid each of them the equivalent of four weeks' salary.

II. Judgments Below

A. Supreme Court of Ontario

¶ 7     The two cases were tried before Hollingworth J. on April 9 and 10, 1987. On April 9, 1987 Hollingworth J. made a preliminary ruling on the standard for determining the appropriate notice period in each case. The issue was whether the payment of four weeks' salary in lieu of notice to Machtinger and Lefebvre was sufficient, or whether Machtinger and Lefebvre were entitled to what would be considered reasonable notice at common law.

¶ 8     Hollingworth J. held that Lefebvre and Machtinger were entitled to reasonable notice of termination. Relying on two Ontario County Court decisions, Collins v. Kappele (1983), 3 C.C.E.L. 228 and Pickup v. Litton Business Equipment Ltd. (1983), 3 C.C.E.L. 266, the learned trial judge held that the termination clauses in the two contracts were invalid because they did not comply with the minimum notice period of four weeks required by the Act. In holding that the appellants were entitled to reasonable notice, Hollingworth J. also relied on s. 6 of the Act, which provides that the civil remedies of an employee are not affected by the Act.

¶ 9     Hollingworth J. delivered his judgment orally on April 10, 1987. At the outset, he rejected the argument that the period of reasonable notice should be reduced because the present appellants had signed contracts in which they agreed to very short notice periods. The respondent had argued following Pickup, supra, that the period of notice should be reduced by 25 percent because Machtinger and Lefebvre had agreed to very short notice periods. Hollingworth J. found that this case could be distinguished from Pickup because the termination clauses in this case were "unconscionable".

¶ 10     Following Bardal v. Globe & Mail Ltd. (1960), 24 D.L.R. (2d) 140 (Ont. H.C.), Hollingworth J. held that the period of reasonable notice for Machtinger was 7 months, and for Lefebvre, 7 1/2 months. He left the quantum of damages to be agreed between the parties.

B. Ontario Court of Appeal (1988), 66 O.R. (2d) 545

¶ 11     The unanimous judgment of the Ontario Court of Appeal allowing the respondent's appeal was

delivered by Howland C.J.O. (Goodman and Robins JJ.A. concurring). The Court of Appeal found that, although the attempt of the parties to contract for a period of notice less than the minimum required by the Act was necessarily null and void, the course of dealing between the parties and the terms of the contract provided evidence from which the intention of the parties could be inferred. Howland C.J.O. found that the parties had never intended that there should be a period of 7 or 7 1/2 months' notice (at pp. 549-50):

> In my opinion, a term should not be implied that a contract of employment could only be terminated on reasonable notice where the parties have by agreement over a period of time expressly provided for either no notice or for two weeks' notice. While the express termination provisions are null and void under the Employment Standards Act, there is evidence before the court as to the prior dealings between the parties and the existence of employment contracts whose terms represented the agreement of the parties. In those circumstances, a term requiring reasonable notice should not be implied. The parties never intended that there should have been a period of seven or seven and one-half months' notice.

¶ 12    Howland C.J.O. held that Pickup, supra, was not good law, and distinguished Collins, supra, on the grounds that in that case the circumstances had so changed over the course of the plaintiff's employment that "the whole substratum of the contract disappeared" (at p. 551).

¶ 13    In the absence of an implied term of reasonable notice in the two contracts, Howland C.J.O. held that Machtinger and Lefebvre were limited to the benefits conferred by the Act. The minimum period of notice being fixed at four weeks by s. 40(1)(c) of the Act, Howland C.J.O. held that the respondent had complied with the Act by paying Machtinger and Lefebvre four weeks' pay in lieu of notice.

III. Statutory Provisions

¶ 14

Employment Standards Act, R.S.O. 1980, c. 137

> 1. In this Act,
>
> ...
>
> (e)    "employment standard" means a requirement imposed upon an employer in favour of an employee by this Act or the regulations;
>
> 2. ...
> (2) This Act applies to every contract of employment, oral or written, express or implied,
>
> (a)    where the employment is for work or services to be performed in Ontario; or
> (b)    where the employment is for work or services to be performed both in and out of Ontario and the work or services out of Ontario are a continuation of the work or services in Ontario.

3. Subject to section 4, no employer, employee, employers' organization or employees' organization shall contract out of or waive an employment standard, and any such contracting out or waiver is null and void.

4. (1) An employment standard shall be deemed a minimum requirement only.

(2) A right, benefit, term or condition of employment under a contract, oral or written, express or implied, or under any other Act or any schedule, order or regulation made thereunder that provides in favour of an employee a higher remuneration in money, a greater right or benefit or lesser hours of work than the requirement imposed by an employment standard shall prevail over an employment standard.

6. No civil remedy of an employee against his employer is suspended or affected by this Act.

40. (1) No employer shall terminate the employment of an employee who has been employed for three months or more unless he gives,

...

(c)    four weeks notice in writing to the employee if his period of employment is five years or more but less than ten years;

...

and such notice has expired.

(7) Where the employment of an employee is terminated contrary to this section,

(a)    the employer shall pay termination pay in an amount equal to the wages that the employee would have been entitled to receive at his regular rate for a regular non-overtime work week for the period of notice prescribed by subsection (1) ... and any wages to which he is entitled;

## IV. Issue on Appeal

¶ 15    This appeal raises one issue, namely:

If an employment contract stipulates a period of notice less than that required by the Employment Standards Act, R.S.O. 1980, c. 137, is an employee who is dismissed without cause entitled to reasonable notice of termination, or to the minimum period of notice required by the Act?

## V. Analysis

### A. Introduction

¶ 16    At least on their face, the two contracts at issue in this case represent attempts to contract out of the minimum notice periods required by the Act. Under these circumstances, the question posed by this appeal is deceptively simple: of what significance is an attempt to contract out of the minimum notice requirements of the Act?

¶ 17    Howland C.J.O. held that, although the contractual terms were in breach of the Act, they were nonetheless relevant to determining the intention of the parties as to what the notice period should be. Specifically, Howland C.J.O. held that the terms of the contracts entered into by the parties were such as

to make it unnecessary and improper for the court to imply a term of reasonable notice. Instead, Howland C.J.O. gave effect to the intention of the parties, as evidenced by the terms of the contracts they entered into, and held that the appellants were entitled only to the minimum notice period set out in the Act.

¶ 18    With respect, I cannot agree with the reasoning of the Chief Justice of Ontario, and I have come to the conclusion that the appeal must be allowed. I divide my analysis into three parts. In the first part, I discuss the common law presumption that reasonable notice is required to terminate contracts of employment for an indefinite term. In the second part, I review the impact of the provisions of the Act on the two contracts at issue in this appeal. Finally, I turn to a consideration of the policy dimensions of the issue before us.

B. Reasonable Notice at Common Law

¶ 19    The history of the common law principle that a contract for employment for an indefinite period is terminable only if reasonable notice is given is a long and interesting one, going back at least to 1562 and the Statute of Artificers, 5 Eliz. 1, c. 4. The Statute of Artificers prohibited employers from dismissing their servants unless sufficient cause had been shown before two justices of the peace: see S. M. Jacoby, "The Duration of Indefinite Employment Contracts in the United States and England: An Historical Analysis" (1982), 5 Comp. Lab. L.J. 85, at p. 88. By the middle of the nineteenth century, however, English courts were beginning to imply a term into contracts of employment that the contract could be terminated without cause provided that reasonable notice was given. Although it was initially necessary to prove the incorporation of a custom of termination on reasonable notice into the contract in each particular case, the English courts gradually came to accept reasonable notice as a contractual term to be implied in the absence of evidence to the contrary: M. R. Freedland, The Contract of Employment (1976), at pp. 151-54. In Canada, it has been established since at least 1936 that employment contracts for an indefinite period require the employer, absent express contractual language to the contrary, to give reasonable notice of an intention to terminate the contract if the dismissal is without cause: Carter v. Bell & Sons (Canada) Ltd., [1936] O.R. 290 (C.A.).

¶ 20    The parties devoted considerable attention in argument before us to the law governing the implication of contractual terms, and specifically to the relevance of the intention of the parties to the implication of a term of reasonable notice of termination in employment contracts. The relationship between intention and the implication of contractual terms is complex, and I am of the opinion that this appeal can and should be resolved on narrower grounds. For the purposes of this appeal, I would characterize the common law principle of termination only on reasonable notice as a presumption, rebuttable if the contract of employment clearly specifies some other period of notice, whether expressly or impliedly.

¶ 21    This is the approach taken by Freedland, supra, who states that, "the pattern of contract now generally accepted and applied by the courts in the absence of evidence to the contrary is one of employment for an indefinite period terminable by either party upon reasonable notice, but only upon reasonable notice" (p. 153). The same approach was adopted by the Ontario Court of Appeal in Prozak v. Bell Telephone Co. of Canada (1984), 46 O.R. (2d) 385. Writing for the court, Goodman J.A. noted at p. 399 that, "if a contract of employment makes no express or specifically implied provision for its duration or termination, there is likely to be implied at common law a presumption that the contract is for an indefinite period and terminable by a reasonable notice given by either party ...". Basically, this is also the approach taken by I. Christie, in Employment Law in Canada (1980), at p. 347.

¶ 22    What constitutes reasonable notice will vary with the circumstances of any particular case. The most frequently cited enumeration of factors relevant to the assessment of reasonable notice is from the

judgment of McRuer C.J.H.C. in Bardal, supra, at p. 145:

> There can be no catalogue laid down as to what is reasonable notice in particular classes of cases. The reasonableness of the notice must be decided with reference to each particular case, having regard to the character of the employment, the length of service of the servant, the age of the servant and the availability of similar employment, having regard to the experience, training and qualifications of the servant.

Hollingworth J. referred to the factors set out in Bardal in determining what would constitute reasonable notice for the two appellants. His determination in this respect was not challenged in this appeal.

C. The Employment Standards Act

¶ 23    It was acknowledged by the appellants and the respondent that, but for the possible effects of the Act, no issue as to the validity of the employment contracts would have arisen. The presumption at common law that a contract of employment for an indefinite term is terminable only on reasonable notice would have been rebutted by the clear language of the contract specifying shorter notice periods. But what is the effect of the Act?

¶ 24    The Act provides for mandatory minimum notice periods. The provision relevant to the appellants is set out in s. 40(1)(c) of the Act, which provides that an employer must give any employee who has been employed for five years or more but less than ten years four weeks' notice of termination. Section 40(7)(a) provides that, if the required notice is not given, the employer shall pay the employee an amount equivalent to his or her regular wages for the period of notice.

¶ 25    It is also clear from ss. 4 and 6 of the Act that the minimum notice periods set out in the Act do not operate to displace the presumption at common law of reasonable notice. Section 6 of the Act states that the Act does not affect the right of an employee to seek a civil remedy from his or her employer. Section 4(2) states that a "right, benefit, term or condition of employment under a contract" that provides a greater benefit to an employee than the standards set out in the Act shall prevail over the standards in the Act. I have no difficulty in concluding that the common law presumption of reasonable notice is a "benefit", which, if the period of notice required by the common law is greater than that required by the Act, will, if otherwise applicable, prevail over the notice period set out in the Act. Any possible doubt on this question is dispelled by s. 4(1) of the Act, which expressly deems the employment standards set out in the Act to be minimum requirements only.

¶ 26    What is at issue in this appeal is the effect, if any, to be given to a term of an employment contract which does not comply with the minimum notice requirements of the Act. Is such a term capable of displacing the common law presumption of reasonable notice? The effect of ss. 3 and 4 of the Act is to make any attempt to contract out of the minimum employment standards of the Act by providing for lesser benefits than those minimum employment standards, "null and void". The two contracts at issue on this appeal do attempt to contract out of the minimum notice period set out in s. 40 (1)(c) of the Act by specifying notice periods shorter than the statutory minimum. Accordingly, the two contracts are not in compliance with the mandatory language of s. 3 of the Act, and those portions of the two contracts specifying the notice periods are "null and void".

¶ 27    In argument, the respondent accepted that the attempt to contract out of the provisions of the Act was "null and void", but argued that the documents should be considered as evidence "that contracts were entered into which expressed clearly the intention of the parties with respect to notice of termination." I cannot accept this argument. In Rover International Ltd. v. Cannon Film Sales Ltd.,

[1989] 1 W.L.R. 912, the Court of Appeal was faced with a contract which was entirely void. Kerr L.J. refused to look to the terms of the contract to limit the recovery of the appellant in quantum meruit (p. 928):

> ... if the imposition of a "ceiling" in the present case were accepted, then the consequences would be far-reaching and undesirable in other situations which it would be impossible to distinguish in principle. It would then follow that an evaluation of the position of the parties to a void contract, or to one which becomes ineffective subsequently, could always be called for. We know that this is not the position in the case of frustrated contracts, which are governed by the Law Reform (Frustrated Contracts) Act 1943. It would cause many difficulties if the position were different in relation to contracts which are void ab initio. By analogy to [the respondent's] submission in the present case, in deciding on the equities of restitution the court could then always be called upon to analyse or attempt to forecast the relative position of the parties under a contract which is ex hypothesi non-existent. This is not an attractive proposition, and I can see no justification for it in principle or upon any authority.

¶ 28     In this case we are not faced with an entirely void contract, but a contract of which one clause is null and void by operation of statute. I would nonetheless apply the reasoning of Kerr L.J.: if a term is null and void, then it is null and void for all purposes, and cannot be used as evidence of the parties' intention. If the intention of the parties is to make an unlawful contract, no lawful contractual term can be derived from their intention. In Erlund v. Quality Communication Products Ltd. (1972), 29 D.L.R. (3d) 476 (Man. Q.B.), Wilson J. was faced with a contract of employment which was void by reason of the Statute of Frauds. Relying on James v. Thomas H. Kent & Co., [1950] 2 All E.R. 1099 (C.A.), Wilson J. held that in the absence of a valid contract, he had no choice but to imply a term that the employee was entitled to reasonable notice.

¶ 29     Moreover, because the Act declares the notice provisions of the contracts in dispute to be null and void, it seems to me that the proper question to ask in determining the parties' intention is: what did the parties intend should the notice provisions be found to be null and void? There is simply no evidence with which to answer this question. In Suleman v. British Columbia Research Council (1989), 38 B.C.L.R. (2d) 208, Lysyk J., on facts analogous to those in the case at bar, found that there was no evidence of the parties' intention in the face of minimum employment standards with which the employer was required to comply. Lysyk J. was considering the effect of s. 2(1) of the Employment Standards Act, S.B.C. 1980, c. 10, which is very similar in wording to s. 3 of the Act. Lysyk J. concluded as follows, at p. 214:

> I find nothing in the evidence in the present case to warrant the conclusion that the parties, had they turned their minds to the subject, would have agreed to substitute for the void contractual term the minimum period of notice required by statute instead of looking to the common law standard of reasonable notice.

D. Policy Considerations

¶ 30     I turn finally to the policy considerations which impact on the issue in this appeal. Although the issue may appear to be a narrow one, it is nonetheless important because employment is of central importance to our society. As Dickson C.J. noted in Reference Re Public Service Employee Relations Act (Alta.), [1987] 1 S.C.R. 313, at p. 368:

> Work is one of the most fundamental aspects in a person's life, providing the

individual with a means of financial support and, as importantly, a contributory role in society. A person's employment is an essential component of his or her sense of identity, self-worth and emotional well-being.

I would add that not only is work fundamental to an individual's identity, but also that the manner in which employment can be terminated is equally important.

¶ 31     Section 10 of the Interpretation Act, R.S.O. 1980, c. 219, provides that every Act "shall be deemed to be remedial" and directs that every Act shall "receive such fair, large and liberal construction and interpretation as will best ensure the attainment of the object of the Act according to its true intent, meaning and spirit." The objective of the Act is to protect the interests of employees by requiring employers to comply with certain minimum standards, including minimum periods of notice of termination. To quote Conant Co. Ct. J. in Pickup, supra, at p. 274, "the general intention of this legislation [i.e. the Act] is the protection of employees, and to that end it institutes reasonable, fair and uniform minimum standards." The harm which the Act seeks to remedy is that individual employees, and in particular non-unionized employees, are often in an unequal bargaining position in relation to their employers. As stated by Swinton, supra, at p. 363:

> ... the terms of the employment contract rarely result from an exercise of free bargaining power in the way that the paradigm commercial exchange between two traders does. Individual employees on the whole lack both the bargaining power and the information necessary to achieve more favourable contract provisions than those offered by the employer, particularly with regard to tenure.

¶ 32     Accordingly, an interpretation of the Act which encourages employers to comply with the minimum requirements of the Act, and so extends its protections to as many employees as possible, is to be favoured over one that does not. In this regard, the fact that many individual employees may be unaware of their statutory and common law rights in the employment context is of fundamental importance. As B. Etherington suggests in "The Enforcement of Harsh Termination Provisions in Personal Employment Contracts: The Rebirth of Freedom of Contract in Ontario" (1990), 35 McGill L.J. 459, at p. 468, "the majority of unorganized employees would not even expect reasonable notice prior to dismissal and many would be surprised to learn they are not employed at the employer's discretion."

¶ 33     If the only sanction which employers potentially face for failure to comply with the minimum notice periods prescribed by the Act is an order that they minimally comply with the Act, employers will have little incentive to make contracts with their employees that comply with the Act. As Swinton and Etherington suggest, most individual employees are unaware of their legal rights, or unwilling or unable to go to the trouble and expense of having them vindicated. Employers can rely on the fact that many employees will not challenge contractual notice provisions which are in fact contrary to employment standards legislation. Employers such as the present respondent can contract with their employees for notice periods below the statutory minimum, knowing that only those individual employees who take legal action after they are dismissed will in fact receive the protection of the minimum statutory notice provisions.

¶ 34     In my view, an approach more consistent with the objects of the Act is that, if an employment contract fails to comply with the minimum statutory notice provisions of the Act, then the presumption of reasonable notice will not have been rebutted. Employers will have an incentive to comply with the Act to avoid the potentially longer notice periods required by the common law, and in consequence more employees are likely to receive the benefit of the minimum notice requirements. Such an approach is also more consistent with the legislative intention expressed by s. 6 of the Act, which expressly preserves the civil remedies otherwise available to an employee against his or her employer.

¶ 35    Moreover, this approach provides protection for employees in a manner that does not disproportionately burden employers. Absent considerations of unconscionability, an employer can readily make contracts with his or her employees which referentially incorporate the minimum notice periods set out in the Act or otherwise take into account later changes to the Act or to the employees' notice entitlement under the Act. Such contractual notice provisions would be sufficient to displace the presumption that the contract is terminable without cause only on reasonable notice. This point was recognized by Lysyk J. in Suleman, supra, at p. 214:

> An employer who wishes to guard against being called upon to give any more notice or severance pay than legislation demands can readily draw a contractual clause which, in effect, converts the statutory floor into a ceiling. But here the employer has authored a contractual term which simply fails to comply with the law. In such circumstances, it is not evident why the employee should be placed in a worse position than if the contract had said nothing at all about notice of termination.

¶ 36    Finally, I would note that the Act sets out what the provincial legislature deems to be fair minimum notice periods. One of the purposes of the Act is to ensure that employees who are discharged are discharged fairly. In the present case, the employer attempted to contract with its employees for notice periods which were less than what the legislature had deemed to be fair minimum notice periods. Given that the employer has attempted, whether deliberately or not, to frustrate the intention of the legislature, it would indeed be perverse to allow the employer to avail itself of legislative provisions intended to protect employees, so as to deny the employees their common law right to reasonable notice.

VI. Conclusion and Disposition

¶ 37    I would conclude that both the plain meaning of ss. 3, 4 and 6 and a consideration of the objects of the Act lead to the same result: where an employment contract fails to comply with the minimum notice periods set out in the Act, the employee can only be dismissed without cause if he or she is given reasonable notice of termination.

¶ 38    Accordingly, the appeal should be allowed, the decision of the Ontario Court of Appeal set aside, and the judgment of Hollingworth J. restored. The appellants shall have their costs here and in the courts below.

¶ 39    I have had the benefit of reading the reasons of my colleague, McLachlin J. I simply wish to add that, although I agree with her conclusion, I do not find it necessary or advisable to revisit Canadian Pacific Hotels Ltd. v. Bank of Montreal, [1987] 1 S.C.R. 711, to dispose of this appeal.

    The following are the reasons delivered by

¶ 40    McLACHLIN J.:-- I agree with my colleague Justice Iacobucci that the judgment of the Court of Appeal must be set aside and that the plaintiffs are entitled to reasonable notice notwithstanding the contractual terms to the contrary. While I am in substantial agreement with my colleague, I find that I differ from him on one, to my mind, crucial point. In my view, resolution of this case necessarily involves an examination of the principles of law governing implied contractual terms, and in particular, the role to be assigned to the intention of the parties in determining the term to be implied in a case such as this. This, as I apprehend the arguments and the judgments below, is the heart of the debate before us.

¶ 41    The cause of action on which the plaintiffs rely is breach of contract, to be more specific, breach of a contract of employment. To succeed each plaintiff must establish: (a) the existence of a term of the

contract entitling him to reasonable notice of termination; and (b) that that term was breached by the employer. Iacobucci J. purports to circumvent this algorithm by stating that the case can be resolved on the narrower ground of a "presumption". But to assist the plaintiffs, that presumption must operate so as to presume the existence of a term of reasonable notice in the contract; otherwise the plaintiffs have no cause of action. To put it another way, a presumption is simply an evidentiary technique by which the elements of a cause of action may be established; it cannot itself stand as an element of a cause of action. So any attempt to avoid the question of implied terms is illusory, as I see the matter.

¶ 42    The difficulty experienced by each plaintiff is that the contract between him and his employer contained an express term stipulating that the plaintiff was entitled, in the case of Machtinger, to no notice whatsoever, and in the case of Lefebvre, to only two weeks' notice. The first problem is to displace this term. That is done by the Employment Standards Act, R.S.O. 1980, c. 137, s. 40(1) of which stipulated a minimum period of notice in the circumstances of this case of four weeks. As explained by Iacobucci J., the effect of ss. 3 and 4 of the Act is to render the stipulation for lesser notice null and void. We arrive then at the situation where there is no term in the contract dealing with notice upon dismissal.

¶ 43    The law says that where the contract is silent as to the term of notice upon dismissal, the court will imply a term of notice. But what term should be implied? Here the courts below divided. The trial judge says the term to be implied is one for "reasonable notice". He based his assessment of reasonable notice on what was generally fair in the circumstances, without reduction for the fact that the parties to the contract had expressed the intention in their contracts that the plaintiffs were to be entitled to no or only nominal notice. He found that period to be 7 months in the case of Machtinger, 7 1/2 months in the case of Lefebvre.

¶ 44    The Court of Appeal, on the other hand, felt that the term implied must reflect the intention of the parties. Since the parties never intended notice of 7 to 7 1/2 months, the Court imposed the term which, within the limits of the Act, best reflected that intention, namely four weeks.

¶ 45    So the real issue is this: in the absence in a contract of employment of a legally enforceable term providing for notice on termination, on what basis is a court to imply a notice period, and in particular, to what extent is intention to be taken into account in fixing an implied term of reasonable notice in an employment contract?

¶ 46    This question cannot be answered without examining the legal principles governing the implication of terms. The intention of the contracting parties is relevant to the determination of some implied terms, but not all. Intention is relevant to terms implied as a matter of fact, where the question is what the parties would have stipulated had their attention been drawn at the time of contracting to the matter at issue. Intention is not, however, relevant to terms implied as a matter of law. As to the distinction between types of implied terms see Treitel, The Law of Contract (7th ed. 1987), at pp. 158-165 (dividing them into three groups: terms implied in fact; terms implied in law; and terms implied as a matter of custom or usage), and Canadian Pacific Hotels Ltd. v. Bank of Montreal, [1987] 1 S.C.R. 711.

¶ 47    Requirements for reasonable notice in employment contracts fall into the category of terms implied by law: Allison v. Amoco Production Co., [1975] 5 W.W.R. 501 (Alta. S.C.), at pp. 508-9 per MacDonald J. They do not depend upon custom or usage, although custom and usage can be an element in determining the nature and scope of the legal duty imposed. Nor do they fall into the category of terms implied as a matter of fact, where the law supplies a term which the parties overlooked but obviously assumed.

¶ 48     Terms implied in contracts of employment imposing reasonable notice requirements depend rather on a number of factors, which

> ... must be decided with reference to each particular case, having regard to the character of the employment, the length of service of the servant, the age of the servant and the availability of similar employment, having regard to the experience, training and qualifications of the servant.
> (Bardal v. Globe & Mail Ltd. (1960), 24 D.L.R. (2d) 140 (Ont. H.C.), at p. 145 per McRuer C.J.H.C.)

These considerations determine the appropriate notice period on termination. They do not depend upon contractual intention. Indeed, some of them -- such as the length of service and prospects of employment -- are usually not known at the time the contract is made. Thus the term of notice fixed by the court is, to borrow the language of Treitel at p. 162, a "legal incident" of a particular kind of contractual relationship.

¶ 49     In my opinion, this analysis is fully in accordance with the decision of this Court in CP Hotels, supra. In that case Le Dain J. analyzed the bases upon which a term may be implied in a contract. The first category includes terms implied as a matter of custom or usage. In order for a term to be implied on this basis there must be evidence to support an inference that the parties to the contract would have understood such a custom or usage to be applicable; terms are implied in this manner on the basis of a presumed intention. The second category encompasses terms implied as necessary to give business efficacy to a contract. These are terms which the parties to a given contract would obviously have assumed. They are thus also implied on the basis of presumed intention, and correspond to Treitel's category of terms implied in fact.

¶ 50     The final category of implied terms considered in CP Hotels, supra, is the one applicable in the present case. These are terms implied not on the basis of presumed intention, but "as legal incidents of a particular class or kind of contract, the nature and content of which have to be largely determined by implication" (p. 776). These correspond to Treitel's category of terms implied in law.

¶ 51     Relying on the decision of the House of Lords in Liverpool City Council v. Irwin, [1977] A.C. 239, Le Dain J. suggested that the test for implication of a term as a matter of law is necessity. An examination of that case reveals what is meant by "necessity" in this context. In that case the House of Lords was concerned to reject the test for implication of such terms proposed by Lord Denning M.R. in dissent in the Court of Appeal, under which a court could imply in law whatever term it thought "reasonable", including anticipating the recommendations for statutory reform of Law Reform Commissions.: Liverpool City Council v. Irwin, [1976] 1 Q.B. 319 (C.A.). This, the House of Lords thought, seemed "to extend a long, and undesirable, way beyond sound authority" (p. 254, per Lord Wilberforce). In its place Lord Wilberforce said that the applicable test was that "such obligation should be read into the contract as the nature of the contract implicitly requires, no more, no less: a test, in other words, of necessity" (p. 254).

¶ 52     The test for "necessity" adopted by the House of Lords in Liverpool City Council is not whether the term is "necessary" for the very existence of the contract. All members of the House approved the implication of a term that a landlord in a tenancy agreement had an obligation to keep common parts of the building in repair. While the tenancy agreement could have continued without this term, it was necessary in a practical sense to the fair functioning of the agreement, given the relationship between the parties. As Cons J.A. described it in Tai Hing Cotton Mill Ltd. v. Liu Chong Hing Bank Ltd., [1984] 1 Lloyd's Rep. 555 (Hong Kong C.A.), the House of Lords took a "practical view of necessity" (p. 560). I note that although the Privy Council reversed Cons. J.A. in the result, it specifically approved as correct

the analytical approach adopted by him: [1986] A.C. 80, at pp. 104-5.

¶ 53    Lord Wilberforce relied on the earlier decision of the House in Lister v. Romford Ice and Cold Storage Co., [1957] A.C. 555, in stating that in determining what is necessary regard must be had to both "the inherent nature of a contract and of the relationship thereby established" (pp. 254-55). As Viscount Simonds said in that case, the question is whether the term sought to be implied is a "necessary condition" of the contractual relationship. Thus:

> ... the real question becomes, not what terms can be implied in a contract between two individuals who are assumed to be making a bargain in regard to a particular transaction or course of business; we have to take a wider view, for we are concerned with a general question, which, if not correctly described as a question of status, yet can only be answered by considering the relation in which the drivers of motor-vehicles and their employers generally stand to each other. Just as the duty of care, rightly regarded as a contractual obligation, is imposed on the servant, or the duty not to disclose confidential information, or the duty not to betray secret processes, just as the duty is imposed on the master not to require his servant to do any illegal act, just so the question must be asked and answered whether in the world in which we live today it is a necessary condition of the relation of master and man that the master should, to use a broad colloquialism, look after the whole matter of insurance. [At p. 576, citations omitted.]

¶ 54    In the same way, the question which courts have been asking themselves is whether in the world in which we live today it is a necessary condition of the relation (to use more modern language) of employer and employee that there should be a contractual duty imposed on the employer to provide the employee with reasonable notice of termination. The answer provided has been a resounding "yes". I agree with the following comment of Treitel on the Liverpool City Council necessity test: "it is, with respect, hard to see any difference between attaching a legal incident to a contract on the ground of necessity and imposing a duty" (p. 162). To my mind, where the law has for many years imposed a legal duty on contracting parties, as it has in implying the term that employers must give employees reasonable notice of termination, that duty has clearly been found to be "necessary" in the sense required by both the House of Lords in Liverpool City Council and this Court in CP Hotels.

¶ 55    Viewed thus, the error of the Court of Appeal was to characterize a term properly implied in law as a term to be implied in fact. This led the court to look to the intention of the parties, as revealed in their course of dealing and the notice terms (now null and void) of their employment contracts, in determining what notice period ought to be implied. As the parties had contracted for less than reasonable notice of termination, the court held that it would be improper to imply a reasonable notice term into the contracts, and held the plaintiffs to be entitled only to the minimum notice periods required by the Act.

¶ 56    But what is at issue is not the intention of the parties, but the legal obligation of the employer, implied in law as a necessary incident of this class of contract. That duty can be displaced only by an express contrary agreement: see Sterling Engineering Co. v. Patchett, [1955] A.C. 534 (H.L.), at pp. 543-44 per Viscount Simonds and at p. 547 per Lord Reid; Treitel, supra, at pp. 161-62. Since there is no contrary agreement here, the Act having rendered what contrary agreement there was null and void, the reasonable term of notice implied by the law is not displaced and will be imposed by the court.

¶ 57    I would dispose of the appeal as proposed by Iacobucci J.

# TAB D

Indexed as:

# McKinley v. BC Tel

Martin Richard McKinley, appellant;

v.

BC Tel, British Columbia Telephone Company, BC Telecom
Inc., BC Tel Services Inc., BC Tel Systems Support Inc.,
B.C. Mobile Ltd., BC Tel Properties Inc., Canadian
Telephones and Supplies Ltd. and TSI Telecommunications
Services International Inc., respondents.

[2001] 2 S.C.R. 161
[2001] S.C.J. No. 40
2001 SCC 38
File No.: 27410.

### Supreme Court of Canada

2001: January 24 / 2001: June 28.

### Present: McLachlin C.J. and L'Heureux-Dubé,
### Iacobucci, Major, Bastarache, Binnie and Arbour JJ.

## ON APPEAL FROM THE COURT OF APPEAL FOR BRITISH
## COLUMBIA
## (90 paras.)

*Employment law — Wrongful dismissal — Dishonest conduct — Whether employee's dishonesty, in
and of itself, necessarily gives rise to just cause for summary dismissal — Whether nature and context of
such dishonesty must be considered — Whether trial judge erred in instructing jury that employee's
dishonesty would merit termination only if it was of "a degree that was incompatible with the
employment relationship" — Applicable standard for assessing whether and in what circumstances
dishonesty provides just cause.*

*Employment law — Wrongful dismissal — Jury's verdict — Dishonest conduct — Jury finding that
just cause for summary dismissal did not exist — Whether jury's verdict reasonable.*

*Damages — Wrongful dismissal — Extended period of notice — Whether trial judge erred by
putting issue of extended notice period before jury — Whether jury award for damages representing
extended notice period reasonable.*

[page 162]

*Damages — Wrongful dismissal — Aggravated damages — Whether criteria for allowing issue of
aggravated damages to go to jury met.*

*Damages — Wrongful dismissal — Punitive damages — Whether issue of punitive damages should*

*have been put to jury.*

The appellant is a chartered accountant who was employed by the respondents ("BC Tel"). In 1993, he began to experience high blood pressure as a result of hypertension. By June 1994 his blood pressure was rising on a daily basis and following his physician's advice he took a leave of absence from work. The appellant had indicated to his employer that he wished to return to work, but in a position that carried less responsibility. He was advised that BC Tel would attempt to find another suitable position for him within its corporate structure. On August 31, 1994 BC Tel terminated the appellant's employment. By that time, the appellant had worked for BC Tel for almost 17 years and was 48 years of age. The appellant rejected BC Tel's severance offer and took the position that his employment was terminated without just cause and without reasonable notice or pay in lieu of reasonable notice. He brought a wrongful dismissal action in the British Columbia Supreme Court. B.C. Tel took the position that they had just cause for the appellant's summary dismissal, alleging that he had been dishonest about his medical condition, and the treatments available for it.

The trial judge held that there was sufficient evidence to put the question of just cause for dismissal to the jury. In instructing the jury on this point, he stated that in order for just cause to exist, the jury must find (a) that the appellant's conduct was dishonest in fact, and (b) that "the dishonesty was of a degree that was incompatible with the employment relationship". The trial judge also held that the jury could consider whether aggravated damages as well as damages for bad faith in the conduct or manner of the dismissal were warranted. On the other hand, he held that there was no evidence upon which a claim for punitive damages could be based, and thus, this question was not put to the jury. The jury found in favour of the appellant, awarding him general damages, special damages, aggravated damages, and pension contributions. The Court of Appeal set aside the jury award and ordered a new trial, finding that the trial judge committed a reversible error in instructing the jury that the appellant's dishonesty would merit termination only if it was of a degree that was "incompatible [page163] with the employment relationship". The appellant appealed to this Court and BC Tel cross-appealed, submitting that, if the Court dismissed the appeal, it ought to dismiss the appellant's wrongful dismissal action outright rather than order a new trial.

**Held:** The appeal should be allowed. The cross-appeal should be dismissed.

Whether an employer is justified in dismissing an employee on the grounds of dishonesty is a question that requires an assessment of the context of the alleged misconduct. More specifically, the test is whether the employee's dishonesty gave rise to a breakdown in the employment relationship. Just cause for dismissal exists where the dishonesty violates an essential condition of the employment contract, breaches the faith inherent to the work relationship, or is fundamentally or directly inconsistent with the employee's obligations to his or her employer. In accordance with this test, a trial judge must instruct the jury to determine: (1) whether the evidence established the employee's deceitful conduct on a balance of probabilities; and (2) if so, whether the nature and degree of the dishonesty warranted dismissal. The second branch of the test does not blend questions of fact and law. Rather, assessing the seriousness of the misconduct requires the facts established at trial to be carefully considered and balanced. As such, it is a factual inquiry for the jury to undertake. In certain contexts, the contextual approach might lead to a strict outcome: cause for termination exists where theft, misappropriation or serious fraud is found. However, lesser sanctions may be applied for less serious types of misconduct. An effective balance must be struck between the severity of an employee's misconduct and the sanction imposed.

The approach endorsed by the Court of Appeal would entitle an employer to dismiss an employee for just cause for a single act of dishonesty, however minor. The consequences of dishonesty would remain the same, irrespective of whether the impugned behaviour was sufficiently egregious to violate

or undermine the obligations and faith inherent to the employment relationship. Such an approach could foster results that are both unreasonable and unjust. Absent an analysis of the [page164] surrounding circumstances of the alleged misconduct, its level of seriousness, and the extent to which it impacted upon the employment relationship, dismissal on a ground as morally disreputable as "dishonesty" might well have an overly harsh and far-reaching impact for employees. In addition, allowing termination for cause wherever an employee's conduct can be labelled "dishonest" would further unjustly augment the power employers wield within the employment relationship. An analytical framework that examines each case on its own particular facts and circumstances, and considers the nature and seriousness of the dishonesty in order to assess whether it is reconcilable with sustaining the employment relationship, is favoured. The trial judge's instructions were entirely consistent with the contextual approach and cannot serve as a basis for setting aside the jury verdict.

An appellate court is entitled to set aside a jury's verdict where it is found that the evidence did not permit a jury acting judicially to reach the conclusion that it did. In the present case, while there may not have been a full disclosure of all material facts by the appellant concerning his treatment and medication, an analysis of the record as a whole leads to the conclusion that the jury could have reasonably and judicially found that the appellant did not engage in dishonest conduct of a degree incompatible with his employment relationship. There is therefore no basis upon which to interfere with the jury's verdict that B.C. Tel had not proven just cause warranting dismissal.

There is also no basis for interfering with the trial decision on the issue of the extended notice period. Where a dismissal is accompanied by bad faith or unfair dealing on the part of the employer, Wallace establishes that such conduct merits compensation by way of an extension to the notice period. This remedy is not triggered by the dismissal itself, but by the exacerbating factors that, in and of themselves, inflict injury upon the employee. The trial judge's analysis and jury charge adhered to the principles set out by this Court in Wallace, and the jury could, based on the evidence, reasonably find that the notice period should be extended. Although the appellant may have agreed to terminate his employment contract, this did not necessarily imply a waiver of his right to be treated fairly and in good faith by his employer, nor did it preclude the protection that [page165] Wallace intended to confer by recognizing an award for extended notice.

The order for aggravated damages must be set aside since the criteria for allowing the question of aggravated damages to go to the jury were not met. The proper threshold for allowing the issue of aggravated damages to be determined by a jury is whether sufficient evidence exists. The standard set out by the trial judge fell short of that test by suggesting, in effect, that any evidence, even a mere scintilla thereof, would suffice to put the matter of aggravated damages to the jury for its consideration. Applying the correct standard to the present case, there was not sufficient evidence before the trial judge to allow the jury to deliberate on the question of aggravated damages.

Finally, the trial judge's ruling that the question of punitive damages should be withheld from the jury was sound and should be left undisturbed. The evidence did not support a finding of an "independent wrong", including discrimination, and B.C. Tel's conduct was not sufficiently harsh, vindictive, reprehensible, malicious or extreme in nature to warrant punishment.

## Cases Cited

*Applied*: Wallace v. United Grain Growers Ltd., [1997] 3 S.C.R. 701; *referred to*: McPhillips v. British Columbia Ferry Corp. (1994), 94 B.C.L.R. (2d) 1; Vancouver-Fraser Park District v. Olmstead, [1975] 2 S.C.R. 831; Clouston & Co. v. Corry, [1906] A.C. 122; Laws v. London Chronicle, Ltd., [1959] 2 All E.R. 285; R. v. Arthurs, Ex parte Port Arthur Shipbuilding Co. (1967), 62 D.L.R. (2d) 342; Blackburn v. Victory Credit Union Ltd. (1998), 36 C.C.E.L. (2d) 94; Jewitt v. Prism Resources Ltd.

(1981), 30 B.C.L.R. 43; Hill v. Dow Chemical Canada Inc. (1993), 11 Alta. L.R. (3d) 66; MacNaughton v. Sears Canada Inc. (1997), 186 N.B.R. (2d) 384; Dougherty v. Bathurst Golf Association Ltd. (1997), 189 N.B.R. (2d) 230; Butler v. Canadian National Railways, [1939] 3 W.W.R. 625; Holloway v. Encor Energy Corp. (1991), 93 Sask. R. 226; Epoch v. Beaver Lumber Co. (1997), 45 C.C.E.L. (2d) 135; Thompson v. Boise Cascade Canada Ltd. (1994), 7 C.C.E.L. (2d) 17; Justason v. Cox Radio & T.V. Ltd. (1997), 190 N.B.R. (2d) 228; McCluskey v. Lawtons Drug Stores Ltd. (1998), 204 N.B.R. (2d) 137, aff'd (1999), 210 N.B.R. (2d) 198; Boston Deep Sea [page166] Fishing and Ice Co. v. Ansell (1888), 39 Ch. D. 339; Federal Supply and Cold Storage Co. of South Africa v. Angehrn & Piel (1910), 80 L.J.P.C. 1; Real Canadian Superstore (Saskatchewan) v. United Food and Commercial Workers, Local 1400 (1998), 173 Sask. R. 203; Reade v. Newfoundland Co-Ordinating Council on Deafness (1987), 63 Nfld. & P.E.I.R. 194; Smith v. Dawson Memorial Hospital and Flood (1978), 29 N.S.R. (2d) 277; Evans v. Sobeys Capital Inc. (1995), 15 C.C.E.L. (2d) 197; Lake Ontario Portland Cement Co. v. Groner, [1961] S.C.R. 553; Reference Re Public Service Employee Relations Act (Alta.), [1987] 1 S.C.R. 313; Machtinger v. HOJ Industries Ltd., [1992] 1 S.C.R. 986; McCannell v. McLean, [1937] S.C.R. 341; Gray Coach Lines Ltd. v. Payne, [1945] S.C.R. 614; Scotland v. Canadian Cartridge Co. (1919), 59 S.C.R. 471; Vorvis v. Insurance Corp. of British Columbia, [1989] 1 S.C.R. 1085; Horton v. Niagara (Regional Municipality) (1987), 9 C.H.R.R. D/4611; Wamboldt v. Department of National Defence (1983), 4 C.H.R.R. D/1479; British Columbia (Public Service Employee Relations Commission) v. BCGSEU, [1999] 3 S.C.R. 3; British Columbia (Superintendent of Motor Vehicles) v. British Columbia (Council of Human Rights), [1999] 3 S.C.R. 868; Collinson v. William E. Coutts Co., [1995] B.C.J. No. 2766 (QL).

## Statutes and Regulations Cited

Canadian Human Rights Act, R.S.C. 1985, c. H-6.
Rules of the Supreme Court of Canada, SOR/83-74, Rule 29 [mod. SOR/95-325, s. 2].

## Authors Cited

Levitt, Howard A. The Law of Dismissal in Canada, 2nd ed. Aurora, Ont.: Canada Law Book, 1992.

APPEAL and CROSS-APPEAL from a judgment of the British Columbia Court of Appeal (1999), 123 B.C.A.C. 295, 67 B.C.L.R. (3d) 337, 42 C.C.E.L. (2d) 168, [1999] B.C.J. No. 1075 (QL), allowing an appeal and dismissing a cross-appeal from a decision of Paris J. Appeal allowed. Cross-appeal dismissed.

D. Murray Tevlin, Geoffrey J. Litherland and Jennifer A. Lamont, for the appellant/respondent on the cross-appeal.

[page167]

Jack Giles, Q.C., and Karen Shirley-Paterson, for the respondents/appellants on the cross-appeal.
Solicitors for the appellant/respondent on the cross-appeal:
    Tevlin, Gleadle, Vancouver.
Solicitors for the respondents/appellants on the cross-appeal: Farris, Vaughan, Wills & Murphy, Vancouver.

The judgment of the Court was delivered by

**IACOBUCCI J.:—**

I. Introduction

¶ 1    This appeal arises out of a wrongful dismissal action. It calls upon the Court to elaborate the circumstances in which an employer would be justified in summarily dismissing an employee as a result of the latter's dishonest conduct. More specifically, the question is whether any dishonesty, in and of itself, suffices to warrant an employee's termination, or whether the nature and context of such dishonesty must be considered in assessing whether just cause for dismissal exists.

¶ 2    The appeal also raises ancillary questions relating to the propriety of the trial judge's decision to put to the jury questions related to awards for an extended notice period, aggravated damages, and punitive damages. In addition, the parties sought a review of the reasonableness of the jury verdict on various matters decided at trial. A cross-appeal also has been brought, wherein the respondents submitted that, if the Court dismissed the appeal, it ought to dismiss the appellant's wrongful dismissal action outright rather than order a new trial.

¶ 3    For the reasons that follow, I am of the view that this appeal should be allowed and that the jury's verdict should be restored on all questions except that related to aggravated damages. As I would allow the appeal, the cross-appeal must per force be dismissed.

II. Factual Background

¶ 4    The appellant, Martin Richard McKinley, is a chartered accountant who was employed by the respondents, the BC Tel group of companies ("BC Tel"). While working for BC Tel, he held various [page168] positions, earned promotions, and received salary increases. In 1991, he became Controller, Treasurer and Assistant Secretary to certain BC Tel companies. But in 1993, the appellant began to experience high blood pressure as a result of hypertension. Initially, this condition was brought under control through medication, and by taking some time away from work. However, by May of 1994, the appellant's health took a turn for the worse. His blood pressure had begun to rise again, and by June of that year, it was rising on a daily basis. Following his physician's advice, the appellant took a leave of absence from work.

¶ 5    By July 1994, the appellant's superior, Ian Mansfield ("Mansfield"), raised the issue of the appellant's termination from his employment. During discussions with his employers, the appellant indicated that he wished to return to work, but in a position that carried less responsibility. He was advised that BC Tel would attempt to find another suitable position for him within its corporate structure. However, alternative employment was never offered to the appellant. Although at least two positions for which the appellant qualified opened during the period in question, these were filled by other employees.

¶ 6    While the appellant was still on leave from work owing to his health condition, Mansfield telephoned him and instructed him to report to the respondents' offices on August 31, 1994. The appellant complied, and on that day, the respondents terminated his employment. By that time, the appellant had worked for BC Tel for almost 17 years and was 48 years of age.

¶ 7    Although the respondents made the appellant a severance offer, this was rejected. According to the appellant, his employment was terminated without just cause and without reasonable notice or pay in lieu of reasonable notice. He thus brought a wrongful dismissal action in the Supreme Court of British Columbia, arguing that his termination was an arbitrary and wilful breach of his employment contract,

which was conducted in a high-handed and flagrant manner. The appellant maintained that the respondents' actions amounted to an intentional infliction of mental suffering. He alleged [page169] that, as a result of the wrongful dismissal, he lost his employment income and benefits, as well as the short-term disability benefits he was then receiving. He also argued that the dismissal prevented him from qualifying for, or receiving, any long-term disability benefits, and caused him to lose his future pension benefits. As such, the appellant sought an order for general compensatory damages, special damages for the expenses incurred in attempting to find new employment, aggravated damages, and damages for mental distress and the intentional infliction of mental suffering, as well as punitive damages.

¶ 8     Aside from his wrongful dismissal action, the appellant filed an information with the Canadian Human Rights Commission, based on the same allegations of fact. He argued that his dismissal contravened the Canadian Human Rights Act, R.S.C. 1985, c. H-6. At the time of trial, he had not yet filed a formal complaint.

¶ 9     The respondents admitted to having terminated the appellant's employment on August 31, 1994. However, their initial defence rested on the ground that, in dismissing the appellant, they offered him a compensation package of salary and benefits in lieu of reasonable notice. Moreover, the respondents maintained that throughout the months of July and August 1994, they used their best efforts, to the appellant's knowledge, to locate an alternate suitable position for him within BC Tel. Finally, the respondents denied the appellant's allegations with respect to the flagrant nature of the dismissal, and submitted that the termination actually occurred in a professional manner, and in consultation with the appellant.

¶ 10     In a Further Amended Statement of Defence (October 6, 1997), the respondents maintained that the appellant's illness "frustrated the object of the [appellant's] employment". They thus claimed that they were justified in treating the employment contract [page170] as at an end, and in terminating it as they did on August 31, 1994. The respondents submitted that in dismissing the appellant, they offered him a compensation package in lieu of reasonable notice.

¶ 11     However, on November 20, 1997, three days into the trial of this case, the respondents obtained permission from the court to amend their pleadings once again. They abandoned the defence of frustration, and instead argued that just cause for the appellant's summary dismissal existed. Specifically, the respondents alleged that the appellant had been dishonest about his medical condition, and the treatments available for it. This argument was based on the respondents' recent discovery of a letter (dated December 12, 1994) written by the appellant to Dr. Peter Graff, an internal medicine and cardiac specialist, who was one of the appellant's attending physicians. In this letter, the appellant wrote to Dr. Graff acknowledging that, during a previous medical appointment, Dr. Graff had recommended a certain medication - the "beta blocker" - as the next method of treatment for the appellant's hypertension. Although beta blockers were not prescribed at that time, the letter indicated that Dr. Graff had advised the appellant that such treatment should begin upon the latter's return to work, if his blood pressure remained high.

¶ 12     The respondents claimed that the appellant deliberately withheld the truth as to Dr. Graff's recommendations regarding the use of beta blockers and their ability to enable him to return to his job without incurring any health risks. However, the appellant's evidence at trial revealed that, insofar as he was concerned, he had not lied to the respondents.

¶ 13     At trial, the appellant's wrongful dismissal action was heard before a judge and jury. Paris J. held that there was sufficient evidence to put the question of just cause for dismissal to the jury. In instructing the jury on this point, Paris J. stated that, in order for just cause to exist, it must find (a) that the appellant's conduct was dishonest in fact, and (b) that "the dishonesty was of a degree that was

incompatible with the employment relationship". Paris J. also held that the jury could consider [page171] whether aggravated damages, as well as damages for bad faith in the conduct or manner of the dismissal were warranted. On the other hand, he held that there was no evidence upon which a claim for punitive damages could be based, and thus, this question was not put to the jury.

¶ 14    The jury found in favour of the appellant, awarding him the following amounts: $108,793 in general damages; $1,233 in special damages; $100,000 in aggravated damages; $6,091 in pension contributions; prejudgment interest; and costs. Paris J. refused to make an order for special costs, and for increased costs.

¶ 15    The Court of Appeal for British Columbia set the jury award aside and ordered a new trial. The appellant's cross-appeal on the question of punitive damages was dismissed. According to the Court of Appeal, dishonesty is always cause for dismissal. Thus, by instructing jurors that the appellant's dishonesty would merit termination only if it was of a degree that was "incompatible with the employment relationship", Paris J. committed a reversible error.

III.    Judicial History
A.    Supreme Court of British Columbia (Paris J.), November 27, 1997

¶ 16    Paris J. made several observations regarding the instructions and questions he would put to the jury. First, with respect to the question of just cause for dismissal, he stated that - without making any comments as to its weight - he was bound to note that there was some evidence of a lack of frankness by the appellant regarding his ability to return to his previous position. But, it was to be left to the jury to decide whether the evidence amounted to [page172] proof of "dishonesty of a degree incompatible with the employment relationship".

¶ 17    Paris J. held further that questions regarding damages related to bad faith in the conduct or manner of dismissal were to be put to the jury. In this regard, it was to determine whether the evidence revealed that there was bad faith or unfair conduct by the respondents, as contemplated by this Court in Wallace v. United Grain Growers Ltd., [1997] 3 S.C.R. 701. If so, it was to decide by how many months the notice period should be extended beyond that which would be considered as the "reasonable" period of notice in this case.

¶ 18    The trial judge also found that the question of aggravated damages should be decided by the jury. In his view, there was some evidence to support the appellant's contention that, within the context of the dismissal, the respondents engaged in a wilful or deliberate infliction of mental distress amounting to tortious conduct. Whether the appellant actually suffered such mental distress, and whether there existed an intention to inflict such distress was to be inferred from the evidence, and was for the jury to decide.

¶ 19    However, Paris J. held that there was no evidence upon which the appellant's claim for punitive damages could be based. He found that human rights legislation did not add anything to this dimension of the case, and there was no evidence of discrimination on the basis of disability. Moreover, Paris J. stated that there was no proof of harsh, vindictive, and malicious conduct on the respondents' part.

¶ 20    In charging the jury on the issue of dismissal for just cause on the basis of an employee's dishonesty, Paris J.'s instructions were as follows:

    Now in this case, the defendant puts forward the defence that it had just cause for dismissal of the plaintiff. If just cause existed at the time of the dismissal, the defendant

had the right to terminate the employment contract without giving any notice. That is because conduct amounting to just cause for dismissal constitutes a breach of the contract. Now the burden of proving just [page173] cause is on the defendant. Now what constitutes just cause for dismissal may vary depending upon the circumstances of the case which must be assessed by you the jury. Generally speaking, however, examples of just cause would be an employee's serious misconduct, habitual neglect of duty, incompetence, repeated willful [sic] disobedience, or dishonesty of a degree incompatible with the employment relationship. The conduct must be such as to undermine or seriously impair the trust and confidence the employer is entitled to place in the employee in the circumstances of their particular relationship. Something less than that is not sufficient cause for dismissal without reasonable notice. Perhaps I should repeat that for you. As to just cause for dismissal the conduct of the employee must be such as to undermine or seriously impair the trust and confidence the employer is entitled to place on the employee in the circumstances of their particular relationship. In the case of dishonesty it must be of a degree incompatible with the employment relationship. Something less than that is not sufficient cause for dismissal without reasonable notice.

...

Remember that as I have told you to find cause for dismissal you would have to find not only that the plaintiff was deceitful as the defendant contends but that the dishonesty was of a degree that was incompatible with the employment relationship. [Emphasis added.]

The question put to the jury on this point asked simply:

Have the Defendants proven that (unknown to them at the time), cause for dismissal existed when they terminated the Plaintiff on August 31, 1994?

The jury responded to this question in the negative.

B.  Court of Appeal for British Columbia (Hollinrake J.A. for the Court) (1999), 67 B.C.L.R. (3d) 337

¶ 21    On appeal, the respondents argued that the trial judge's jury instructions were incorrect in law. They maintained that an employee's dishonest conduct, irrespective of its degree, is always cause [page174] for dismissal. In this respect, the respondents relied on McPhillips v. British Columbia Ferry Corp. (1994), 94 B.C.L.R. (2d) 1 (C.A.); leave to S.C.C. refused, [1995] 1 S.C.R. ix.

¶ 22    The Court of Appeal held that the dishonesty asserted by the respondents was not as clear as in McPhillips, where an employee billed his employer for unauthorized personal expenses. However, it found that Paris J. invited the jury to consider the extent of the dishonesty alleged, and to determine whether this "was of a degree that was incompatible with the employment relationship," and thus "sufficient to warrant dismissal". According to the Court of Appeal, such instructions were incorrect as a matter of law. In this regard, Hollinrake J.A. stated at para. 25:

Dishonesty within the contract of employment, as is the case alleged here, is cause and that cause is not founded on the basis of the "degree" of the dishonesty.

Considering the evidence before the jury and the question that had been put to it in regard to the existence of just cause, Hollinrake J.A. held that it was not possible to discern the jury's exact findings. It may have found that, on the basis of the evidence as a whole, there was no dishonesty. However, the jury also may have concluded that there was dishonesty related to the employment contract, but that such dishonesty was not of the requisite "degree" to provide just cause for dismissal, as articulated by the trial judge. If the second scenario were true, a miscarriage of justice had resulted in this case.

¶ 23     In considering the specific nature of the flaw within the jury charge, Hollinrake J.A. stated at paras. 27 and 28:

> In my opinion, this jury should have been instructed that if it found dishonesty on the evidence as asserted by the [respondents] it must, as a matter of law, conclude that there existed cause for dismissal. The only finding of fact for the jury to make was dishonesty or no dishonesty [page175] and if the former was found by the jury the judge would then have been bound as a matter of law to conclude that there was cause for dismissal. That conclusion is mandated by the McPhillips case.
> I am unable to see any difference in substance from the charge before us and that in McPhillips. In my opinion, they both suffer from the identical fatal flaw. That being, it cannot be determined on appeal whether or not the jury had found there was no dishonesty or there was dishonesty found but in the collective mind of the jury that dishonesty did not "justify the firing" (McPhillips) or was not "of a degree incompatible with the employment relationship" (the instant case).

¶ 24     The court thus stated that the jury charge in this case - which referred to the "degree of dishonesty" incompatible with the employment relationship - put a mixed question of fact and law to the jury. Whether the appellant had been dishonest with his employers was a question of fact for the jury to decide. However, the jury should not have been permitted to determine whether the "degree" of dishonesty sufficed to warrant dismissal, since as a matter of law, all dishonesty within an employment relationship provides just cause.

¶ 25     Before the Court of Appeal, the respondents, referring to the case of Vancouver-Fraser Park District v. Olmstead, [1975] 2 S.C.R. 831, submitted that the appellant's wrongful dismissal claim should be dismissed in preference to ordering a new trial. They argued that it would be impossible for any jury acting judicially to reach the conclusion that the appellant was honest with his employers about his ability to return to work. The Court of Appeal declined to dismiss the action. It held that, given the evidence, there was some measure of confusion in the mind of the appellant as to the availability of a different job, the medical advice he received, and what future steps he should take for his own health and well-being. Thus, while the evidence could allow a jury to arrive at a finding of dishonesty justifying dismissal without notice, it [page176] also would be open to the trier of fact to conclude that there was no dishonest conduct on the part of the appellant. As such, the appellant's action against his former employers could not be dismissed.

¶ 26     Accordingly, the appeal was allowed, the order of the British Columbia Supreme Court set aside, and a new trial was ordered on all issues. The appellant's cross-appeal on the issue of whether the trial judge erred by failing to put the question of punitive damages to the jury was unnecessary to deal with, given the order for a new trial on all issues. As such, the cross-appeal was dismissed without reasons.

IV. Issues

¶ 27    This appeal raises the following issues:

    A.    Did the trial judge err by instructing the jury that, to find just cause for dismissal, it would have to find not only that the plaintiff was deceitful, but that the dishonesty was "of a degree that was incompatible with the employment relationship"?

    B.    Based on the evidence before it, could the jury, acting judicially, have reasonably found that the appellant's conduct was not dishonest and thus, that just cause for summary dismissal did not exist?

    C.    Was the jury award for damages representing an extended notice period reasonable?

    D.    Should the question of aggravated damages have been put to the jury in this case?

    E.    Should the question of punitive damages have been put to the jury in this case?

[page177]

## V. Analysis
### A. The Standard for Dishonest Conduct in the Employment Relationship

¶ 28    Although this Court has yet to consider the question of whether an employee's dishonesty, in and of itself, necessarily gives rise to just cause for summary dismissal, this issue has been examined by the English courts, as well as appellate and lower courts in Canada. From an analysis of this jurisprudence, no clear principle or standard emerges. Rather, while one line of authority suggests that the nature of the dishonesty and the circumstances surrounding its occurrence must be considered, another seems to indicate that dishonest conduct alone - regardless of its degree - creates just cause for dismissal. A brief review of these two strands of jurisprudence would be useful before determining which should guide this Court's analysis in the present case.

    1.    Authority Indicating that Context Must Be Considered when Assessing Whether Dishonesty Amounts to Just Cause for Dismissal

¶ 29    When examining whether an employee's misconduct - including dishonest misconduct - justifies his or her dismissal, courts have often considered the context of the alleged insubordination. Within this analysis, a finding of misconduct does not, by itself, give rise to just cause. Rather, the question to be addressed is whether, in the circumstances, the behaviour was such that the employment relationship could no longer viably subsist.

¶ 30    The Privy Council's decision in Clouston & Co. v. Corry, [1906] A.C. 122, adopted this analytical framework. The question arising in that case was whether an employee's public drunkenness and disobedient conduct warranted his dismissal. The Privy Council's ruling spoke generally to the concept of "misconduct" and held that there was no [page178] fixed rule of law to define when termination would be warranted. The question is one of degree. The trial judge must first determine whether there is any evidence to submit to the jury in support of the allegation of justifiable dismissal. He or she also may direct jurors by informing them of the nature of the acts which, as a matter of law, will justify dismissal. However, the ultimate question of whether just cause for such dismissal exists is one of fact that the jury must decide. Thus, the Privy Council indicated that it is not sufficient that the jury find misconduct alone, since this will not necessarily provide a basis for dismissal. Rather, the jury must determine that the misconduct is impossible to reconcile with the employee's obligations under the employment contract. In this regard, Lord James of Hereford stated at p. 129:

In the present case the tribunal to try all issues of fact was a jury. Now the sufficiency of the justification depended upon the extent of misconduct. There is no fixed rule of law defining the degree of misconduct which will justify dismissal. Of course there may be misconduct in a servant which will not justify the determination of the contract of service by one of the parties to it against the will of the other. On the other hand, misconduct inconsistent with the fulfilment of the express or implied conditions of service will justify dismissal. [Emphasis added.]

¶ 31    A similar analysis was undertaken in subsequent decisions dealing with this issue. For instance, in Laws v. London Chronicle, Ltd., [1959] 2 All E.R. 285, the English Court of Appeal stated the following at p. 287:

[S]ince a contract of service is but an example of contracts in general, so that the general law of contract will be applicable, it follows that, if summary dismissal is claimed to be justifiable, the question must be whether the conduct complained of is such as to show the servant to have disregarded the essential conditions of the contract of service. [Emphasis added.]

As such, Lord Evershed, M.R., held that a single act of disobedience justified dismissal only if it demonstrated that the servant had repudiated the contract or one of its essential conditions. In this [page179] way, the ruling in Laws indicated that an analysis of whether an employee's misconduct warrants dismissal requires an assessment of its degree and surrounding circumstances.

¶ 32    This contextual approach also has been adopted in several decisions by Canadian appellate courts. For example, in R. v. Arthurs, Ex parte Port Arthur Shipbuilding Co. (1967), 62 D.L.R. (2d) 342, at p. 348, the Ontario Court of Appeal stated that an employer's right to summarily dismiss an employee is triggered by "serious misconduct", which was recognized as including habitual neglect of duty, incompetence, wilful disobedience or "conduct incompatible with his duties, or prejudicial to the employer's business."

¶ 33    More recently, the Nova Scotia Court of Appeal in Blackburn v. Victory Credit Union Ltd. (1998), 36 C.C.E.L. (2d) 94, adopted a contextual analysis for assessing whether misconduct - and in particular, dishonest misconduct - warranted summary dismissal. On this point, Flinn J.A., writing for the court at p. 110, held:

The difficulty which I have with the position of counsel for the employer is that, in dealing with this aspect of his first ground of appeal, he treats the acts of misconduct in isolation. The courts do not consider an act of misconduct, in and of itself, to be grounds for dismissal without notice, unless it is so grievous that it gives rise to the inference that the employee intends no longer to be bound by the contract of service.
There is no definition which sets out, precisely, what conduct, or misconduct, justifies dismissal without notice, and rightly so. Each case must be determined on its own facts... .

Thus, according to this reasoning, an employee's misconduct does not inherently justify dismissal without notice unless it is "so grievous" that it intimates the employee's abandonment of the intention to remain part of the employment relationship. In drawing this conclusion, the Nova Scotia Court of Appeal relied on the following passage in H. A. [page180] Levitt's The Law of Dismissal in Canada (2nd ed. 1992), at p. 124:

What constitutes just cause in a specific situation is particularly difficult to enumerate because it depends not only on the category and possible consequences of the misconduct, but also on both the nature of the employment and the status of the employee ... .

The existence of misconduct sufficient to justify cause cannot be looked at in isolation. Whether misconduct constitutes just cause has to be analyzed in the circumstances of each case. Misconduct must be more serious in order to justify the termination of a more senior, longer-service employee who has made contributions to the company.

¶ 34    The jurisprudence also reveals that an application of a contextual approach - which examines both the circumstances surrounding the conduct as well as its nature or degree - leaves the trier of fact with discretion as to whether a dishonest act gives rise to just cause. For example, in Jewitt v. Prism Resources Ltd. (1981), 30 B.C.L.R. 43 (C.A.), Taggart J.A. held that an analysis of the employee's misconduct "in the circumstances" of that case did constitute cause for dismissal. Jewitt involved an employee who allowed a co-director's signature to be traced on a balance sheet. In contrast, an examination of the surrounding circumstances in Hill v. Dow Chemical Canada Inc. (1993), 11 Alta. L.R. (3d) 66 led the Alberta Court of Queen's Bench to conclude that the misconduct in question merely reflected a single incident of "poor judgment". This finding, along with the conclusion that the employee lacked an intention to deceive, caused the court to conclude that the impugned behaviour did not warrant summary dismissal. At issue in Hill was an employee's unauthorized donation of bandages and ice packs owned by his employer to a local hockey team, in breach of company procedure. Similarly, in MacNaughton v. Sears Canada Inc. (1997), 186 N.B.R. (2d) 384 (C.A.), Bastarache J.A., as he then was, found that the impugned conduct of the employee was not sufficiently serious to justify his dismissal, as it did not repudiate an essential condition of the [page181] employment contract. Although the employee had been subject to prior reprimands, these reprimands must also be taken in context, and do not eliminate the need for the misconduct "to be of some importance" (p. 394). This same court affirmed, in Dougherty v. Bathurst Golf Association Ltd. (1997), 189 N.B.R. (2d) 230, that just cause exists where the misconduct in question is "clearly inconsistent" with the employee's duties under the employment contract.

¶ 35    Cases in which courts have explicitly ruled that the issue of just cause is one of fact to be put to a jury lend further support to an approach that considers the particular circumstances surrounding the alleged employee misconduct. Rather than viewing cause for dismissal as a legal conclusion that must be drawn in any case where disobedience (including dishonesty) is proven, these cases indicate that just cause can only be determined through an inquiry by the trier of fact into (a) whether the evidence demonstrated employee misconduct and (b) whether, in the circumstances, such misconduct sufficed to justify the employee's termination without notice.

¶ 36    This approach was adopted in Butler v. Canadian National Railways, [1939] 3 W.W.R. 625 (Sask. C.A.), a case in which an employee was dismissed from his position based on evidence that CNR property was missing from a department that he was charged with overseeing. In the appeal from the verdict finding insufficient cause for dismissal, Turgeon C.J.S., citing Clouston, supra, held that the issue of cause was unquestionably one of fact to be put to the jury. In a concurring judgment, Gordon J.A. also cited Clouston to reject the employer's argument that the question of whether it had sufficient cause for dismissal was [page182] an issue of law. In this regard, Gordon J.A. made the following comments at p. 631:

I think, therefore, with deference, that the learned trial Judge was right in submitting the question to the jury. It was only necessary for the plaintiff to establish that he was employed for an indefinite time and that he was dismissed without notice.

The onus then shifted to the defendant to prove that such dismissal was justified...
. With deference therefore, I think that the learned trial Judge was right in submitting
the question to the jury. The plaintiff has a statutory right to have the issues in the
action decided by the jury. A Judge can intervene and say that there is no evidence to
go to a jury so far as the plaintiff is concerned but I know of no authority which gives
the Judge power to say that the defendant had given sufficient evidence to satisfy the
onus thrown upon him and that therefore he will not submit the case to the jury.
[Emphasis added.]

¶ 37      This reasoning was endorsed by the Saskatchewan Court of Appeal in Holloway v. Encor
Energy Corp. (1991), 93 Sask. R. 226. Referring explicitly to Butler and Clouston, Gerwing J.A. held at
p. 228 that "[i]t was not open to the trial judge to reserve to himself the question of just cause". Rather,
this issue was considered to be one of fact, to be left for the jury to decide.

¶ 38      In addition to the appellate decisions mentioned above, the contextual approach to assessing
employee misconduct also has been followed in several trial judgments in Canada. See for example:
Epoch v. Beaver Lumber Co. (1997), 45 C.C.E.L. (2d) 135 (Ont. Ct. (Gen. Div.)), at p. 143; Thompson
v. Boise Cascade Canada Ltd. (1994), 7 C.C.E.L. (2d) 17 (Ont. Ct. (Gen. Div.)), at p. 34. Further in
Justason v. Cox Radio & T.V. Ltd. (1997), 190 N.B.R. (2d) 228 (Q.B.), and McCluskey v. Lawtons
Drug Stores Ltd. (1998), 204 N.B.R. (2d) 137 (Q.B.), aff'd (1999), 210 N.B.R. (2d) 198 (C.A.), the court
examined the [page183] nature and extent of the misconduct, as well as the surrounding circumstances,
in order to determine whether the employment relationship could be sustained.

¶ 39      To summarize, this first line of case law establishes that the question whether dishonesty
provides just cause for summary dismissal is a matter to be decided by the trier of fact, and to be
addressed through an analysis of the particular circumstances surrounding the employee's behaviour. In
this respect, courts have held that factors such as the nature and degree of the misconduct, and whether it
violates the "essential conditions" of the employment contract or breaches an employer's faith in an
employee, must be considered in drawing factual conclusions as to the existence of just cause.

¶ 40      But a second branch of jurisprudence sets out a separate analytical structure for this issue, and
suggests that the only question for a trier of fact is whether employee dishonesty exists. Once this is
established, the conclusion that must be reached as a matter of law is that the employer had the right to
dismiss its employee. It is to this second line of authority that I now turn.

   2.    Authority Indicating that Dishonesty In and Of Itself Warrants Dismissal Without
         Notice

¶ 41      The broad language used in a second line of decisions indicates that dishonesty, in and of itself,
provides just cause, irrespective of the factors and circumstances surrounding the conduct, the nature or
degree of such dishonesty, or whether it breached the essential conditions of the employment
relationship.

¶ 42      This approach was articulated by the English Court of Appeal in Boston Deep Sea Fishing and
Ice Co. v. Ansell (1888), 39 Ch. D. 339. In that case, an agent had been instructed to arrange for several
fishing boats to be built for his employer. [page184] The agent then received a secret commission from
the boat builder, which the company learned of approximately one year later. The employee's conduct
was found to be fraudulent, and this was held to provide ample justification for dismissal without notice.
In reaching this conclusion, Bowen L.J. discussed the standard applicable for determining when
dishonesty suffices as cause for terminating the employment relationship. At p. 363 he stated:

[I]n cases where the character of the isolated act is such as of itself to be beyond all dispute a violation of the confidential relation, and a breach of faith towards the master, the rights of the master do not depend on the caprice of the jury, or of the tribunal which tries the question. Once the tribunal has found the fact - has found that there is a fraud and breach of faith - then the rights of the master to determine the contract follow as matter of law.

This passage indicates that once the confidence inherent to the master-servant relationship is breached, just cause for dismissal - as a matter of law - is automatically triggered, and must not depend on whether the trier of fact finds that such cause exists. Although Bowen L.J. spoke primarily to fraud, he also indicated that "breach of faith" in general may warrant dismissal. Such broad language suggests that any dishonest conduct which ruptures the trust inherent to the employer-employee relationship provides just cause.

¶ 43    A similar view was adopted by the Privy Council in Federal Supply and Cold Storage Co. of South Africa v. Angehrn & Piel (1910), 80 L.J.P.C. 1. This case made plain that an employee who engages in a fraudulent act of a serious nature (in that case, taking a secret commission) intimates that he or she has forfeited the right to be continued in the employer's service. In this respect, it was stated at p. 3:

> An agent who takes a secret commission does a dishonest act, and that act shews he is unfit for a position of [page185] trust and confidence. It is the revelation of character which justifies dismissal... .

Although the dishonest act alone served as a basis for cause, it is also important to note that the misconduct was fraudulent in character, a point that was emphasized by the Privy Council. This suggests an awareness and consideration of the "nature" of the misconduct in rendering judgment.

¶ 44    In British Columbia, the leading case on the matter in issue - and the authority that the Court of Appeal relied on in the instant case - is McPhillips, supra. The judicial history underlying that case is quite similar to that in the present appeal. In McPhillips, an employee billed unauthorized personal items ordered from one of his employer's suppliers to his employer. Upon discovering this, the employer terminated the employee for just cause, which was then challenged by the employee before the courts. In a recharge to the jury, the trial judge provided the following instructions on the issue of cause (at pp. 5-6):

> The defendant must convince you in this case that the plaintiff was dishonest, that he breached a trust imposed on him. And as I said whether there is a cause to dismiss is a finding of fact. If you are convinced that the plaintiff was dishonest, you must be convinced that that fact, in all the circumstances of the relationship between the plaintiff and the defendant, justified the firing. [Emphasis added by Hollinrake J.A.]

In reviewing this jury charge, the Court of Appeal in McPhillips held that the trial judge erred by leaving it to the jury to decide whether the employee's dishonesty was, "in all the circumstances" of the employment relationship, sufficient to warrant dismissal. Rather, relying on Boston Deep Sea Fishing, supra, the court held at p. 6 that "[d]ishonesty is always cause for dismissal because it is a breach of the condition of faithful service" (emphasis added).

[page186]

¶ 45    Writing for the Court of Appeal in McPhillips, Hollinrake J.A. went on to distinguish that case from Clouston by indicating that the contextual approach for assessing whether misconduct amounts to just cause could not be extended to cases in which such misconduct was rooted in dishonest behaviour. He thus concluded that the law on this issue required that the jury be instructed that, if dishonesty on the part of the employee was found, cause was thereby established as a matter of law, and thus, the employer was justified in terminating employment.

¶ 46    The strict approach reflected in McPhillips resonates in several other decisions rendered by Canadian courts, which have held that a finding of dishonesty, in and of itself, creates just cause for summary dismissal. In each of these cases, however, the courts dealt with forms of dishonesty that, as in McPhillips, bordered on theft, misappropriation, forgery or a fraudulent sham. In that connection, the courts drew parallels between dishonesty and fraud, either by noting their common ingredients (see Real Canadian Superstore (Saskatchewan) v. United Food and Commercial Workers, Local 1400 (1998), 173 Sask. R. 203 (Q.B.), per Klebuc J.), or by characterizing both as equal causes for dismissal (see Reade v. Newfoundland Co-Ordinating Council on Deafness (1987), 63 Nfld. & P.E.I.R. 194 (Nfld. S.C.T.D.), at p. 198, per Wells J.; and Smith v. Dawson Memorial Hospital and Flood (1978), 29 N.S.R. (2d) 277 (S.C.), per Morrison J.). In this vein, courts also emphasized that, for dishonesty to amount to cause, the employer must prove intent on the employee's part to engage in deceitful conduct (see Evans v. Sobeys Capital Inc. (1995), 15 C.C.E.L. (2d) 197 (Nfld. C.A.), per Cameron J.A.).

¶ 47    This line of jurisprudence seems to indicate that a finding of dishonesty gives rise to just cause as a matter of law. However, I am struck by the fact that, in all of the cases considered here, where cause was found to exist, courts were confronted [page187] with very serious forms of employee dishonesty. This point is instructive for determining the proper analytical approach to be adopted in the case at bar.

3.    Applicable Standard for Assessing Whether and in What Circumstances Dishonesty Provides Just Cause

¶ 48    In light of the foregoing analysis, I am of the view that whether an employer is justified in dismissing an employee on the grounds of dishonesty is a question that requires an assessment of the context of the alleged misconduct. More specifically, the test is whether the employee's dishonesty gave rise to a breakdown in the employment relationship. This test can be expressed in different ways. One could say, for example, that just cause for dismissal exists where the dishonesty violates an essential condition of the employment contract, breaches the faith inherent to the work relationship, or is fundamentally or directly inconsistent with the employee's obligations to his or her employer.

¶ 49    In accordance with this test, a trial judge must instruct the jury to determine: (1) whether the evidence established the employee's deceitful conduct on a balance of probabilities; and (2) if so, whether the nature and degree of the dishonesty warranted dismissal. In my view, the second branch of this test does not blend questions of fact and law. Rather, assessing the seriousness of the misconduct requires the facts established at trial to be carefully considered and balanced. As such, it is a factual inquiry for the jury to undertake.

¶ 50    While ample case law supports this position, as discussed above, a second line of jurisprudence seems to run counter to it, suggesting that dishonest conduct always, irrespective of its surrounding circumstances, amounts to cause for dismissal. However, a closer inspection of these cases reveals that they actually support a contextual approach. As noted, these judgments involved dishonesty that was symptomatic of an overarching, and very serious misconduct. In most cases, the courts were [page188] faced with allegations to the effect that an employee had intentionally devised to extract some financial gain or profit to which he or she was not entitled, at his or her employer's expense. Such conduct was frequently tantamount to a serious form of fraud, and explicitly characterized by the courts as such.

¶ 51    This being the case, I conclude that a contextual approach to assessing whether an employee's dishonesty provides just cause for dismissal emerges from the case law on point. In certain contexts, applying this approach might lead to a strict outcome. Where theft, misappropriation or serious fraud is found, the decisions considered here establish that cause for termination exists. This is consistent with this Court's reasoning in Lake Ontario Portland Cement Co. v. Groner, [1961] S.C.R. 553, where this Court found that cause for dismissal on the basis of dishonesty exists where an employee acts fraudulently with respect to his employer. This principle necessarily rests on an examination of the nature and circumstances of the misconduct. Absent such an analysis, it would be impossible for a court to conclude that the dishonesty was severely fraudulent in nature and thus, that it sufficed to justify dismissal without notice.

¶ 52    This is not to say that there cannot be lesser sanctions for less serious types of misconduct. For example, an employer may be justified in docking an employee's pay for any loss incurred by a minor misuse of company property. This is one of several disciplinary measures an employer may take in these circumstances.

¶ 53    Underlying the approach I propose is the principle of proportionality. An effective balance must be struck between the severity of an employee's misconduct and the sanction imposed. The importance of this balance is better understood by considering the sense of identity and self-worth individuals frequently derive from their employment, a [page189] concept that was explored in Reference Re Public Service Employee Relations Act (Alta.), [1987] 1 S.C.R. 313, where Dickson C.J. (writing in dissent) stated at p. 368:

> Work is one of the most fundamental aspects in a person's life, providing the individual with a means of financial support and, as importantly, a contributory role in society. A person's employment is an essential component of his or her sense of identity, self-worth and emotional well-being.

This passage was subsequently cited with approval by this Court in Machtinger v. HOJ Industries Ltd., [1992] 1 S.C.R. 986, at p. 1002, and in Wallace, supra, at para. 95. In Wallace, the majority added to this notion by stating that not only is work itself fundamental to an individual's identity, but "the manner in which employment can be terminated is equally important".

¶ 54    Given this recognition of the integral nature of work to the lives and identities of individuals in our society, care must be taken in fashioning rules and principles of law which would enable the employment relationship to be terminated without notice. The importance of this is underscored by the power imbalance that this Court has recognized as ingrained in most facets of the employment relationship. In Wallace, both the majority and dissenting opinions recognized that such relationships are typically characterized by unequal bargaining power, which places employees in a vulnerable position vis-à-vis their employers. It was further acknowledged that such vulnerability remains in place, and becomes especially acute, at the time of dismissal.

¶ 55    In light of these considerations, I have serious difficulty with the absolute, unqualified rule that the Court of Appeal endorsed in this case. Pursuant to its reasoning, an employer would be entitled to dismiss an employee for just cause for a single act of dishonesty, however minor. As a result, the consequences of dishonesty would remain the same, irrespective of whether the impugned behaviour was sufficiently egregious to violate or undermine [page190] the obligations and faith inherent to the employment relationship.

¶ 56    Such an approach could foster results that are both unreasonable and unjust. Absent an analysis

of the surrounding circumstances of the alleged misconduct, its level of seriousness, and the extent to which it impacted upon the employment relationship, dismissal on a ground as morally disreputable as "dishonesty" might well have an overly harsh and far-reaching impact for employees. In addition, allowing termination for cause wherever an employee's conduct can be labelled "dishonest" would further unjustly augment the power employers wield within the employment relationship.

¶ 57    Based on the foregoing considerations, I favour an analytical framework that examines each case on its own particular facts and circumstances, and considers the nature and seriousness of the dishonesty in order to assess whether it is reconcilable with sustaining the employment relationship. Such an approach mitigates the possibility that an employee will be unduly punished by the strict application of an unequivocal rule that equates all forms of dishonest behaviour with just cause for dismissal. At the same time, it would properly emphasize that dishonesty going to the core of the employment relationship carries the potential to warrant dismissal for just cause.

4. Application to Paris J.'s Jury Instructions

¶ 58    Applying the foregoing analysis to this case, unlike the Court of Appeal, I see no reason to interfere with the trial decision on the basis of Paris J.'s instructions to the jury. This charge - to the effect that the appellant's dishonesty had to be "of a degree incompatible with the employment relationship" - properly advised jurors to consider the circumstances surrounding the appellant's conduct with a view to appreciating whether the extent of the alleged dishonesty undermined his essential obligations to his employers. Paris J.'s instructions therefore were entirely consistent with the contextual approach discussed above, and thus [page191] do not serve as a basis for setting the jury verdict aside.

B. Reasonableness of the Jury Verdict

¶ 59    The respondents maintain that, even if Paris J. did not err in charging the jury, the jury's verdict was unreasonable and unjust, and thus should be overturned. This Court has repeatedly used a test of "reasonableness" when considering whether to set aside a jury's verdict. In Vancouver-Fraser Park District, supra, at p. 839, de Grandpré J. held that while jury verdicts must be treated with considerable respect and be accorded great weight, they should not be regarded with awe. Rather, where it is found that the evidence "did not permit a jury acting judicially to reach the conclusion" that it did, an appellate court is entitled to set it aside.

¶ 60    Similarly, in McCannell v. McLean, [1937] S.C.R. 341, Duff C.J. stated the reasonableness test as follows at p. 343:

> [T]he verdict of a jury will not be set aside as against the weight of evidence unless it is so plainly unreasonable and unjust as to satisfy the Court that no jury reviewing the evidence as a whole and acting judicially could have reached it.

In addition, an appellate court that finds there was "no evidence" supporting a particular verdict has "the right and the duty" to set aside that verdict (see Gray Coach Lines Ltd. v. Payne, [1945] S.C.R. 614, at p. 618). Although these two tests are distinct, in neither case may the appellate court set aside a verdict on "mere doubts [it] may entertain" or on its "reaching on the reading of the evidence a conclusion different from that the jury reached" (see Scotland v. Canadian Cartridge Co. (1919), 59 S.C.R. 471, at p. 477, per Davies C.J.).

[page192]

¶ 61    In the present case, given the variance in the evidence before the jury, I must conclude that it could have reasonably and judicially found that the appellant did not engage in dishonest conduct of a degree incompatible with his employment relationship. Therefore, the requisite standard for setting aside the verdict was not met, as I now will discuss.

¶ 62    The December 12, 1994 letter from the appellant to Dr. Graff, an internal medicine and cardiac specialist and one of his treating physicians, provides an instructive starting point for the analysis of this issue. In this letter, the appellant requested that Dr. Graff clarify his recollection of the treatment recommended during a medical appointment that had taken place on July 20, 1994. The most relevant passage of this letter for the purposes of the present appeal states the following:

> The only issue that concerns me is that while I agree that you recommended a "beta blocker" as the next method of treatment on July 20, 1994, it is my understanding that you did not want me to start treatment until I returned to work. I remember telling you that BCTEL did not want me back at work until my blood pressure was fully controlled - a concept that bothered you at the time... . My recollection is that you said that if I was not returning to the stressfull [sic] job that causing [sic] my elevated blood pressure, then I should remain on Adalat until I was in my new job. If my blood pressure remained elevated in my new job, I was to return to see you to begin a "beta blocker" treatment. You did not issue me a prescription or give me any "beta blocker" samples on July 20.
> ... It does not make sense to me that I would refuse to try "beta blockers" as it also does not make sense that you would prescibe [sic] medication where the apparent cause or trigger was removed!

According to the respondents, this letter revealed the appellant's knowledge of the availability of a medication, namely, the beta blocker, which one of his physicians believed could effectively enable him to return to his former position without any [page193] risk to his health. Moreover, the respondents pointed out that, on cross-examination, the appellant testified that Dr. Graff did not discuss any of the adverse side effects of this medication with him. The appellant further testified that Dr. Graff was of the view that, while this medication should not be prescribed at that time, if the appellant returned to work in his former position and his blood pressure continued to rise, there would be a reason to consider administering the beta blockers.

¶ 63    The respondents also argued that this letter indicated that Dr. Graff had implied during the July 20, 1994 appointment that the appellant could return to work, in which case beta blockers might eventually become necessary. However, in voice mail messages left for his immediate superior just after that appointment (on July 20th and 27th, 1994), the appellant stressed that both his family doctor and Dr. Graff were of the view that "a new job, a new change of environment" was what he truly needed. While the appellant alluded to the possibility of trying a "new medication", he indicated that Dr. Graff was of the view that it should not be attempted - given its adverse side effects - if his health could be improved by "a job change in a different kind of environment".

¶ 64    From this evidence, a certain degree of inconsistency can be identified between what the appellant appears to have been told by Dr. Graff, and the information he subsequently conveyed to his employers. The evidence suggests that Dr. Graff believed that the appellant could return to work, even in his former position as Controller, and, if his hypertension became more acute at that point, it could be controlled through the use of beta blockers. However, the voice mail messages of July 20th and July 27th indicate that the appellant did not put this information forward as fully and clearly as he might have. Rather than mention the possibility of returning to his former position if beta blockers were administered, he instead stressed that his physicians were of the view that a change in jobs would in fact

be the most beneficial [page194] form of "treatment". At trial, however, the appellant admitted on cross-examination that this advice had not in fact been given by his specialist.

¶ 65    This contradiction could raise some suspicion in the minds of jurors as to the trustworthiness of the appellant's character. But, does the evidence lead unquestionably and unequivocally to the conclusion that the appellant's conduct was sufficiently dishonest to provide just cause for summary dismissal? A review of the evidence in its entirety leads me to answer this question in the negative. To my mind, the material in the record provides a sufficient basis for a jury to conclude that the appellant reasonably and truly believed that his physicians, including Dr. Graff, were of the view that beta blockers should be considered only as a "last resort" treatment, and that they were not yet required at that point in time. The soundness of this interpretation is reinforced by Dr. Graff's assessment of the appellant on July 6, 1994, in which he stated that he "would be reluctant to change the medications [the appellant] is on at this point in time", and instead "suggested that he return to work, and closely monitor his blood pressure at the office and at home". If the appellant's blood pressure continued to rise, Dr. Graff was of the view that another form of medication (Hytrin) should be used. He indicated that beta blockers should be considered only if this proved unsuccessful. Given that the appellant testified to being under the impression that his employers were seeking out alternate positions for him within BC Tel, a rational and logical inference to draw from the evidence is that he believed, on his physician's advice, that beta blockers would be administered only if he returned to work in his original job.

¶ 66    The respondents claimed in oral argument that the appellant's falsehood lay in giving Dr. Graff's imprimatur to the notion that beta blockers carried adverse side effects. However, a review of the evidence that attested to the potential risks of this medication suggests that the appellant's physicians would have been reluctant to prescribe it unless it [page195] was required to bring the appellant's hypertension under control. At trial, Dr. Charles R. Brasfield, a medical doctor and psychiatrist who treated the appellant on an intermittent basis between 1993 and 1996, testified that the side effects of beta blockers could include an increase in depression, as well as specific sexual side effects, congestive heart failure, and respiratory arrest. Moreover, the evidence suggests the appellant's awareness of these side effects. In a document entitled "History of High Blood Pressure and BC Tel Involvement", which was introduced as an exhibit at trial, the appellant stated that another one of his physicians (Dr. Andersen) refused to prescribe beta blockers because of their "unacceptable side effects".

¶ 67    Despite these potential risks, the evidence also suggests that the appellant would have been willing to accept treatment through beta blockers had he believed this would be necessary for enabling him to return to work at BC Tel. In the December 12, 1994 letter, the appellant told Dr. Graff that "[i]t does not make sense" that he would refuse to try beta blockers. Furthermore, the appellant testified that he kept his employers aware of his medical issues, and even explained the potential for beta blockers to be used as treatment. According to this evidence, the appellant asked his employers whether he should return to Dr. Graff to try beta blockers; yet, his superior indicated that this would not be necessary, since he would likely be placed in another, less stressful position. The appellant's testimony in regard to his willingness to attempt beta blockers is corroborated by a note handwritten by BC Tel's Human Resources Manager on September 1, 1994, the day following the appellant's dismissal. This document indicates that in a telephone conversation that morning, the appellant told the Human Resource Manager that "if he had known the only job was his old one the Doctor would have changed his medication and he could have returned to work".

¶ 68    The respondents claimed that this evidence revealed that the appellant truly did not believe [page196] beta blockers to be unsafe. To my mind, however, it provided a sufficient basis upon which the jury could reasonably conclude that the appellant was willing, as a "last resort", to take a risky medication if this became necessary to return to BC Tel.

¶ 69    Thus, while there may not have been a full disclosure of all material facts by the appellant, this was not required of him. Rather, the question is whether he engaged in dishonesty in a manner that undermined, or was incompatible with his employment relationship. An analysis of the record as a whole leads me to conclude that the jury, acting judicially, could have reasonably found that this was not the case. For this reason, there is no basis upon which to interfere with the jury's verdict that the respondents had not proven just cause warranting dismissal.

C. Extended Notice Period

¶ 70    At the outset, it should be noted that the reasonableness of the extended notice period, as well as the question of aggravated damages (discussed below), were not called into question by the appellant, but by the respondents. Normally, a respondent seeking to raise an issue on appeal must do so by applying for leave to cross-appeal, pursuant to Rule 29 of the Rules of the Supreme Court of Canada, SOR/83-74. However, this was unnecessary in this case. Rule 29 indicates that "[a] respondent who seeks to set aside or vary the whole or any part of the disposition of the judgment appealed from shall apply for leave to cross-appeal within 30 clear days after the service of the application for leave" (emphasis added). In the present case, the Court of Appeal for British Columbia allowed the respondents' appeal and ordered a new trial on all issues. The respondents do not seek to have any part of this disposition set aside or varied. Rather, they have raised the issues of the extended notice period and aggravated damages as alternative arguments, stating that if the trial judgment is restored, the awards under these heads should be struck. The respondents never reached these alternative arguments before the [page197] Court of Appeal, since that court accepted their main position that the trial judgment should be set aside in its entirety. Consequently, the Court of Appeal never ruled on the propriety of the jury's awards for an extended notice period and aggravated damages.

¶ 71    Before this Court, the respondents again raised these issues in the alternative. I thus begin by examining the extended notice award, and will proceed to consider the question of aggravated damages in the discussion that follows.

¶ 72    At trial, Paris J., referring to this Court's decision in Wallace, supra, ruled that whether damages representing an extended period of notice should be awarded in this case was a question for the jury to decide. He stated that it would be for jurors to determine whether such a remedy was warranted, based on "whether the matters pointed to by counsel in submissions, if proven by the evidence, constitute such bad faith or unfair conduct as contemplated by the Wallace case". Pursuant to its deliberations, the jury concluded that a reasonable notice period in this case was 22 months. Having found that the respondents acted in a manner that was unfair or in bad faith in conducting the dismissal, the jury extended this notice period by an additional four months to represent the damage caused by these exacerbating factors.

¶ 73    In Wallace, this Court recognized that the parties to an employment contract are subject to obligations of good faith and fair dealing. These obligations subsist throughout the relationship up until, and including its termination. In the context of dismissal from employment, the majority in Wallace [page198] described the employer's duties at para. 98 as follows:

> [A]t a minimum, I believe that in the course of dismissal employers ought to be candid, reasonable, honest and forthright with their employees and should refrain from engaging in conduct that is unfair or is in bad faith by being, for example, untruthful, misleading or unduly insensitive.

¶ 74    Where a dismissal is accompanied by bad faith or unfair dealing on the part of the employer, Wallace establishes that such conduct merits compensation by way of an extension to the notice period.

This remedy is not triggered by the dismissal itself, but by the exacerbating factors that, in and of themselves, inflict injury upon the employee. The nature of this remedy thus was described in Wallace, at para. 103, as follows:

> [W]here an employee can establish that an employer engaged in bad faith conduct or unfair dealing in the course of dismissal, injuries such as humiliation, embarrassment and damage to one's sense of self-worth and self-esteem might all be worthy of compensation depending upon the circumstances of the case. In these situations, compensation does not flow from the fact of dismissal itself, but rather from the manner in which the dismissal was effected by the employer.

Wallace also made clear that the extent by which a notice period should be extended for bad faith or unfair dealing in the conduct of a dismissal will depend, in each case, on the degree of injury that an employee sustains. While recognizing that tactics that affect the employee's ability to find new employment is particularly deserving of such a remedy and may merit more compensation, the majority also ruled that "intangible injuries", which give rise to emotional damage, also may suffice to attract an award in the form of an extended notice period (para. 104).

¶ 75    In the present case, the respondents argued that Paris J. erred by putting the question of an [page199] extended notice period before the jury. They maintained that because the appellant agreed to his termination pending an acceptable severance package, he should not be entitled to complain about the "manner" of this dismissal once it actually occurred. I respectfully disagree. Although the appellant may have agreed to terminate his employment contract, it certainly cannot be said that this necessarily implied a waiver of his right to be treated fairly and in good faith by his employers, nor that it precluded the protection that Wallace intended to confer by recognizing an award for extended notice.

¶ 76    In putting the question of extended notice to the jury, Paris J.'s reasoning was entirely consistent with the decision in Wallace. An examination of his charge to jurors reveals that, in his view, there was sufficient evidence that the respondents engaged in bad faith or unfair dealing in dismissing the appellant. In this respect, Paris J. pointed to the fact that the appellant submitted that he was dismissed while on short-term disability and suffering from hypertension and depression, and that the respondents took this route rather than find him another position within the company. The trial judge further noted the evidence pointed to by the appellant, which related to the difficulty the appellant experienced in obtaining a copy of his long-term disability plan from his employers, and the fact that the respondents reduced their severance offer during negotiations over the appellant's termination. Paris J. then properly instructed the jury that it was to decide, based on this Court's decision in Wallace, whether, in light of this evidence, bad faith conduct or unfair dealing on the part of the respondents had been proven. If so, Paris J. explained that the length of the notice period was to be extended by "such further period that [was thought to be] reasonable in the circumstances".

[page200]

¶ 77    Considering that Paris J.'s analysis and jury charge adhered to the principles set out in Wallace, and because the jury could, based on the evidence before it, reasonably find that the notice period should be extended by four months, I see no basis for interfering with the trial decision on this point.

D. Aggravated Damages

¶ 78    The key principles for establishing the circumstances in which aggravated damages in wrongful dismissal actions may be awarded were set out by this Court in Wallace and in Vorvis v. Insurance

Corp. of British Columbia, [1989] 1 S.C.R. 1085. In Vorvis, McIntyre J. (writing for the majority) highlighted that unlike punitive damages, aggravated damages serve the purpose of compensation for intangible injuries. He stated that such damages could be awarded where: (1) an employer's conduct was "independently actionable", (2) it amounted to a wrong that was separate from the breach of contract for failure to give reasonable notice of termination, and (3) it arises from the dismissal itself, rather than the employer's conduct before or after the dismissal (pp. 1103-4).

¶ 79     These criteria were considered in Wallace, where the majority also recognized that aggravated damages could be awarded for mental distress flowing from a wrongful dismissal. However, in Vorvis and Wallace alike, aggravated damages were denied to the plaintiff.

¶ 80     In the present case, Paris J. noted that the standard to apply in assessing the issue of aggravated damages is that set out in Wallace. While he properly recognized that such damages require "an [page201] independent cause of action", he then articulated the applicable threshold in the following way:

> It seems to me that, speaking at least in a general way, the evidence pointed to by counsel as the manner of the conduct of dismissal has to be considered as some evidence of willfull [sic] or deliberate infliction of mental distress which would be tortious conduct. Whether the plaintiff suffered such mental distress and whether an intention to inflict any such mental distress can be inferred from the evidence is for the jury to say. I cannot say there is no evidence of such things. [Emphasis added.]

On this basis, Paris J. allowed the jury to consider the issue of aggravated damages. The jury decided that the appellant was entitled to damages under this head in the amount of $100,000.

¶ 81     The respondents disputed the trial decision on this point, stating that Paris J. employed an incorrect standard in allowing the jury to consider the question of aggravated damages. I am also of that opinion. According to Wallace, the proper threshold for allowing this issue to be determined by a jury is whether or not sufficient evidence exists. It was found on the facts of that case that there was no basis upon which to interfere with the finding that "there was insufficient evidence" of a separately actionable wrong (emphasis added). The standard set out by Paris J. fell short of the Wallace test by suggesting, in effect, that any evidence, even a mere scintilla thereof, would suffice to put the matter of aggravated damages to the jury for its consideration.

¶ 82     Applying the correct standard to the present case, I would conclude that there was not sufficient evidence before Paris J. to allow the jury to deliberate on the question of aggravated damages. More specifically, a fair reading of the evidence does not, in my view, suggest that the respondents acted with an intention to harm the appellant either by deliberately inflicting mental distress or by acting in a discriminatory manner. It is true that, as the appellant noted, the illness from which he suffered, [page202] namely hypertension, has been considered a disability in human rights jurisprudence (see Horton v. Niagara (Regional Municipality) (1987), 9 C.H.R.R. D/4611 (Ont. Bd. Inq.), and Wamboldt v. Department of National Defence (1983), 4 C.H.R.R. D/1479 (Can. Trib.)). Yet, while the appellant was never offered an alternate position within BC Tel to accommodate his health needs, the evidence is far from clear that the respondents did not make a bona fide effort to find other viable work for him. This is evidence negating any wilful intention to harm, as was argued by the appellant. In this connection, the record indicates that the appellant was aware that the respondents were in the process of downsizing during the time in question, and it thus would be difficult to find a suitable alternate position. Moreover, although two positions for which the appellant was qualified did become available while he was on disability leave, the evidence does not establish that he was the victim of discrimination, and denied such work on the basis of his illness. Rather, legitimate explanations were offered to clarify why the

respondents decided that the appellant should not fill these positions.

¶ 83     Thus, despite the allegations raised by the appellant, the evidence fails to establish any separate actionable wrong on the respondents' part. In this respect, I would emphasize that the conduct of the parties must be assessed in light of the context in which it was undertaken. Here, the impugned behaviour occurred during negotiations between the parties over the appellant's termination from BC Tel. Within this bargaining relationship, both sides were entitled to put their strongest case forward. Consequently, in this setting, clear evidence is required to substantiate a claim that the employer's conduct rises to the level of an intentional infliction of harm.

¶ 84     Having considered all of this, I find that the criteria for allowing the question of aggravated damages to go to the jury were not met in the [page203] instant case. Therefore, the order for aggravated damages must be set aside.

E. Punitive Damages

¶ 85     As is the case for aggravated damages, the starting point for assessing the propriety of an award for punitive damages in the context of a wrongful dismissal action begins with this Court's decisions in Vorvis and Wallace. As alluded to earlier, in Vorvis, McIntyre J. recognized the confusion that sometimes exists between aggravated and punitive damages, and explained that these two heads of damages are distinguishable by their different purposes. While aggravated damages aim to compensate for intangible injury, punitive damages are penal and exemplary in nature, and may be awarded only where the conduct giving rise to the complaint is found to merit punishment.

¶ 86     In Vorvis, the Court sought to determine whether punitive damages may be awarded in an action for breach of contract based on the wrongful dismissal of an employee, and if so, whether the circumstances of that case called for such an award. Pursuant to a review of the relevant common law authorities on this issue, McIntyre J. held that although punitive damages will very rarely be appropriate in breach of contract cases, there are some situations in which such an award would be warranted. More specifically, such damages may be awarded where the defendant's conduct constituted a separate, actionable wrong, independent of the dismissal itself. Furthermore, the conduct must be deserving of punishment because of its extreme and injurious character. In this respect, McIntyre J. stated, at pp. 1107-8:

> [P]unitive damages may only be awarded in respect of conduct which is of such nature as to be deserving of punishment because of its harsh, vindictive, reprehensible and malicious nature. I do not suggest that I have [page204] exhausted the adjectives which could describe the conduct capable of characterizing a punitive award, but in any case where such an award is made the conduct must be extreme in its nature and such that by any reasonable standard it is deserving of full condemnation and punishment.

Within the particular circumstances of Vorvis, the employer's conduct, standing alone, was not considered sufficiently offensive to constitute an actionable wrong, nor of a nature that would justify the imposition of a punitive damages award.

¶ 87     This analysis was adopted in Wallace, where it was held that an award for damages beyond compensation for breach of an employment contract "must be founded on a separately actionable course of conduct" (para. 73). This criterion applies to both aggravated and punitive damages. However, punitive damages were distinguished in Wallace, at para. 79, as follows:

Punitive damages are an exception to the general rule that damages are meant to compensate the plaintiff. The purpose of such an award is the punishment of the defendant: S. M. Waddams, The Law of Damages (3rd ed. 1997), at p. 483. The appellant argued that the trial judge and the Court of Appeal erred in refusing to award punitive damages. I do not agree. Relying on Vorvis, supra, Lockwood J. found that UGG did not engage in sufficiently "harsh, vindictive, reprehensible and malicious" conduct to merit condemnation by such an award. He also noted the absence of an actionable wrong. The Court of Appeal concurred. Again, there is no reason to interfere with these findings. Consequently, I agree with the courts below that there is no foundation for an award of punitive damages.

¶ 88    In the present appeal, the trial judge held that the appellant had not adduced evidence upon which to base a viable claim for punitive damages. In his view, the proof was not indicative of harsh, vindictive and malicious conduct by the respondents, nor of contempt for the appellant's rights. Paris J. further held that human rights legislation did not add [page205] anything to this dimension of the case, as there was no evidence to substantiate an argument that the appellant suffered discrimination on the basis of disability in the sense contemplated by such legislation. The appellant's cross-appeal from this holding before the Court of Appeal for British Columbia was dismissed without reasons.

¶ 89    Paris J.'s reasoning on this issue was consistent with the principles and analytical framework set out in Vorvis and Wallace. First, as discussed in regard to the propriety of the aggravated damages award, there is insufficient evidence to establish an actionable wrong, separate and apart from the dismissal, on the respondents' part. As discussed, the appellant was correct to state that his hypertension constituted a disability in law. Thus, the failure to find him another position may create a prima facie case of discrimination, given the employer's duty to accommodate disabled employees to the point of undue hardship. See British Columbia (Public Service Employee Relations Commission) v. BCGSEU, [1999] 3 S.C.R. 3, and British Columbia (Superintendent of Motor Vehicles) v. British Columbia (Council of Human Rights), [1999] 3 S.C.R. 868. Moreover, this discrimination may in turn give rise to a punitive damages award. See Collinson v. William E. Coutts Co., [1995] B.C.J. No. 2766 (S.C.) (QL). But, for the reasons set out above, I am of the view that there is no basis for interfering with Paris J.'s conclusion that the evidence did not support a finding of an "independent wrong", including discrimination. Furthermore, based on my review of the evidence, I cannot say that Paris J. erred in concluding that the respondents' conduct was not of a character contemplated by McIntyre J. in Vorvis. In other words, it was not sufficiently harsh, vindictive, reprehensible, malicious or extreme in nature to warrant punishment. As such, Paris J.'s ruling that the question of punitive [page206] damages should be withheld from the jury was sound, and should be left undisturbed.

## VI. Disposition

¶ 90    For the foregoing reasons, the appeal is allowed, the judgment of the British Columbia Court of Appeal is set aside, and the order of Paris J. is restored, with the exception of the award for aggravated damages, which is struck. Having allowed the appeal, it is unnecessary for this Court to deal with the cross-appeal, which is therefore dismissed. Because of the appellant's substantial success, I would grant him costs here and in the courts below.

QL Update: 20010628
cp/e/qlcvd